IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TENNESSEE
AT GREENEVILLE, TENNESSEE

| | |
|---|---|
| JOHNSON CITY ENERGY AUTHORITY, d/b/a BRIGHTRIDGE | )<br>)<br>) |
| Plaintiff, | )  CASE NO.: _____ |
| V. | )<br>)<br>) |
| UNITED TELEPHONE SOUTHEAST, LLC, d/b/a CENTURYLINK, | )<br>)<br>) |
| Defendant. | ) |

## COMPLAINT FOR DECLARATORY JUDGMENT

Comes Plaintiff, Johnson City Energy Authority, d/b/a BrightRidge (herein, "BrightRidge"), and, pursuant to 28 U.S.C. § 2201, requests this Honorable Court declare the rights and obligations of the parties hereto relative to an actual controversy between BrightRidge and Defendant United Telephone Southeast, LLC, d/b/a CenturyLink ("CenturyLink") concerning a certain Joint Use Agreement ("Agreement") first entered into on July 1, 1980, by and between the respective predecessors-in-interest of BrightRidge and CenturyLink, said Agreement having been amended on several occasions since first being entered into.

### PARTIES

1. Plaintiff, BrightRidge, was initially created as part of the City of Johnson City, Tennessee under the Municipal Electric Power Act of 1935, and was known as the "Johnson City Power Board". Subsequently, on March 31, 2017, said Johnson City Power Board became the

Johnson City Energy Authority under the Municipal Energy Authority Act, Chapter 995 of the 2016 Public Acts of the Tennessee General Assembly. Pursuant to that Public Act, an assignment and assumption agreement was entered into between the City of Johnson City, Tennessee and the BrightRidge which transferred all right, title, and interest and related assets in/of the Johnson City Power Board to BrightRidge, including, but not limited to, the Agreement, as amended, which is the subject matter of this Declaratory Judgment civil action. BrightRidge is a Tennessee municipal energy authority doing business solely in Tennessee, with its principal place of business located at 2600 Boones Creek Rd, Johnson City, TN 37615.

2. Defendant, United Telephone Southeast LLC, d/b/a CenturyLink, is a Virginia Limited Liability Company, whose principal address is: Reba Culbertson, 100 CenturyLink Drive, Monroe, LA 71203-2041. CenturyLink provides both telephone and internet broadband services within the service territory of BrightRidge. The Agreement at issue was executed and entered into in the State of Tennessee. CenturyLink is not, and has never been, a Tennessee Corporation or LLC, nor has its principal place of business even been in the State of Tennessee.

## JURISDICTION AND VENUE

3. Jurisdiction is predicated upon 28 U.S.C. § 1332, diversity of citizenship of the parties hereto. BrightRidge is a Tennessee Municipal Energy Authority created and doing business under the laws of the State of Tennessee, lying in the State of Tennessee. CenturyLink is a Virginia Limited Liability Company, whose principal office is Reba Culbertson, 100 CenturyLink Drive, Monroe, LA 71203-2041. CenturyLink is not and never has been a Tennessee Corporation or LLC. The amount in controversy exceeds $75,000.00, exclusive of costs and interests.

4. Venue is proper in that the actual controversy in question arose in the Eastern District of Tennessee.

## STATEMENT OF FACTS

5. CenturyLink's predecessor-in-interest, United Inter-Mountain Telephone Company, entered in the Agreement, as amended, with BrightRidge's predecessor-in-interest, the Johnson City Power Board, in 1980. The Agreement has been amended five (5) times since its initial effective date. BrightRidge attaches as EXHIBIT 1, the original Agreement and first three (3) amendments to the Agreement.

6. Amendment No. One (12/31/80), Amendment No. Two (12/31/82), and Amendment No. Three (11/14/95) dealt primarily with modifications to the pole adjustment/attachment payments which BrightRidge makes to CenturyLink and CenturyLink, in turn, makes to BrightRidge. These adjustment or attachment payments arise out of the fact CenturyLink has its lines and equipment on poles belonging to BrightRidge and BrightRidge has some, but much fewer lines and equipment on poles belonging to CenturyLink (i.e., joint use poles).

7. At the end of 2008, CenturyLink created a crisis which constituted a breach of the Agreement by refusing to make pole adjustment/attachment payments for 2008. BrightRidge proceeded to intervene in Docket No. 08-00219 before the Tennessee Regulatory Authority (now, Tennessee Public Utility Commission) wherein Embarq Corporation and CenturyTel, Inc., (predecessors of CenturyLink) were seeking approval of their proposed merger. The purpose of the intervention was to seek assurances that the merged company would not operate in the

unacceptable manner that Embarq (a predecessor to CenturyLink and a parent of United Telephone Southeast, LLC) had operated in the preceding several years.

8. The intervention by BrightRidge (and other Power Companies) forced CenturyLink to enter into negotiations over the various disputes that existed with BrightRidge, including the 2008 payments mentioned in Paragraph 7 above. Those negotiations resulted in a SETTLEMENT AGREEMENT, which resolved <u>some</u> but not all disputes between BrightRidge and CenturyLink. A copy of that SETTLEMENT AGREEMENT is submitted herewith as EXHIBIT 2. Its effective date was April 14, 2009.

9. BrightRidge and CenturyLink continued to negotiate and continued to dispute the amounts owed by CenturyLink to BrightRidge and over other terms and conditions of the Agreement and the business relationship between BrightRidge and CenturyLink. Eventually, the parties were able to agree upon and enter into Amendment No. Four to the Agreement, effective January 2010. This Amendment No. Four is submitted herewith as EXHIBIT 3 (Representative sample). However, certain other remaining disputes, including the remaining net amounts due to BrightRidge for pole adjustment/attachment payments for 2008 and for 2009, remained outstanding, even though CenturyLink made a partial payment for 2008, accepted by BrightRidge under protest.

10. When CenturyLink refused to reach agreement with BrightRidge on all issues, including, but not limited to, the amounts due for pole adjustment/attachment payments for 2008 and 2009, BrightRidge and five other TVA Power Distributors located in Northeast Tennessee filed suit in this Court in Case No. 2:10-cv-48 against CenturyLink, the Court being referred to all documents which are contained in that case.

11. BrightRidge and other Plaintiffs in Case No. 2:10-cv-48 and CenturyLink mediated that civil action and entered into a Settlement Agreement effective 10/28/10. A portion of that Settlement Agreement, which resulted in the dismissal of Case No. 2:10-cv-48, was the execution by BrightRidge (and other Power distributions) and CenturyLink of Amendment No. Five to the Agreement, said Amendment No. Five being submitted herewith as <u>EXHIBIT 4</u> (Representative sample).

12. The net effect of the disputes, the civil action, the settlements and the Amendments to the Agreement was that said Agreement was substantially amended relative to procedures under the Agreement and formulas were put in place which would determine the amounts of the pole adjustment/attachment payments BrightRidge and CenturyLink would make going forward, even beyond January, 2020. (See, e.g., Amendment No. 5, <u>EXHIBIT 4</u>).

13. Thereafter, disputes arose between some of the other TVA Power Distributors regarding unauthorized attachments discovered by a pole inventory in the wake of the settlement of Case No.: 2:10-cv-48. Three TVA Power Distributors filed a subsequent civil action against CenturyLink in this Court as Case No.: 2:13-cv-00267, which was subsequently settled. BrightRidge did not take part in that action but did arrive at an agreement with CenturyLink concerning the issues in that civil action.

14. As mentioned above, the Johnson City Energy Authority, d/b/a BrightRidge, came into existence on March 31, 2017, and received all rights and obligations the Johnson City Power Board enjoyed under the Agreement, as amended.

15. In recent years, BrightRidge and CenturyLink have continued to operate under the Agreement as amended. Both BrightRidge and CenturyLink have expanded the services each

offers to its customers, including broadband internet service. Currently, within the BrightRidge service territory, 86.4% of all poles belong to BrightRidge and 13.6% belong to CenturyLink.

16. CenturyLink has installed an entire broadband internet system on poles owned by BrightRidge and on its own poles. At no time did CenturyLink seek the permission of BrightRidge to make these installations on the poles of BrightRidge. Said installation by CenturyLink of its broadband network was generally consistent with certain language of ARTICLE IX of the Agreement – "When either party desires to change the character of its circuit on jointly used poles..." (See, EXHIBIT 1), even though CenturyLink failed to completely comply with either ARTICLE VI and ARTICLE IX. It should be noted that broadband internet service is not "Telephone" as discussed in ARTICLE I of the Agreement. CenturyLink introduced an entirely new system, product, and service within the four (4) feet labeled "Telephone" in ARTICLE I. CenturyLink also has permitted other service providers to place equipment, lines, etc. on those portions of its poles called "Telephone".

17. Disputes between BrightRidge and CenturyLink have arisen since the formation of BrightRidge, specifically, whether or not BrightRidge has the contractual right, under said Agreement, to construct its broadband internet lines in that area on poles belonging to CenturyLink, the "...space of four feet" assigned to the "Telephone" by ARTICLE I of the Agreement, as amended.

# DISCUSSION OF DISPUTE UNDER THE 1980 AGREEMENT, AS AMENDED

## A. ARE THE ATTACHMENTS MADE BY BRIGHTRIDGE TO THAT PORTION OF THE CENTURYLINK POLES DESIGNATED AS "TELEPHONE" PERMITTED BY THE AGREEMENT, AS AMENDED?

18. While the entire Agreement, as amended, is incorporated herein by reference (EXHIBIT 1), the following portions of the Agreement, as amended, are particularly relevant to the issues in dispute between BrightRidge and CenturyLink:

"ARTICLE I

Definitions

For the purpose of this agreement, the following terms when used herein, shall have the following meanings:
A. NORMAL SPACE – means sufficient space on a joint use pole for the use of each party, taking into consideration requirements of the National Electrical Safety Code. Except only as to the portion of its said space which, by the terms of the National Electrical Safety Code, may be occupied by certain attachments thereto described of the other party, this space is specifically defined as follows:
    (1) for the Electric Company, the uppermost six (6) feet;
    (2) for the Telephone Company, a space of four (4) feet at sufficient distance below the space of the Electric Company to provide at all times the minimum clearance required by the specifications referred to in Article IV, and at sufficient height above the ground to provide proper vertical clearance for the lowest horizontally run line wires or cables attached in such space.
B. NORMAL JOINT USE POLE – means a pole which meets the requirements of the National Electrical Safety Code for support and clearance of supply and communication conductors under conditions existing at the time joint use is established, or is to be created under known plans of either party. Specifically, a normal joint pole under this agreement shall be a 40 foot class 4 wood pole. The pole should be of an agreeable treatment.
    The foregoing definition of "a normal joint pole" is not intended to preclude the use of joint poles shorter or of less strength than the normal joint pole in locations where such poles will meet the known or anticipated requirements of the parties hereto.

Page 7
Case 2:20-cv-00030-KAC-CRW   Document 1   Filed 02/19/20   Page 7 of 13   PageID #: 7

C. ATTACHMENTS – mean materials or apparatus now or hereafter used by either party in the construction, operation or maintenance of its plant carried on poles.

D. SUPPORTING ATTACHMENTS – mean attachments made on poles which in general, relieve the Licensee of the necessity or providing a pole at or near the same location for the purpose of supporting its wires or cables.

E. OWNER – means the party owning the pole to which attachments are made.

F. LICENSEE – means the party having the right under this agreement to make attachments to a pole of which the other party is the Owner.

## ARTICLE III

### Permission for Joint Use

Each party hereto hereby permits joint use by the other party of any of its poles when brought under this Agreement as herein provided, subject to the terms and conditions herein stated.

## ARTICLE VI

### Placing, Transferring or Rearranging Attachments

A. Whenever either party desires to reserve space on any pole of the other, for any attachments requiring space thereon, not then specifically reserved hereunder for its use, it shall make written application therefore, specifying in such notice the location of the pole in question, the number and kind of attachments which it desires to place thereon, and the character of the circuits to be used. Within ten (10) days after the receipt of such notice, the Owner shall notify the Applicant in writing whether or not said pole is of those excluded from joint use under the provisions of Article 11. Upon receipt of notice from the Owner that said pole is not of those excluded and after completion of any transferring or rearranging which is then required in respect to attachments on said poles, including any necessary pole replacements as provided in Article VII "A," the Applicant shall have the right as Licensee hereunder to use said space for attachments and circuits of the character specified in said application in accordance with the terms of this agreement. Service wire attachment or emergency construction can be placed in accordance with the specifications, upon verbal approval, subsequently approved in writing.

B.  Except as herein otherwise expressly provided, each party shall place, maintain, rearrange, transfer and remove its own attachments, and shall at all times perform such work promptly and in such a manner as not to interfere with work being done by the other party.

C.  In any case where one party provides at the request of the other party double thimble guy rods for the use of both parties, the party requesting the double thimble guy rod shall pay to the party placing the guy rod a sum equal to half of the cost of the anchor and guy rod in place. In cases where existing anchors are adequate for the needs of either party, the party desiring additional guys will where necessary, install double thimble guy rods at no expense to the other party, and the other party will, at its own expense, transfer its guys to the new rod. The ownership of the double thimble rod will be vested in the owner of the pole.

## ARTICLE IX

### Procedure When Character of Circuits Is Changed

When either party desires to change the character of its circuits on jointly used poles, such party shall give sixty (60) days notice to the other party of such contemplated change, and in the event that the party agrees to joint use with such changed circuits, then the joint use of such poles shall be continued with such changes in construction as may be necessary to meet the requirements of the National Electrical Safety Code, being made at the expense of the party desiring to make the change. In the event, however, that the other party fails within thirty (30) days from receipt of such notice to agree in writing to such change, then both parties shall cooperate in accordance with the following plan:

A.  The parties hereto shall determine the most practical and economical method of effectively providing for separate lines and the party whose circuits are to be moved shall promptly carry out the necessary work.

B.  The cost of re-establishing such circuits in the new location as are necessary to furnish the same business facilities that existed in the joint use at the time such change was decided upon, shall be equitably apportioned between the parties hereto.

Unless otherwise agreed by the parties, ownership of any new line constructed under the foregoing provision in a new location shall vest in the party for whose use it is constructed. The net cost of establishing service in the new location shall be exclusive of any increased cost due to the substitution for existing facilities of other facilities of a substantially new or improved type or of increased capacity, but shall include, among other items, the cost of the new pole line, including rights of way, the cost of removing attachments from the old poles to the new location, and the cost of placing the attachments on the poles in the new location.

Page 9
Case 2:20-cv-00030-KAC-CRW   Document 1   Filed 02/19/20   Page 9 of 13   PageID #: 9

19. Currently, BrightRidge has both electric lines and the backbone of its broadband internet system in the six (6) feet designated as "Electric" by ARTICLE I of the Agreement, as amended, on the 13.6% of the poles owned by CenturyLink in the Bright Ridge service territory. BrightRidge, after giving proper notice to CenturyLink under the Agreement, including ARTICLES VI and IX, has begun constructing broadband internet lines in the four (4) feet of CenturyLink's poles designated as "Telephone". BrightRidge has the absolute right to make such attachments on CenturyLink's poles, as long as proper safety requirements are complied with, under ARTICLES III, VI, and IX, among other ARTICLES.

20. As stated, BrightRidge has thus been granted permission by ARTICLE III to use the CenturyLink poles for its broadband internet services. It has followed the precise procedures set forth in ARTICLES VI and IV. CenturyLink has admitted this is in as much as it followed these ARTICLES, to some degree, in the installation of its broadband internet services on the joint use poles owned by BrightRidge.

21. CenturyLink disagrees with BrightRidge's interpretation of the Agreement, as amended. CenturyLink claims BrightRidge has no right to make such broadband attachments in the "Telephone" zone, and, further, asserts that any such attachments BrightRidge had made is a trespass and an unauthorized attachment. CenturyLink has demanded:

> 1.) BrightRidge sign a newly-created pole attachment agreement for use of the telephone space and pay a market attachment rate going forward, the amount to be determined solely by CenturyLink;
>
> 2.) For all so-called "unauthorized attachments" allegedly made by BrightRidge to date, BrightRidge must pay CenturyLink $500.00 per attachment, plus costs of some survey;

Page 10
Case 2:20-cv-00030-KAC-CRW   Document 1   Filed 02/19/20   Page 10 of 13   PageID #: 10

3.) BrightRidge must also cure some alleged NESC violations and pay for the costs incurred by CenturyLink in monitoring the NESC remediation; and

4.) BrightRidge must pay CenturyLink's attorneys' fees to date, and the expenses incurred by CenturyLink.

22. BrightRidge absolutely disputes CenturyLink's interpretation of the Agreement, as amended. It is BrightRidge's position that:

1.) It has the contractual right to erect its broadband lines on CenturyLink poles, including in the so-called "Telephone" zone;

2.) It cannot be compelled to sign any new pole attachment agreement as the Agreement, as amended, covers these new attachments;

3.) CenturyLink does not have the right to extort the payment of any fees from BrightRidge;

4.) BrightRidge is not trespassing; and, CenturyLink has no right to collect any attorneys' fees and expenses from BrightRidge.

23. In summary, CenturyLink asserts BrightRidge must enter into a new and separate Agreement with it as to be allowed to utilize the "Telephone" zone for BrightRidge's broadband internet service; and, as such, the Agreement, as amended, has no application to this situation. In connection therewith, CenturyLink charges that any BrightRidge broadband internet attachments on CenturyLink poles are "unauthorized" and trespassing. While BrightRidge asserts these attachments are not unauthorized and certainly cannot be trespassing on "joint use poles" the parties have utilized for decades the Agreement, as amended, does contain language which addresses unauthorized attachments. See, ARTICLE XII, SECTION E, AMENDMENT NO. COURT, EXHIBIT 3 hereto. The new BrightRidge attachments are not unauthorized.

CenturyLink's demands for "new" terms and conditions are baseless. Indeed, to attempt to force BrightRidge to agree to its new demands constitutes breaches of the Agreement, as amended.

24. As such, the battle being joined, BrightRidge prays this Court review all evidence and declare the rights and obligations of the parties hereto pursuant to 28 U.S.C. § 2201.

PREMISES CONSIDERED, BrightRidge demands judgment against CenturyLink and prays for the following:

1. <u>That</u>, pursuant to 28 U.S.C. § 2201, the Court review all evidence and declare the rights and obligations of the parties hereto, including, but not limited to: (A) determining whether BrightRidge has the right under the Agreement, as amended, to make broadband attachments on CenturyLink poles in the "Telephone" zone; (B) whether any attachments made by BrightRidge on CenturyLink poles constitutes trespassing and/or unauthorized attachments; (C) whether CenturyLink can compel BrightRidge to sign a new pole attachment agreement and pay market rate attachment fees going forward; (D) whether CenturyLink can compel BrightRidge to pay $500.00 for attachments made heretofore and the costs of a survey revealing any NESC violations; and (E) whether CenturyLink is entitled to the payment by BrightRidge of various fees and expenses, including attorneys' fees.

2. BrightRidge asks this Honorable Court to find (A) that BrightRidge has the right to place its broadband lines on CenturyLink poles, even in the so-called "Telephone" zone; under the Agreement, as amended, (B) that BrightRidge, under the Agreement, as amended, and, particularly, ARTICLE VI and IX, has complied with said Agreement and, except for standard attachment fees under said Agreement, BrightRidge has no further monetary obligation of any kind owing to CenturyLink.

3.  That the Court grant BrightRidge other and further relief, and general relief, and award BrightRidge discretionary costs.

Respectfully submitted,

JOHNSON CITY POWER BOARD, d/b/a BRIGHTRIDGE

/s/ William C. Bovender
William C. Bovender (BPR #000751)
Stephen M. Darden (BPR #011461)
Joseph B. Harvey (BPR #028891)
**HUNTER, SMITH & DAVIS, LLP**
1212 N. Eastman Road
P. O. Box 3740
Kingsport, TN 37664
Ph: (423) 378-8858
Fx: (423) 378-8801
*Counsel for Plaintiff*

## CERTIFICATE OF SERVICE

I hereby certify that on this the 19th day of February, 2020, a copy of the foregoing Complaint for Declaratory Judgment was filed electronically. Notice of this filing will be sent by operation of the Court's electronic filing system to all parties indicated on the electronic filing receipt. All other parties will be served by regular U.S. mail and EMail. Parties may access this filing through the Court's electronic filing system.

Misty Smith Kelley, Esq.
BAKER DONELSON
633 Chestnut Street, Suite 1900
Chattanooga, TN 37450
mkelley@bakerdonelson.com
*Counsel for Defendant*

/s/William C. Bovender
William C. Bovender
