THIS AGREEMENT, made this ___1st___ day of __July__ , __1980__ ,
by and between the __BRISTOL TENNESSEE ELECTRIC SYSTEM__ incorporated
under the laws of the State of Tennessee, hereinafter called the "Electric
Company", party of the first part, and the __UNITED INTER-MOUNTAIN__
__TELEPHONE COMPANY__, a corporation of the State of Virginia, hereinafter
called the "Telephone Company", party of the second part.

## WITNESSETH:

WHEREAS, the Electric Company and the Telephone Company desire
to cooperate in accordance with the "Principles and Practices for the Joint
Use of Wood Poles by Supply and Communication Companies" as contained
in the report of the Joint General Committee of the Edison Electric Institute
and the Bell Telephone System dated July 1945, and amendments thereto,
and to establish joint use of their respective poles when and where joint
use shall be of mutual advantage; and

WHEREAS, the conditions determining necessity or desirability of
joint use depend upon service requirements to be met by both parties,
including considerations of safety and economy, and each of them should be
the judge of what the character of its circuits should be to meet its service
requirements and as to whether or not these service requirements can be
properly met by joint use of poles;

NOW, THEREFORE, in consideration of the premises and the mutual
covenants herein contained, the parties hereto, for themselves, their
successors and assigns, do hereby covenant and agree as follows:

## ARTICLE I

### Definitions

For the purpose of this agreement, the following terms when used
herein, shall have the following meanings;

A. NORMAL SPACE - means sufficient space on a joint use pole
for the use of each party, taking into consideration require-
ments of the National Electrical Safety Code.
Except only as to the portion of its said space which, by
the terms of the National Electrical Safety Code, may be
occupied by certain attachments therein described of the
other party, this space is specifically defined as follows:

    (1) for the Electric Company, the uppermost six (6) feet;
    (2) for the Telephone Company, a space of four (4) feet
        at sufficient distance below the space of the Electric
        Company to provide at all times the minimum clearance
        required by the specifications referred to in Article IV,
        and at sufficient height above the ground to provide
        proper vertical clearance for the lowest horizontally
        run line wires or cables attached in such space.

B. NORMAL JOINT USE POLE - means a pole which meets the
requirements of the National Electrical Safety Code for support
and clearance of supply and communication conductors under
conditions existing at the time joint use is established, or is
to be created under known plans of either party. Specifically,
a normal joint pole under this agreement shall be a 40 foot
class 4 wood pole. The pole should be of an agreeable treatment.

The foregoing definition of "a normal joint pole" is not intended to
preclude the use of joint poles shorter or of less strength than the
normal joint pole in locations where such poles will meet the known or
anticipated requirements of the parties hereto.

C. ATTACHMENTS - mean materials or apparatus now or hereafter
used by either party in the construction, operation or maintenance
of its plant carried on poles.
D. SUPPORTING ATTACHMENTS - mean attachments made on poles which,

EXHIBIT

in general, relieve the Licensee of the necessity of providing a
pole at or near the same location for the purpose of supporting
its wires or cables.

E.  OWNER — means the party owning the pole to which attachments are
made.

F.  LICENSEE — means the party having the right under this agreement
to make attachments to a pole of which the other party is the Owner.


## ARTICLE II

### Territory and Scope of Agreement

This agreement shall be in effect and shall cover all wooden poles of
each of the parties now existing, hereinafter erected or acquired, within
the common operating areas served by the parties hereto, when said poles
are brought hereunder, excepting;

A.  Poles which, in the Owner's judgment, are necessary for its
own sole use; and

B.  Poles which carry, or are intended to carry, circuits of a
character that in the Owner's judgment proper rendering of its
service now or in the future makes joint use of such poles un-
desirable.


## ARTICLE III

### Permission for Joint Use

Each party hereto hereby permits joint use by the other party of any
of its poles when brought under this agreement as herein provided, subject
to the terms and conditions herein stated.


## ARTICLE IV

### Specifications

Joint use of poles covered by this agreement shall at all times be in
conformity with terms and provisions of the current issue of the National
Electrical Safety Code as to minimum requirements, and such revisions and
amendments thereto from time to time as may be necessary by reason of
developments and improvements in the art as may be mutually agreed upon and
approved in writing by the _____Manager_____ .
of the Electric Company and the Vice President-Operations of the
Telephone Company.

Edison Electric Institute Publication M-12, a report of the Joint
Committee on Plant Coordination of the Edison Electric Institute and the
Bell Telephone System, based on the National Electrical Safety Code, and
such revisions and amendments thereto as may be made from time to time is
to be used as a guide in the administration of this agreement.


## ARTICLE V

### Right-Of-Way For Licensee's Attachments

A.  The Owner and Licensee will cooperate as far as may be practicable
in obtaining rights of way for both parties. When a written easement is
secured it shall be in sufficient detail for identification and recording,
where required, and shall be subject to inspection by the other party upon
request. However, no guarantee is given by the Owner of permission from
property owners, municipalities or others for the use of poles by the
Licensee, and if objection is made thereto and the Licensee is unable to
satisfactorily adjust the matter within a reasonable time, the Owner may
at any time, upon

thirty (30) days notice in writing to the Licensee, require the Licensee to remove its attachments from the poles involved, and the Licensee shall, within thirty (30) days after receipt of said notice, remove its attachments from such poles at its sole expense. Should the Licensee fail to remove its attachments as herein provided, the Owner may remove them at the Licensee's expense, without any liability whatever for such removal or the manner of making it, for which expense the Licensee shall reimburse the Owner on demand.

B. Where the property owners will allow it, the owner of the line shall obtain a right of way swath extending not less than 10 feet on each side of the center line of the line. Where property owners object to this swath each party will be responsible for obtaining permission for a swath satisfactory for its own requirements.

After permission of property owners is obtained, the owner of the line will provide the initial clearance of the swath to meet the requirements of both parties with a minimum of 10 feet on each side of the centerline of the line.

However, in cases where the right of way clearance, including tree trimming, is more than indicated above, due to the requirements of the Licensee, the extra clearance costs shall be borne by the Licensee.

C. It is agreed that the cost of maintenance of right of way and recurring trimming should be borne jointly to the extent that each of the parties will benefit by the joint endeavor. Due to varying conditions expected to be encountered, the division of cost of maintaining right of way and tree trimming shall be agreed upon after a joint inspection by representatives of both parties of the work operations required to provide necessary clearances.

The division of cost as provided in this section shall be based on mutually agreeable predetermined divisions of cost and shall be subject to revision at the request of either party upon ninety (90) days written notice. The Division of Cost, as agreed to, shall then be evidenced by an exchange of letters as provided under Article XXII.

As between the parties to this contract, the company performing the work shall assume all responsibility of claims and suits which may arise from this work.

## ARTICLE VI

### Placing, Transferring or Rearranging Attachments

A. Whenever either party desires to reserve space on any pole of the other, for any attachments requiring space thereon, not then specifically reserved hereunder for its use, it shall make written application therefor, specifying in such notice the location of the pole in question, the number and kind of attachments which it desires to place thereon, and the character of the circuits to be used. Within ten (10) days after the receipt of such notice, the Owner shall notify the Applicant in writing whether or not said pole is of those excluded from joint use under the provisions of Article II. Upon receipt of notice from the Owner that said pole is not of those excluded, and after completion of any transferring or rearranging which is then required in respect to attachments on said poles, including any necessary pole replacements as provided in Article VII "A," the Applicant shall have the right as Licensee hereunder to use said space for attachments and circuits of the character specified in said application in accordance with the terms of this agreement. Service wire attachments or emergency construction can be placed in accordance with the specifications, upon verbal approval, subsequently approved in writing.

B. Except as herein otherwise expressly provided, each party shall place, maintain, rearrange, transfer and remove its own attachments, and shall at all times perform such work promptly and in such a manner as not to interfere with work being done by the other party.

C. In any case where one party provides at the request of the other party double thimble guy rods for the use of both parties, the party requesting the double thimble guy rod shall pay to the party placing the guy rod a sum equal to half of the cost of the anchor and guy rod in place. In cases where existing anchors are adequate for the needs of either party, the party desiring additional guys will, where necessary, install double thimble guy rods in accordance to the other party and the other party will, at its own expense, transfer its guys to the new rod. The owner-

Case 2:20-cv-00036-RWS Document 35 Filed 02/07/20 Page 3 of 15 PageID #: 16

ship of the double thimble rod will be vested in the owner of the pole.

## ARTICLE VII

### Erecting, Replacing Or Relocating Poles

A. Whenever any jointly used pole, or any pole about to be so used under the provisions of this agreement, is insufficient in size or strength for the existing attachments and for the proposed immediate additional attachments thereon, the Owner shall promptly replace such pole with a new pole of the necessary size and strength, and make such other changes in the existing pole line, in which such pole is included, as may be made necessary by the replacement of such pole and the placing of the Licensee's circuits as proposed.

B. Whenever it is necessary to change the location of a jointly used pole, by reason of any state, municipal or other governmental requirement, or the requirements of a property owner, the Owner shall, before making such change in location, give notice thereof in writing (except in cases of emergency when verbal notice will be given, and subsequently confirmed in writing) to the Licensee, specifying in such notice the time of such proposed relocation, and the Licensee shall, at the time so specified, transfer its attachment to the pole at the new location.

In the case of a pole along subdivided property which is not set opposite a lot line, the owner of such pole will, if conditions require, move same at the request of the Licensee, each party bearing the cost of moving its facilities.

C. Whenever either party hereto is about to erect new poles within the territory covered by this agreement, either as an additional pole line, as an extension of an existing pole line, or as the reconstruction of an existing pole line, it shall notify the other in writing at least thirty (30) days before beginning the work (shorter notice, including verbal notice subsequently confirmed in writing, may be given in cases of emergency), and shall submit with such notice its plans showing the proposed location and size of the new poles and the character of circuits it will use thereon. The other party shall, within twenty (20) days after the receipt of such notice, reply in writing to the party erecting the new poles, stating whether such other party does, or does not, desire space on the said poles, and if it does desire space thereon, the character of the circuits it desires to use and the amount of space it wishes to reserve. This notice of desire to establish joint use should include detail plans of any changes in the plans of the other party which are desired in order to permit the establishment of joint use. If such other party requests space on the new poles, and if the character and number of circuits and attachments are such that the Owner does not wish to exclude the poles from joint use under the provision of Article II, then poles suitable for the said joint use shall be erected in accordance with the provisions and the payment of costs as provided in paragraphs "D," "E" and "F" of this Article.

D. In any case where the parties hereto shall conclude arrangements for the joint use of any new poles to be erected, the ownership of such poles shall be determined by mutual agreement, to the end that each party hereto shall at all times own approximately one-half of the total number of poles jointly used under this agreement, due regard being given to the desirability of avoiding mixed ownership in any given line. In the event of disagreement as to ownership, the party then owning the smaller number of joint poles under this agreement shall promptly erect the new joint poles and be the owner thereof.

E.  The costs of erecting joint poles coming under this agreement, either as new pole lines, as extensions of existing pole lines, or to replace existing poles, either existing jointly used poles or poles not previously involved in joint use, shall be borne by the parties as follows:

1.  A normal joint pole, or a joint pole shorter or smaller than the normal pole, shall be erected at the sole expense of the Owner, except as provided in Section "F" of this Article.

2.  A pole taller or stronger than the normal pole, the extra height and strength of which is due wholly to the Owner's requirements, shall be erected at the sole expense of the Owner.

3.  In the case of a pole taller or stronger than the normal pole, the extra height and strength of which is due wholly to the Licensee's requirements, the Licensee shall pay to the Owner a sum equal to the difference between the cost in place of such pole and the cost in place of a normal joint pole, the rest of the cost of erecting such pole to be borne by the Owner, except as provided in Section "F" of this Article.

4.  In the case of a pole taller or stronger than the normal pole, the extra height and strength of which is due to the requirements of both parties, the Licensee shall pay to the Owner a sum equal to one-half the difference between the cost in place of such pole and the cost in place of a normal joint pole, the rest of the cost of erecting such pole to be borne by the Owner.

5.  In the case of a pole taller or stronger than the normal pole, where height and strength in addition to that needed for the purpose of either or both of the parties hereto is necessary in order to meet the requirements of public authority or of property owners, one-half of the excess cost of such pole due to such requirements shall be borne by the Licensee; the rest of the cost of such pole to be borne as provided in that one of the preceding paragraphs 1, 2, 3 or 4, within which it would otherwise properly fall.

F.  In any case where a pole is erected hereunder to replace another pole (solely because such other pole is not tall enough, or of the required strength, to provide adequately for the Licensee's requirements, or where such pole, whether it carry space reserved for the Licensee's use or not, had at the time of its erection, been pronounced by the Licensee as satisfactory and adequate for its requirements, the Licensee shall, upon erection of the new pole, pay to the Owner, in addition to any amounts payable by the Licensee under paragraphs 3, 4 or 5, of Section "E" of this Article, a sum equal to the sacrificed life of the pole which is replaced (then value in place of the pole replaced plus cost of removal less salvage), and the pole removed shall remain the property

of the Owner. In any case where the other party by mutual consent erects and owns a joint pole to replace an existing pole of the Owner (instead of the Owner doing so as it is contemplated by Section "A" of this Article that the Owner will do), such other party shall pay to the Owner of the replaced pole a sum equal to the then value in place of the pole which is replaced, and the pole removed shall thereupon become the property of such other party which has erected the replacing pole.

G. When replacing a jointly used pole carrying aerial cable terminals, underground connections or transformer equipment, the new pole shall be set in the same hole which the replaced pole occupied, unless special conditions make it necessary or mutually desirable to set it in a different location.

H. Any payments made by the Licensee under the foregoing provisions of this Article for poles taller than normal shall not in any way affect the ownership of said poles.

I. Any payments as provided in the foregoing provisions of this Article may be based on mutually agreeable predetermined amounts. The amounts agreed to shall be subject to revision at the request of either party at the end of each three year period, or at other times as may be mutually agreed to, and may be cancelled at any time by either party by a written notice. The amounts agreed to shall be evidenced by an exchange of letters, as provided under Article XXII.

### ARTICLE VIII

#### Maintenance Of Poles And Attachments

A. The Owner shall, at its own expense, maintain its joint poles in a safe and serviceable condition, and in accordance with Article IV of this agreement and the requirements of the National Electrical Safety Code, and shall replace, subject to the provisions of Article VII, such of said poles that become defective.

B. Each party shall, at its own expense, at all times maintain all of its attachments in accordance with Article IV of this agreement and the National Electrical Safety Code and keep them in safe condition and in thorough repair.

### ARTICLE IX

#### Procedure When Character Of Circuits Is Changed

When either party desires to change the character of its circuits on jointly used poles, such party shall give sixty (60) days notice to the other party of such contemplated change, and in the event that the party agrees to joint use with such changed circuits, then the joint use of such poles shall be continued with such changes in construction as may be necessary to meet the requirements of the National Electrical Safety Code, being made at the expense of the party desiring to make the change. In the event, however, that the other party fails within thirty (30) days from receipt of such notice to agree in writing to such change, then both parties shall cooperate in accordance with the following plan:

A. The parties hereto shall determine the most practical and economical method of effectively providing for separate lines, and the party whose circuits are to be moved shall promptly carry out the necessary work.

B. The cost of re-establishing such circuits in the new location as are necessary to furnish the same business facilities that existed in the joint use at the time such change was decided upon, shall be equitably apportioned between the parties hereto.

Unless otherwise agreed by the parties, ownership of any new line constructed under the foregoing provision in a new location shall vest in the party for whose use it is constructed. The net cost of establishing service in the new location shall be exclusive of any increased cost due to the substitution for existing facilities of other facilities of a substantially new or improved type or of increased capacity, but shall include, among other items, the cost of the new pole line, including rights of way, the cost of

removing attachments from the old poles to the new location, and the cost of placing the attachments on the poles in the new location.

## ARTICLE X

### Bills And Payments For Work

Upon the completion of work performed hereunder by either party, the expense of which is to be borne wholly or in part by the other, the party performing the work shall present to the other party, within thirty (30) days after the completion of such work, a statement showing the amount due, and such other party shall, within thirty (30) days after such statement is presented, pay to the party doing the work the amount due.

## ARTICLE XI

### Abandonment Of Jointly Used Poles

A. If the Owner desires at any time to abandon any jointly used pole, it shall give the Licensee notice in writing to that effect at least thirty (30) days prior to the date on which it intends to abandon such pole. If, at the expiration of said period, the Owner shall have no attachments on such pole but the Licensee shall not have removed all of its attachments there-from, such pole shall thereupon become the property of the Licensee, and the Licensee shall save harmless the former Owner of such pole from all obligation, liability, damages, cost, expenses or charges incurred thereafter, because of, or arising out of, the presence or condition of such pole or any attachments thereon; and shall pay the Owner a sum equal to the then value in place of such abandoned pole, or poles, or such other equitable sum as may be agreed upon between the parties. Credit shall be allowed for any payments which the Licensee may have made under the provisions of Article VII, Sections "E" and "F", when the pole was originally set, provided the Licensee furnishes proof of such payment.

B. The Licensee may at any time abandon the use of a joint pole by giving due notice thereof in writing to the Owner and by removing therefrom any and all attachments it may have thereon.

## ARTICLE XII

### Adjustment Payments

The parties contemplate that the use or reservation of space on poles by each party, as Licensee of the other under this agreement, shall be reciprocal and mutual insofar as this may be practicable.

A. Adjustment payments per pole due from either party as Licensee to the other party as Owner shall, subject to the provision of Article XIII, be $7.40 per annum.

B. On or about December 1st of each year, each party, acting in cooperation with the other, subject to the provisions of the following paragraph of this Section, shall have ascertained and tabulated the total number of poles in use by each party as Licensee for which an adjustment payment shall be made to the other party as Owner.

C. The total adjustment payment due each party shall be determined by multiplying the poles owned by each party, tabulated as indicated in the first paragraph of Section "B" of this Article, by the adjustment payment in Section "A" of this Article.

The smaller total amount covered above shall be deducted from the larger amount and the Electric Company or the Telephone Company, whichever shall owe the larger amount, shall pay to the other the difference between said two amounts as the net adjustment payment due for the year involved. Within ten (10) days after the first day of December next ensuing after the date of this agreement, and within ten (10) days after the first day of December each year thereafter, during the time this agreement shall be in effect, the party to which said adjustment payment is owed, as of said first day of December, shall submit a written statement to the other party giving the correct amount owed by the other party.

The adjustment payment herein provided for shall be paid within ten (10) days after the bill has been submitted, unless said party disputes the

Case 2:20-cv-00030-APG-VCF Document 1-4 Filed 02/13/20 Page 8 of 15 PageID #: 20

amount of such bill within five (5) days from receipt thereof.

Any recurring cost incurred by the Owner, beyond the control of the Owner, solely because of the use of the Owner's poles by the Licensee, shall be paid by the Licensee.

D. At intervals not exceeding five (5) years an actual inventory of attachments shall be made by representatives of the parties. If there is any difference in the number of attachments found by the inventory and the number arrived at by tabulating those reported, correction will be made by retroactive billing for any attachments identified as being responsible for the difference, and any remaining difference will be spread evenly over the years since the last inventory, and billing adjusted accordingly.

## ARTICLE XIII

### Periodical Revision Of Adjustment Payment Rate

A. At any time after January 1, 1980, and at intervals of three (3) years thereafter, the adjustment payment rates applicable under this agreement shall be subject to joint review and revision, as provided for under Section "B" of this Article, upon the written request of either party. In case of revision of the adjustment payment rates as herein provided, the new adjustment payment rates agreed upon shall apply, starting with the annual bill next rendered and continuing until again adjusted.

B. Revisions of the adjustment payments shall be based on experience resulting from previous administration of this agreement. Any changes shall take into account the original cost factors pertinent to the establishing of the pole facilities involved in all joint use existing under this agreement at the time of the said review. If, within ninety (90) days after the receipt of such request, by either party from the other, the parties hereto fail to agree upon a revision of such rate, then the adjustment payment per pole so to be paid shall be an amount equal to one-half of the then average annual total cost per pole, based on average in-plant cost factors, of providing and maintaining the joint poles covered by this agreement. In case of a revision of the adjustment payment as herein provided, the new rate shall be applicable until again revised.

## ARTICLE XIV

### Defaults

A. If either party shall make default in any of its obligations under this agreement, and such default shall continue thirty (30) days after notice thereof in writing from the other party, all rights of the party in default hereunder pertaining to the establishment of future joint use shall be suspended, and if such default shall continue for a period of ninety (90) days after such suspension, the other party may forthwith terminate the right of both parties to make additional attachments. Any such termination of the right to make additional attachments by reason of any such default shall not, however, abrogate or terminate the right of either party to maintain the attachments theretofore made on the poles of the other, and all such prior attachments shall continue thereafter to be maintained pursuant to and in accordance with the terms of this agreement, which agreement shall, so long as said attachments are continued, remain in full force and effect solely and only for the purpose of governing and controlling the rights and obligations of the parties with respect to said attachments.

B. If either party shall make default in the performance of any work which it is obligated to do under this contract, at its sole expense, the other party may elect to do such work, and the party in default shall reimburse the other party for the cost thereof. Failure on the part of the defaulting party to make such payment within thirty (30) days upon presentation of bills therefor shall, at the election of the other party, consitute a default under Section "A" of this Article.

## ARTICLE XV

### Liability And Damages

Whenever any liability for damages is incurred by either or both of the parties hereto for injuries to the employees, or for injury to the property of either party, or for injuries to other persons or their property arising out of the joint use of poles under this agreement, or due to the proximity of the wires and fixtures of the parties hereto attached to the jointly used poles covered by this agreement, the liability for such damages, as between the parties hereto, shall be as follows:

A. Each party shall be liable for all damages for such injuries to persons or property caused solely by its negligence or solely by its failure to comply at any time with the specifications as provided herein.

B. Each party shall be liable for all damages for such injuries to its own employees or its own property that are caused by the concurrent negligence of both parties hereto, or that are due to causes which cannot be traced to the sole negligence of the other party.

C. Each party shall be liable for one-half ($\frac{1}{2}$) of all damages for such injuries to persons other than employees of either party, and for one-half ($\frac{1}{2}$) of all damages for such injuries to property not belonging to either party, that are caused by the concurrent negligence of both parties hereto, or that are due to causes which cannot be traced to the sole negligence of the other party.

D. Where, on account of injuries of the character described in the preceding paragraphs of this Article, either party hereto shall make any payments to injured employees or to their relatives or representatives in conformity with: (1) the provision of any workmen's compensation act or any act creating a liability in the employer to pay compensation for personal injury to an employee by accident arising out of and in the course of the employment, whether based on negligence on the part of the employer or not, or (2) any plan for employee's disability benefits or death benefits now established or hereafter adopted by the parties hereto, or either of them, such payments shall be construed to be damages within the terms of the preceding paragraphs numbered "A" and "B" and shall be paid by the parties hereto accordingly.

E. All claims for damages arising hereunder that are asserted against or affect both parties hereto shall be dealt with by the parties hereto jointly; provided, however, that in any case where the Claimant desires to settle any such claim upon terms acceptable to one of the parties hereto but not to the other, the party to which said terms are acceptable may, at its election, pay to the other party one-half ($\frac{1}{2}$) of the expense which such settlement would involve, and thereupon said other party shall be bound to protect the party making such payment from all further liability and expense on account of such claim.

F. In the adjustment between the parties hereto of any claim for damages arising hereunder, the liability assumed hereunder, by the parties, shall include, in addition to the amounts paid to the Claimant, all expenses incurred by the parties in connection therewith, which shall comprise costs, attorneys' fees, disbursements and other proper charges and expenditures.

## ARTICLE XVI

### Existing Rights Of Other Parties

If either of the parties hereto has, prior to the execution of this agreement, conferred upon others not parties to this agreement, by contract or otherwise, rights or privileges to use any poles covered by this agreement, nothing herein contained shall be construed as affecting said rights or privileges, and either party hereto shall have the right, by contract or otherwise, to continue and extend such existing rights or privileges; it being expressly understood, however, that for the purpose of this agreement,

the attachments of any such outside party shall be treated as attachments belonging to the Grantor, and the rights, obligations, and liabilities hereunder of the Grantor in respect to such attachments shall be the same as if it were the actual Owner thereof. Where municipal regulations require either party to allow the use of its poles for fire alarm, police or other like signal systems, such use shall be permitted under the terms of this Article.

## ARTICLE XVII

### Service of Notices

Wherever in this agreement notice is provided to be given by either party hereto to the other, such notice shall be in writing and given by letter mailed, or by personal delivery, to the Electric Company at its office at __137 Edgemont Avenue, Bristol, Tennessee 37620__ or to the Telephone Company at its office at __112 Sixth Street__ __Bristol, Tennessee 37620__ as the case may be, or to such other address as either party may, from time to time, designate in writing for that purpose.

## ARTICLE XVIII

### Termination of Agreement

This agreement shall continue in full force and effect until the 31st day of December, ___1981___, and shall continue thereafter until terminated, insofar as the making of additional attachments is concerned, by either party, giving to the other one (1) years notice in writing of intention to terminate the right of making additional attachments. Any such termination of the right to make additional attachments shall not, however, abrogate or terminate the right of either party to maintain the attachments theretofore made on the poles of the other, and all such prior attachments shall continue thereafter to be maintained, pursuant to and in accordance with the terms of this agreement, which agreement shall, so long as said attachments are continued, remain in full force and effect solely and only for the purpose of governing and controlling the rights and obligations of the parties with respect to said attachments.

## ARTICLE XIX

### Assignment Of Rights

Except as otherwise provided in this agreement, neither party hereto shall assign or otherwise dispose of this agreement, in whole or in part, without the written consent of the other party; except that either party shall have the right to mortgage any or all of its property rights, privileges and franchises, or lease or transfer any of them to another corporation organized for the purpose of conducting a business of the same general character as that of such party, or to enter into any merger or consolidation; and, in case of the foreclosure of such mortgage, or in case of such lease, transfer, merger, or consolidation, its rights and obligations hereunder shall pass to such successors and assigns; and provided, further, that subject to all of the terms and conditions of this agreement, either party may permit any corporation conducting a business of the same general character as that of such party, with which it is affiliated, or connecting with it, the rights and privileges of this agreement, in the conduct of its said business; and for the purpose of this agreement, all such attachments maintained on any such pole by the permission as aforesaid of either party hereto shall be considered as the attachments of the party granting such permission, and the rights, obligations and liabilities of such party under this agreement, in respect to such attachments, shall be the same as if it were the actual owner thereof.

## ARTICLE XX

### Waiver Of Terms Or Conditions

The failure of either party to enforce or insist upon compliance with any of the terms or conditions of this agreement shall not constitute a general waiver or relinquishment of any such terms or conditions, but the same shall be and remain at all times in full force and effect.

## ARTICLE XXI

### Existing Contracts

All existing agreements between the parties hereto for the joint use of wood poles upon a rental basis within the territory covered by this agreement, except the one dated_____ day of_____ which covers attachments in_____

_____NONE_____

_____

~~existing agreements in this Article Section XX hereto are hereby expressly~~
~~superseded and cancelled~~

## ARTICLE XXII

### Supplemental Routines And Practices

Nothing in the foregoing shall preclude the parties to this agreement from preparing such supplemental operating routines or working practices as they mutually agree to be necessary or desirable to effectively administer the provisions of this agreement.

IN WITNESS WHEREOF, the parties hereto have caused these presents to be executed in duplicate, and their corporate seals to be affixed thereto by their respective officers thereunto duly authorized, on the day and year first above written.

ATTEST:

_Chris Boyd_
Secretary

ATTEST:

_James C. Wright_
Secretary

BRISTOL TENNESSEE ELECTRIC SYSTEM

By: _Michael Bowden_

UNITED INTER-MOUNTAIN TELEPHONE COMPANY

By: _C.H. Breuning_  pres.

# AMENDMENT

This Amendment made this ___31st___ day of ___December___,

19 _80_, by and between United Inter-Mountain Telephone Company

"(Telephone Company") and ___Bristol Tennessee Electric System___

("Electric Company").

## WITNESSETH

WHEREAS, Telephone Company and Electric Company entered

into an Agreement dated ___July 1, 1980___ (the "Agreement")

which Agreement contains the terms and conditions governing the joint

use of their respective poles for the 1980 and subsequent calendar

years at the annual rate of $7.40 per pole attachment (the "New

Rate"); and *9.25 12/1/80 per in.B.*

WHEREAS, Telephone Company and Electric Company now

desire to amend the Agreement to provide that the New Rate shall

not fully apply until the 1981 and subsequent calendar years and

to provide for the rate which will be applicable for the 1980

calendar year.

NOW, THEREFOR, the parties hereto agree as follows:

Paragraph A of Article XII of the Agreement is hereby

amended to read as follows:

"A.  For 1981 and subsequent calendar years, adjustment

payments per pole due from either party as Owner shall, subject

to the provision of Article XIII, be $7.40 per annum.  For calendar

year 1980, the payment shall be the charge in effect for calendar

year 1979 plus sixty (60%) percent of the difference between the

1979 charge and the calculation based on the 1981 rate of $7.40."

IN WITNESS WHEREOF, the parties hereto have caused this

Amendment to be executed in duplicate, and their corporate seals

to be affixed thereto by their respective officers thereunto

duly authorized, on the day and year first above written.

ATTEST:                          Bristol Tennessee Electric System

_Linda J. Parker_
Secretary                        By: _R Michael Browder_


ATTEST:                          UNITED INTER-MOUNTAIN TELEPHONE COMPANY

_James B Wright_     *as'd* By: _C H Browning_  1/22/81
Secretary

## AMENDMENT NO. TWO

This Amendment made this 31st day of December, 1982, by and between United Inter-Mountain Telephone Company ("Telephone Company") and _____ ___Bristol Tennessee Electric System___ ("Electric Company").

### WITNESSETH

WHEREAS, Telephone Company and Electric Company entered into an Agreement dated _____July 1, 1980_____(the "Agreement") and Amended _____December 31, 1980_____(the "Amendment") which Agreement and Amendment contain the terms and conditions governing the joint use of their respective poles for the 1980 and subsequent calendar years at the annual rate of $7.40 per pole attachment (the "New Rate"); and

WHEREAS, Telephone Company and Electric Company now desire to amend the Agreement to provide that the New Rate shall be $9.25 ("The New Rate") per pole attachment subject to the Provisions of ARTICLE XIII "Periodical Revision of Adjustment Payment Rate",

NOW, THEREFORE, the parties hereto agree as follows:

Paragraph A of Article XII of the Agreement is hereby amended to read as follows:

"A. For 1982 and subsequent calendar years, adjustment payments per pole due from either party as Licensee to the other party as owner shall, subject to the provision of Article XIII, be $9.25 per annum."

IN WITNESS WHEREOF, the parties hereto have caused this Amendment to be executed in duplicate, and their corporate seals to be affixed thereto by their respective officers thereunto duly authorized, on the day and year first above written.

ATTEST:                                    BRISTOL TENNESSEE ELECTRIC SYSTEM

_Linda J. Parker_                          By: _Michael Bond_
Secretary

ATTEST:                                    UNITED INTER-MOUNTAIN TELEPHONE COMPANY

_James B Wright_                           By: _Wm A. Blair_
Secretary

## AMENDMENT NO. THREE

This amendment made this _14_ day of _Nov_, 1995, by and between United Telephone - Southeast (Telephone Company) and Bristol Tennessee Electric System (Power Company).

### WITNESSETH

**WHEREAS,** Telephone Company and Power Company entered into an Agreement dated July 1, 1980 (Agreement) and Amended December 31, 1980 and December 31, 1982 (Amendments) which Agreement and Amendments contain the terms and conditions governing the joint use of their respective poles; and

**WHEREAS,** Telephone Company and Power Company now desire to amend the Agreement to provide for New Rates, per pole attachment, subject to the Provisions of ARTICLE XIII "Periodical Revision of Adjustment Payment Rate",

**NOW, THEREFORE,** the parties hereto agree as follows:

Paragraph A of Article XII of the Agreement is hereby amended to read as follows:

"A. For the 1994 calendar year, adjustment payments per pole due from Telephone Company to Power Company, subject to the provision of Article XIII, shall be $18.25 per annum. Payments from Power Company to Telephone Company, subject to the provision of Article XIII, shall be $18.75 per annum.

For the 1995 calendar year, adjustment payments per pole due from Telephone Company to Power Company, subject to the provision of Article XIII, shall be $21.00 per annum. Payments from Power Company to Telephone Company, subject to the provision of Article XIII, shall be $21.50 per annum.

For the 1996 calendar year, adjustment payments per pole due from Telephone Company to Power Company, subject to the provision of Article XIII, shall be $23.00 per annum. Payments from Power Company to Telephone Company, subject to the provision of Article XIII, shall be $23.50 per annum.

For the 1997 calendar year, adjustment payments per pole due from Telephone Company to Power Company, subject to the provision of Article XIII, shall be $25.00 per annum.

Payments from Power Company to Telephone Company, subject to the provision of Article XIII, shall be $25.50 per annum.

The attachment rate of 'joint-use poles owned by power companies' shall be escalated effective January 1, 1998 and annually thereafter, based on the previous annual Handy Whitman Index for public utility construction cost. The attachment rate of 'joint-use poles owned by Telephone Company' shall be $0.50 more than the attachment rate of 'joint-use poles owned by power companies.'"

IN WITNESS WHEREOF, the parties hereto have caused this Amendment to be executed in duplicate, and their corporate seals to be affixed thereto by their respective officers thereunto duly authorized, on the day and year first above written.

ATTEST:                          BRISTOL TENNESSEE ELECTRIC SYSTEM

_Judy Sharrett_                  By: _R Michael Browder_
Secretary

ATTEST:                          UNITED TELEPHONE - SOUTHEAST

_James B Wright_                 By: _William K Smith_