## SETTLEMENT AGREEMENT

This Settlement Agreement ("Agreement") is entered into as of the "Effective Date" (as defined hereinafter) by and between United Telephone Southeast LLC d/b/a Embarq, successor-in-interest to United Inter-Mountain Telephone Company ("Embarq or, "Telephone Company"), Bristol Tennessee Essential Services, f/ka Bristol Tennessee Essential System ("BTES"), Elizabethton Electric System ("Elizabethton Electric"), Erwin Utilities ("Erwin Utilities"), Greeneville Light and Power System ("GLPS"), Holston Electric Cooperative, Inc., ("Holston Electric"), Johnson City Power Board ("JCPB") and Mountain Electric Cooperative ("Mountain Electric"). Embarq, BTES, Elizabethton Electric, Erwin Utilities, GLPS, Holston Electric, JCPB and Mountain Electric may sometimes be referred to in this Agreement individually as a "party" or collectively as the "parties."

### BACKGROUND:

A.    Embarq's predecessor-in-interest, United Inter-Mountain Telephone Company, entered into: (1) that certain agreement with Elizabethton Electric covering the joint use of poles dated November 23, 1980 (as amended, "Elizabethton Agreement"); (2) that certain agreement with Erwin Utilities covering the joint use of poles dated July 1, 1980 (as amended, "Erwin Utilities Agreement"); (3) that certain agreement with GLPS covering the joint use of poles dated July 1, 1980 (as amended, "GLPS Agreement"); (4) that certain agreement with Holston Electric covering the joint use of poles dated October 1, 1980 (as amended, "Holston Electric Agreement"); (5) that certain agreement with JCPB covering the joint use of poles dated July 1, 1980 (as amended, "JCPB Agreement"); (6) that certain agreement with Mountain Electric covering the joint use of poles dated October 24, 1980 (as amended, "Mountain Electric Agreement"); and (7) that certain agreement with BTES covering the joint use of poles dated July 1, 1980 (as amended, "BTES Agreement").

B.    The BTES Agreement, Elizabethton Agreement, Erwin Utilities Agreement, GLPS Agreement, Holston Electric Agreement, JCPB Agreement and Mountain Electric Agreement (collectively, "United Agreements") are entirely equivalent in their terms and conditions and differ only as to the identity of the party entering into the agreement with Embarq. BTES, Elizabethton Electric, Erwin Utilities, GLPS, Holston Electric, JCPB and Mountain Electric are referred to collectively in this Agreement as "Tennessee Power Distributors" or "Electric Company".

C.    A dispute has arisen under the terms of the United Agreements between Embarq and the Tennessee Power Distributors. The Tennessee Power Distributors claim that Embarq has breached the United Agreements ("Dispute").

D.    The Tennessee Power Distributors intervened in Docket No. 08-00219 at the Tennessee Regulatory Authority ("TRA") wherein Embarq Corporation and CenturyTel, Inc., are seeking approval of their proposed merger. The purpose of the intervention was to seek assurances that the merged company will not operate in the unacceptable manner (as alleged by the Tennessee Power Distributors) that Embarq is claimed to have operated in over the past several years. This Agreement, in addition to addressing the "Dispute", is also meant to address the alleged operational issues existing between Embarq and the Tennessee Power Distributors.



EXHIBIT
2

E.    This Agreement is not comprehensive in that   issues remain outstanding which must be resolved by the parties, including but not limited to those issues in Article VI upon which the parties are in general agreement.  Upon all outstanding issues being resolved, Section 5.2 through Section 5.19 and the final language the parties agree upon in the resolution of the issues in Article VI, will be part of an Amendment No. 4 to each of the United Agreements.

F.    The parties desire to resolve portions of the Dispute and operational issues discussed herein amicably, upon the terms and conditions as set forth in this Agreement.

For good and valuable consideration, the receipt of which is acknowledged by the Parties, the Parties agree as follows:

## ARTICLE 1:    NESC Audit

1.1    Embarq will, at its sole expense, perform an inspection of Embarq's Attachments located on the jointly used poles used by the parties, such inspection being for the sole purpose of determining the compliance or non-compliance of its attachments with the version of the National Electric Safety Code ("NESC") that was in effect at the time each inspected attachment was made ("NESC Audit").  The NESC Audit will be completed within 12 months of the Effective Date, and the results of the NESC Audit will be communicated to the Tennessee Power Distributors upon completion.    Within 36 months after the results from the NESC Audit are agreed upon between Embarq and the Tennessee Power Distributors, Embarq will, at its own expense, correct any of its NESC non-compliant attachments.  However, for NESC non-compliant attachments identified as immediate safety threats, Embarq will correct the same pursuant to Section 1.4.  Additionally, Embarq will provide notice of and demand for correction to other attachers' own NESC non-compliance that may be revealed by the NESC Audit.

1.2    The Tennessee Power Distributors will collaborate with Embarq in the performance of the NESC Audit. The NESC Audit will be conducted by a qualified contracting firm.  The scope and guidelines for the NESC Audit will be jointly developed by the Tennessee Distributors and Embarq prior to undertaking the NESC Audit. Such guidelines will include: (a) visual inspection of Embarq's cable attachments, (b) identification and documentation of attachments violating the National Electric Safety Code; (c) the parties' participation in coordination meetings; (d) the parties' review of, reconciliation and concurrence with the results of the NESC Audit;  (e) the parties' participation in quality assurance reviews conducted in the field;  and (f) the parties' certification of the final NESC Audit results.  The compliance or non-compliance of the Tennessee Power Distributors' attachments shall be determined by the version of the NESC that was in effect at the time each inspected attachment was made.

1.3    The Tennessee Power Distributors will, at their own expense, correct their respective NESC non-compliant attachments revealed by the NESC Audit within 36 months from when the NESC Audit results are agreed upon between Embarq and the Tennessee Power Distributors.

However, for NESC non-compliant attachments identified as immediate safety threats, the Tennessee Power Distributors will correct the same pursuant to Section 1.4.

1.4    NESC non-compliance identified by Embarq during the NESC Audit as an immediate safety threat will be corrected by the respective party causing the NESC non-compliance within 30 days of the party receiving notice of the same, unless the parties agree to an alternate time schedule. Subject to applicable law, the party causing the non-compliant condition assumes any and all liability for the NESC non-compliance discovered by the NESC Audit, and will indemnify, defend and hold the other party harmless from and against any claims, causes of actions, damages, liabilities, suits, costs, fees (including reasonable attorneys' fees) arising from or related to such non-compliance.

## ARTICLE II:    Pole Attachment Inventory

2.1    Concurrent with the NESC Audit, Embarq will, at its own expense, conduct a count of the number of attachments of all parties on all jointly used poles used by the parties (estimated to be approximately 140,000 poles) and identify the attaching parties on those jointly used poles ("Pole Attachment Inventory"). The Pole Attachment Inventory will be completed within 12 months of the Effective Date. The Pole Attachment Inventory will be conducted by a contracting firm approved by the parties, and such firm will possess the following minimum qualifications: (a) 10 years experience in conducting pole inventories; (b) technical expertise in mapping, data management, reporting and reconciliation of conflicting source data; and (c) ability to provide inventory results in a data format acceptable to the parties.

2.2    Tennessee Power Distributors will collaborate with Embarq in the performance of the Pole Attachment Inventory. The scope and guidelines for the Pole Attachment Inventory will be jointly developed by the Tennessee Power Distributors and Embarq prior to undertaking the inventory, including, but not limited to: (a) the parties' participation in coordination meeting; (b) the parties' review of, reconciliation and concurrence with the results of the Pole Attachment Inventory; and (c) the parties' certification of the final Pole Attachment Inventory results.

2.3    Any difference in the number of poles attached by either party identified as a result of the Pole Attachment Inventory to be conducted as set forth in this ARTICLE II will be subject to the terms of each of the United Agreements as of the Effective Date, including, but not limited to, the issue of back rental to be paid for unauthorized attachments discovered as a result of the pole attachment inventory discussed in this ARTICLE II, said back rental to be determined as set for in ARTICLE XII of the United Agreements or as otherwise permitted by applicable law.

## ARTICLE III:    Baseline Data

3.1    The results of the NESC Audit and Pole Attachment Inventory will establish the baseline data upon which all future audits and inventories will be measured. Additionally, future

C:\Documents and Settings\lxs9186\Local Settings\Temporary Internet Files\OLK4B\Tennessee Power Distributors Final Settlement and Release 3-24-09.DOC

adjustment payments will reflect the pole count data resulting from the Pole Attachment Inventory, and future invoicing will be adjusted accordingly.

## ARTICLE IV: Payment and Additional Obligations

4.1 **Payment of Invoices.** Within thirty (30) days of March 9, 2009, Embarq will pay to the Tennessee Power Distributors the sum of $23.71 per pole, to cover attachments for 2008, to be applied to the current quantities represented in the Tennessee Power Distributors' invoices submitted to Embarq on February 5, 2009. The Tennessee Power Distributors agree to receive said payment UNDER PROTEST and subject to further negotiations. The Tennessee Power Distributors have asserted this rate is unacceptably low, while Embarq asserts that this rate is fair and reasonable. The Parties have agreed to resolve many of the operational issues between them while continuing to negotiate the proper attachment rate for 2008, 2009 and beyond, and establish a formula used to calculate future attachment rates.

4.2 **Transfer Backlog.** Embarq will eliminate, to the Tennessee Power Distributors' reasonable satisfaction and by April 15, 2009, the transfer backlog where Embarq is, by virtue of its location on the pole, deemed the next party obligated to transfer its Attachments as of the Effective Date. The transfer backlog will consist of those transfer requests provided to Embarq by the Tennessee Power Distributors on or before March 9, 2009. The Tennessee Power Distributors will cooperate with Embarq in this effort, including participating in the reconciliation of the list of pending transfers, ride outs and field inspections.

4.3 **Contractor Agreement.** Embarq and the Tennessee Power Distributors will attempt to negotiate in good faith an agreement with one or more approved contractors for all joint pole related work that will arise under the terms of the United Agreements, specifically including pole change outs and transfers of all attachments.

4.4 **Withdrawal of Claims.** On the Effective Date, the Tennessee Power Distributors will withdraw their Petition for Leave to Intervene on Behalf of Northeast Tennessee TVA Power Distributors, and all associated pleadings, in Docket No. 08-00219 currently pending before the TRA.

## ARTICLE V: Resolution of Certain Operational Issues and Amendment of United Agreements

5.1 **Introduction.** On March 9, 2009, representatives of Embarq and the Tennessee Power Distributors met at the Johnson City Power Board in Johnson City, Tennessee, to discuss the Dispute and outstanding operational and other issues between them. Such issues were discussed in terms of amending the United Agreements to memorialize the resolution of the same. Each party had submitted a proposed Amendment No. 4 to the United Agreements. The proposed Amendment No. 4 of the Tennessee Power Distributors is attached hereto as EXHIBIT 1. The proposed Amendment No. 4 of Embarq is attached hereto as EXHIBIT 2. Counsel for the Tennessee Power Distributors replied to Embarq's proposed Amendment No. 4 (EXHIBIT 2) by letter dated February

Case 2:20-cv-00030-KAC-CRW   Document 1-2   Filed 02/19/20   Page 4 of 51   PageID #: 32

27, 2009, and same was utilized in the discussions between the Parties and is affixed hereto for reference purposes as EXHIBIT 3. Agreement was reached on a number of operational issues. On other issues, one party or the other agreed to study the issue further. There also were issues on which there remained no agreement. Section 5.2 contains the operational issues which the parties resolved. By separate correspondence, the Parties are reviewing the remaining outstanding issues.

5.2. **Operational Issues Resolved Outside of Amendment.** Certain issues that were discussed in terms of amending the United Agreements will not form any part of any amendment to the United Agreements, and the same are as follows:

(a) The following language which was proposed by Embarq as an addition to Article V Section B of the United Agreements will not be a part of any amendment to the United Agreements:

"However, should Owner send Licensee a transfer notice via NJUNS and, after traveling to the transfer location, Licensee reasonably determines the transfer work cannot be done through no fault of Licensee ("Errant Dispatch"), then Owner will pay $250.00 to Licensee for each such Errant Dispatch."

5.3 **Resolved Issues to be Included in Amendment No. 4 to United Agreements.** It is the intent of the parties hereto to create an Amendment No. 4 to the United Agreements and included in said amendment will be language reflecting the resolution of the various issues reflected herein along with subsequently agreed upon language which shall reflect resolution of issues which remain outstanding issues as of the Effective Date.

5.4 **ARTICLE I, SECTION B**: Article I, Section B is amended to read as follows:

"B. NORMAL JOINT USE POLE – means a pole which meets the requirements of the National Electrical Safety Code for support and clearance of supply and communication conductors under conditions existing at the time joint use is established, or is created under known plans of either party. Specifically, a normal joint pole under this Agreement shall be a forty (40) foot pole, which, if same be a wood pole, shall be a class 4 wood pole of an agreeable treatment."

The foregoing definition of "a normal joint use pole" is not intended to preclude the use of joint poles shorter or longer or of more or less strength than the normal joint pole in locations where such poles will meet the known or anticipated requirements of the parties hereto. Also, said definition shall apply to non-wood poles as well as wood poles."

Notwithstanding the foregoing, Telephone Company shall not be required to pay for the additional costs arising from the Owner's replacement of normal joint use poles with poles of a composition more expensive than that of the pole being replaced ("Like for Like Cost Provision"). For example, replacement by the Owner of a wood pole with a steel pole would cause any reimbursement to the Owner to be based upon the cost of a comparably sized wood pole.

5.5 **ARTICLE I, SECTION G**: The following definition is added immediately after ARTICLE 1, SECTION F:

"G. Service Drops: The wire connecting the distributors' component of Licensee's facilities and engagement of Licensee's individual customers."

5.6 **ARTICLE II**: The word "wooden" in the first sentence of ARTICLE II is deleted in its entirety.

5.7 **ARTICLE IV**: ARTICLE IV is deleted in its entirety and replaced with the following:

"SPECIFICATIONS: Attachments to joint use poles covered by this Agreement shall at all times be, at a minimum, in conformity with the terms and provisions of the NESC in effect as of the time the Attachment is made, or as may be agreed upon and approved in writing by the designated representatives of the Electric Company and Telephone Company. The National Electric Code and the National Electrical Safety Code and such revisions and amendments to same as may hereafter be made are to be used as guides in the administration of the Agreement."

5.8 **ARTICLE V, SECTION A**: The third sentence of ARTICLE V, SECTION A, which commences "However, no guarantee ..." is deleted thereafter and the following is inserted in its place:

"However, no guarantee is given by the Owner of permission from property owners, municipalities or others for the use of poles by the Licensee; and, if objection is made thereto, Licensee shall have thirty (30) days within which to remedy the objection. If Licensee is unable to remedy said objection within thirty (30) days, Licensee shall give Owner written notice of same, and, thereafter, Owner shall grant Licensee additional reasonable time within which to remedy the objection, such additional reasonable time not to exceed ninety (90) days (unless otherwise agreed to by the Parties), the Owner may, upon thirty (30) days prior written notice to Licensee, require the Licensee to remove its attachments from the poles involved, and Licensee shall, within thirty (30) days of receipt of said notice, remove its attachments from said poles at its sole expense.

However, should Licensee resort to litigation or appeal to remedy the objection within the initial 30 day time frame or the additional reasonable time granted, and provided Licensee is diligently pursuing such litigation or appeal, Licensee may continue to keep and maintain its relevant attachments, and in doing so, subject to applicable law, Licensee will indemnify Owner from and against all claims, suits, liens, actions, damages, penalties, assessments, fines, losses liabilities, costs, fees (including reasonable attorneys' fees) and expenses resulting from Licensee's continuing to keep and maintain such relevant attachments. If the

litigation or appeal is not resolved within one year of Licensee's receipt of the objection, Licensee must immediately remove its attachments.

Should Licensee fail to remove its attachments as herein provided, the Owner may remove them at Licensee's expense, without any liability whatsoever for such removal or the manner of making it, for which expense Licensee shall reimburse the Owner on demand."

5.9     **ARTICLE VI, SECTION A:** The Parties have agreed to the following:

A. Fifteen Dollars ($15.00) per pole application fee;

B. If the application requests up to ten (10) poles in the same general, the fee for up to ten (10) poles will be limited to Sixty Dollars ($60.00)

C.   However, if poles not in the same general locality are involved, then the Fifteen Dollars ($15.00) per pole attachment fee would apply without discount.

D.   For Service Drops, a ($15.00) per pole fee would be paid, based upon monthly notification of these Attachments.

In addition, ARTICLE VI, SECTION A, the last sentence shall be amended to read:

"Service Drops can be placed in accordance with the specifications without prior notice or application for attachment. However, within ten (10) business days of the first of each month, the Telephone Company will provide a report in writing (or electronically) to the Electric Company of each Service Drop which it made in the preceding month. Said report shall comply with all attachment application requirements, including payments. Emergency construction can be placed upon verbal notice at the numbers listed in Article XVII herein."

5.10     **ARTICLE V, SECTION C:** The Parties agreed to add the following language to ARTICLE V, SECTION C:

"Each party will be responsible for determining the need for and installation of adequate guy rods for its facilities. Joint use of anchor rods will only be permissible when Licensee makes a written request and permission is granted by Owner."

5.11     **ARTICLE VII, SECTION A:** The Parties agree to add the following language to ARTICLE VII, SECTION B:

"However, payment amounts shall be subject to the Like For Like Cost Provision referenced in Article I, Section B."

7

5.12    **ARTICLE VII, SECTION B:** The language in ARTICLE VII, SECTION B stating "(except in cases of emergency when verbal notice will be given, and subsequently confirmed in writing)" will be replaced with:

> "(except in cases of emergency when verbal notice will be given through the emergency phone number(s) provided in Article XVII.)"

Said SECTION will otherwise remain unchanged except the following language will be deleted:

> "In the case of a pole along subdivided property which is not set opposite a lot line, the Owner of such pole will, if conditions require, move same at the request of the Licensee, each party bearing the cost of moving its facilities."

5.13    **ARTICLE VII, SECTION C:** The language in ARTICLE VII, SECTION C stating "(shorter notice, including verbal notice subsequently confirmed in writing, may be given in case of emergency)" will be replaced with:

> "(except in cases of emergency when verbal notice will be given through the emergency phone number(s) provided in Article XVII.)"

5.14    **ARTICLE VII, SECTION F:** The Parties agreed to add the following language to ARTICLE VII, SECTION B:

> "However, payment amounts shall be subject to the Like for Like Cost Provision referenced in Article I, Section B."

5.15    **ARTICLE VII, SECTION G:** ARTICLE VII, SECTION 6 is deleted in its entirety and the following is substituted:

> "G.    When replacing a jointly used pole carrying aerial cable terminals, underground connections, or transformer equipment, the Owner shall make a good faith effort to set the pole at a location mutually desirable to the Parties."

5.16    **ARTICLE VII, SECTION J:** A new SECTION J will be added to read as follows:

> "J.   In the case either party requests the replacement of any existing pole owned by the other party, both parties agree to pay the total cost to replace the pole, including any un-depreciated value of the pole replaced. However, payment amounts shall be subject to the Like For Like Cost Provision referenced in Article I, Section B.

C:\Documents and Settings\lxs9186\Local Settings\Temporary Internet Files\OLK4B\Tennessee Power Distributors Final Settlement and Release 3-24-09.DOC

8

5.17    **ARTICLE VII, SECTION K**:   A new SECTION K will be added to read as follows:

"K.  Each party agrees to respond to emergency situations (i.e. car wreck, fallen trees, etc.) within ninety (90) minutes of notification.  The non-responding party agrees to allow the other party to take corrective action as it deems necessary if the non-responding party fails to respond within the ninety (90) minute response period. The non-responding party will bear all costs of corrective actions and, subject to applicable law, bear all liability associated with conducting corrective actions and hold harmless, defend and indemnify the responsible party for any claims, liabilities, costs, damages, suits, fees (including reasonable attorneys' fees) arising out of the responding party conducting the corrective action.  Any corrective actions taken by the responding party shall be actions said party is qualified to take."

5.18    **ARTICLE VIII, SECTION A**:   ARTICLE VIII, SECTION A, shall read as follows:

"A.  Owner shall, at its own expense, maintain its joint poles in a safe and serviceable condition, and in accordance with ARTICLE IV of this Agreement and the requirements of the National Electrical Safety Code, and shall replace, subject to ARTICLE VII such of said poles that become defective."

5.19    **ARTICLE XVII**:

ARTICLE XVII will be deleted in its entirety and the following substituted therefore:

" POINTS OF CONTACT AND NOTICE

The points of contact listed in this Article XVII ("Points of Contract") will serve as the respective Electric Company and Telephone Company representatives responsible for addressing and handling all operational issues regarding this Agreement.    Except for any notice done pursuant to the NJUNS system (which will require notice to be delivered and deemed effective as is customary under that system), and except for any emergency notice as set forth below, whenever any notice, consent, approval, request, document, demand, authorization or notice of default is required or permitted under this Agreement (collectively, "Notice"), the Notice must be in writing (except for oral notice specifically allowed under this Agreement, if any).  All Notice must be delivered in person, by United States certified mail, return receipt-requested, postage prepaid or by a nationally recognized overnight courier service to the Points of Contact at the following addresses:

For Embarq:
Andy Ice, Manager of Engineering
101 N. Roan St.
Johnson City, TN  37601

(423) 461-7724
Andrew.F.Ice@embarq.com

Joe Lamm, Joint Use Manager
14111 Capital Blvd.
Wake Forest, NC 27587
(919) 554-5251
Joe.Lamm@embarq.com

Wayne Helm, Director of Engineering
717 McGilvary St.
Fayetteville, NC 28301
(910) 323-9052
Wayne.Helm@embarq.com

In addition, copies of all default Notice must be delivered to the parties at the following addresses:

If default Notice to Electric Company:



Attention:

With a copy of such Telephone Company default Notice only (which will not constitute Notice to Telephone Company) to:

Embarq Law Department

5454 West 110th Street

Mailstop: KSOPKJ 0701

Overland Park, KS 66211

Attention: Real Estate Attorney, ARN#

For 



In addition, copies of all default Notice must be delivered to the parties at the following addresses:



Attention: ▨▨▨▨▨▨▨▨

With a copy of such Telephone Company default Notice only (which will not constitute Notice to Telephone Company) to:

XXX

If Notice is given by personal delivery, a receipt indicating that personal delivery was made must be obtained. Notice will be deemed effective on the date of receipt by the addressee as shown on the receipt if given by personal delivery, on the return receipt if Notice is given by certified mail or the confirmation of delivery form if Notice is given by overnight courier service. Rejection or refusal to accept Notice or the inability to deliver Notice because of a changed address which no Notice was given will be deemed to be receipt of the Notice as of the date of rejection, refusal or inability to deliver. Either party may change its address and contact information in this Article XVII by giving Notice of such change to the other party in the manner for giving Notice prescribed above."

For emergency situations requiring verbal notice to Telephone Company under this Agreement, Electric Company shall give verbal notice to Telephone Company by calling Telephone Company using the following phone number: **866-797-0944.**

For emergency situations requiring verbal notice to Electric Company under this Agreement, Telephone Company shall give verbal notice to Electric Company by calling Electric Company using the following phone number: ▨▨▨.

## ARTICLE VI.     RESOLUTION OF OUTSTANDING ISSUES

6.1     **Preliminary Statement:** It is important to the Tennessee Power Distributors and Embarq that all remaining portions of the Dispute be resolved in a timely fashion and in a manner which provides assurances to the Tennessee Power Distributors that Embarq and its successors will adhere to the terms and conditions of Agreements with the Tennessee Power Distributors in the future. As such, while there remain disagreements on certain particulars and amounts, the

Tennessee Power Distributors and Embarq have reached general agreement on certain of the remaining outstanding issues as reflected hereinbelow.

6.2     **Tree Trimming and Right of Way Maintenance**. Embarq hereby acknowledges that it is obligated to assume a portion of the costs incurred by the Tennessee Power Distributors for tree-trimming and right of way maintenance. As such, the attachment fee which Embarq will pay to the Tennessee Power Distributors hereinafter will include reimbursement for a portion of said costs, the precise amount to be subject to further agreement.

6.3     **Future Pole Attachment Inventories and Penalties for Unauthorized Attachments**. Any party responsible for making future unauthorized attachments will, when said future unauthorized attachments are discovered, be required to make application for said attachment within seven (7) calendar days of notice being provided to it of said unauthorized attachment, and, pay the application fee. The responsible party will also pay a penalty for each such attachment in an amount to be agreed upon, but not more than One Hundred Fifty Dollars ($150.00) nor less than twenty five ($25.00) per unauthorized attachment. Further, if the applications are not submitted and the application fee and penalty not paid within thirty (30) calendar days of receipt of notice of the unauthorized attachment, an additional penalty of not more than twenty five Dollars ($25.00) per day nor less than the total sum of twenty five Dollars ($25.00) (said amount yet to be agreed upon) will be paid by the responsible party. Also, the responsible party will remit, in addition to the application fee and penalty, annual pole rental on said unauthorized attachment retroactive to the last joint use pole inventory.

6.4     **Transfers**. It is agreed that the party receiving a request from the other to make a transfer, shall complete same within sixty (60) calendar days; and, if said transfer is not completed within said (60) day period the party requesting the transfer can make the transfer itself and the party which failed to make the transfer will reimburse the other its cost for making said transfer in an amount to be agree upon but in no case less than Two Hundred Fifty Dollars ($250) per transfer.

6.5     **Future NESC Audits and Pole Attachment Inventories**. The parties agree that five (5) years after the completion of the NESC Audit and/or Pole Attachment Inventory discussed in ARTICLES I and II of the Agreement, and every five (5) years thereafter, unless otherwise agreed to in writing, the parties will conduct a Pole Attachment Inventory and, at the option of either Telephone Company or Electric Company, an NESC Audit. The Telephone Company and Electric Company will bear their own respective costs for conducting said inventory and audit. Each party will also bear its own costs for correcting its NESC violations. Unauthorized attachments discovered during said Inventories will be subject to the procedures outlined in ARTICLE VI, Section 6.3 hereinabove.

**ARTICLE VII:**          **MISCELLANEOUS**

7.1     **No Admission**. The entry of the parties into this Agreement will not be construed to be an admission of any liability on the part of any party.

C:\Documents and Settings\lxs9186\Local Settings\Temporary Internet Files\OLK4B\Tennessee Power Distributors Final Settlement and Release 3 24-09.DOC                                                                                                              12

7.2 **Non-Disclosure**. This Agreement and its substance, any information given to a party under this Agreement, any information generated as a result of a party exercising its rights under this Agreement and the substance, terms and conditions of this Agreement will not be disclosed by either party to any person or entity, except: (a) to a party's legal counsel involved with this Agreement; (b ) to those responsible for fulfilling a party's respective obligations under this Agreement; and (c) as disclosure may be required by applicable law.

7.3 **Acknowledgment of Reasonableness**. The parties acknowledge and agree that the terms and conditions of this Agreement are reasonable, and the parties will be estopped from making any assertions to the contrary in any proceeding to enforce the provisions of this Agreement.

7.4 **Entire Agreement**. This Agreement contains the entire agreement between the parties regarding its subject matter, and may not be modified or changed except by a written amendment signed by the authorized representatives of the parties hereto.

7.5 **Outstanding Issues Resolution and Settlement Releases**. The amending of each of the United Agreements will be contained in a final Amendment No. 4 that the parties will enter into upon resolution of all outstanding issues, and the final Amendment No. 4 will include, but not be limited to, the language set forth in Section 5.4 through Section 5.19, as well as the language the parties agree upon in their final resolution of the issues in Article VI. At the time the parties enter into the final Amendment No. 4, the parties will enter into mutual releases acceptable to the parties acknowledging that all outstanding issues between the parties have been resolved and releasing claims for the same. It is the intent of the parties to resolve all outstanding issues and differences and enter into a final Untied Amendment No. 4 and mutual releases within sixty (60) days of the Effective Date of this Agreement.

7.6 **Default.** In the event of a default of this Agreement, the non-defaulting party may resort to any rights or remedies to which it is entitled at law, in equity or under the terms of this Agreement.

7.7 **Counterparts, Facsimile and Electronic Mail Signatures**. This Agreement may be signed in several counterparts, each of which will be fully effective as an original and all of which together will constitute one and the same instrument. Signatures to this Agreement transmitted by facsimile or electronic mail will be deemed the equivalent of delivery of an original signature, provided that the party delivering its signature by facsimile or electronic mail promptly thereafter delivers this Agreement with the original signature to the other party.

7.8 **Effective Date**. This Agreement will become effective on the date this Agreement is last signed by all of the parties ("Effective Date").

IN WITNESS WHEREOF, the parties have caused this Settlement Agreement to be executed by their respective representatives, effective as of the last date same is executed by the Parties.

C:\Documents and Settings\lxs9186\Local Settings\Temporary Internet Files\OLK4B\Tennessee Power Distributors Final Settlement and Release 3 13 24-09.DOC

Case 2:20-cv-00030-KAC-CRW Document 1-2 Filed 02/19/20 Page 13 of 51 PageID #: 41

(End of document signatures on next page)

14

**BRISTOL TENNESSEE ESSENTIAL SERVICES**

By: _____
Name: _____
Title: _____
Date: _____


**ELIZABETHTON ELECTRIC SYSTEM**

By: _____
Name: _____
Title: _____
Date: _____


**ERWIN UTILITIES**

By: _____
Name: _____
Title: _____
Date: _____


**GREENEVILLE LIGHT AND POWER SYSTEM**

By: _____
Name: _____
Title: _____
Date: _____


**HOLSTON ELECTRIC COOPERATIVE, INC.**

By: _____
Name: _____
Title: _____
Date: _____

(Signatures continued on next page)

JOHNSON CITY POWER BOARD

By: _____
Name: _____
Title: _____
Date: _____


MOUNTAIN ELECTRIC COOPERATIVE

By: _____
Name: _____
Title: _____
Date: _____


UNITED TELEPHONE SOUTHEAST LLC DBA EMBARQ

By: _____
Name: James A. Hansen
Title: Senior Vice President, Network Services
Date: 3/26/09

BRISTOL TENNESSEE ESSENTIAL SERVICES

By: _Michael Browder_ (signature)
Name: Dr. Michael Browder
Title: CEO
Date: March 26, 2009


ELIZABETHTON ELECTRIC SYSTEM

By: _____
Name: _____
Title: _____
Date: _____


ERWIN UTILITIES

By: _____
Name: _____
Title: _____
Date: _____


GREENEVILLE LIGHT AND POWER SYSTEM

By: _____
Name: _____
Title: _____
Date: _____


HOLSTON ELECTRIC COOPERATIVE, INC.

By: _____
Name: _____
Title: _____
Date: _____


JOHNSON CITY POWER BOARD

By: _____
Name: _____
Title: _____
Date: _____

**BRISTOL TENNESSEE ESSENTIAL SERVICES**

By: _____
Name: _____
Title: _____
Date: _____

**ELIZABETHTON ELECTRIC SYSTEM**

By: *Curt Alfil*
Name: *Curt Alexander*
Title: *Mayor*
Date: *April 14, 2009*


**ERWIN UTILITIES**

By: _____
Name: _____
Title: _____
Date: _____


**GREENEVILLE LIGHT AND POWER SYSTEM**

By: _____
Name: _____
Title: _____
Date: _____


**HOLSTON ELECTRIC COOPERATIVE, INC.**

By: _____
Name: _____
Title: _____
Date: _____


**JOHNSON CITY POWER BOARD**

By: _____
Name: _____

**BRISTOL TENNESSEE ESSENTIAL SERVICES**

By: _____
Name: _____
Title: _____
Date: _____


**ELIZABETHTON ELECTRIC SYSTEM**

By: _____
Name: _____
Title: _____
Date: _____


**ERWIN UTILITIES**

By: *Lee H. Brown*
Name: Lee H. Brown
Title: General Manager
Date: March 27, 2009


**GREENEVILLE LIGHT AND POWER SYSTEM**

By: _____
Name: _____
Title: _____
Date: _____


**HOLSTON ELECTRIC COOPERATIVE, INC.**

By: _____
Name: _____
Title: _____
Date: _____


**JOHNSON CITY POWER BOARD**

By: _____
Name: _____
Title: _____
Date: _____

**BRISTOL TENNESSEE ESSENTIAL SERVICES**

By: _____
Name: _____
Title: _____
Date: _____

**ELIZABETHTON ELECTRIC SYSTEM**

By: _____
Name: _____
Title: _____
Date: _____

**ERWIN UTILITIES**

By: _____
Name: _____
Title: _____
Date: _____

**GREENEVILLE LIGHT AND POWER SYSTEM**

By: _William M Carroll_
Name: _William M Carroll_
Title: _General Manager_
Date: _3/26/09_

**HOLSTON ELECTRIC COOPERATIVE, INC.**

By: _____
Name: _____
Title: _____
Date: _____

**JOHNSON CITY POWER BOARD**

By: _____
Name: _____
Title: _____
Date: _____

BRISTOL TENNESSEE ESSENTIAL SERVICES

By: _____
Name: _____
Title: _____
Date: _____


ELIZABETHTON ELECTRIC SYSTEM

By: _____
Name: _____
Title: _____
Date: _____


ERWIN UTILITIES

By: _____
Name: _____
Title: _____
Date: _____


GREENEVILLE LIGHT AND POWER SYSTEM

By: _____
Name: _____
Title: _____
Date: _____


HOLSTON ELECTRIC COOPERATIVE, INC.

By: _Larry E Elkins_
Name: _Larry E. Elkins_
Title: _General Manager_
Date: _March 26, 2009_


JOHNSON CITY POWER BOARD

By: _____
Name: _____
Title: _____
Date: _____

BRISTOL TENNESSEE ESSENTIAL SERVICES

By: _____
Name: _____
Title: _____
Date: _____


ELIZABETHTON ELECTRIC SYSTEM

By: _____
Name: _____
Title: _____
Date: _____


ERWIN UTILITIES

By: _____
Name: _____
Title: _____
Date: _____


GREENEVILLE LIGHT AND POWER SYSTEM

By: _____
Name: _____
Title: _____
Date: _____


HOLSTON ELECTRIC COOPERATIVE, INC.

By: _____
Name: _____
Title: _____
Date: _____


JOHNSON CITY POWER BOARD

By: _Homer D. O'Fuller_
Name: _Homer D. O'Fellers_
Title: _President & CEO_
Date: _3/26/09_

MOUNTAIN ELECTRIC COOPERATIVE

By: *Joseph A. Thacker III*
Name: Joseph A. Thacker, III
Title: General Manager
Date: March 26, 2009

UNITED TELEPHONE SOUTHEAST LLC DBA EMBARQ

By: _____
Name: _____
Title: _____
Date: _____

# EXHIBIT 1

## - DRAFT -
## AMENDMENT NO. FOUR

This Amendment No. Four to the Agreement first entered into July 1, 1980, is made and entered into effective the _____ day of _____, 2009, by and between United Telephone Southeast d/b/a Embarq ("Telephone Company") and _____ ("Electric Company");

## RECITALS

WHEREAS, Telephone Company and Electric Company entered into an Agreement dated July 1, 1980 ("Agreement") and;

WHEREAS, said Agreement has previously been amended on three occasions, to wit: Amendment, made December 31, 1980; Amendment No. Two, made December 31, 1982; and Amendment No. Three, made November 13, 1995; and

WHEREAS, Telephone Company and Electric Company desire to amend said Agreement again, same being designated as this Amendment No. Four;

NOW THEREFORE, in consideration of the premises and the mutual covenants contained in the Agreement, Amendments prior hereto, and in this Amendment No. Four, Telephone Company and Electric Company, for themselves, their successors and assigns, do hereby covenant and agree as follows:

1. Article 1, Section B is hereby amended to read as follows:

"B. NORMAL JOINT USE POLE – means a pole which meets the requirements of the National Electrical Safety Code for support and clearance of supply and communication conductors under conditions existing at the time joint use is established, or is created under known plans of either party. Specifically, a normal joint pole under this Agreement shall be a forty (40) foot pole, which, if same be a wood pole, shall be a class 4 wood pole of an agreeable treatment."

The foregoing definition of "a normal joint use pole" is not intended to preclude the use of joint poles shorter or longer or of more or less strength than the normal joint pole in locations where such poles will meet the known or anticipated requirements of the parties hereto. Also, said definition shall apply to non-wood poles as well as wood poles. "

In all other respects, Article I shall remain the same.

2. Article II is hereby amended such that the first line of same shall read as follows:

"This Agreement shall be in effect and shall cover all poles of each of the parties ..."

In all other respects, Article II shall remain the same.

3. Article IV is hereby amended to read as follows:

"SPECIFICATIONS: Joint use of poles covered by this agreement, shall at all times be in conformity with terms and provisions of the current issue of the National Electrical Safety Code as to minimum requirements, and such revisions and amendments thereto from time to time as may be necessary by reason of developments and improvements in the art as may be mutually agreed upon and approved in writing by the designated representatives of the Electric Company and Telephone Company.

The National Electrical Code and the National Electrical Safety Code and such revisions and amendments to same as may hereafter be made are to be used as guides in the administration of this Agreement."

2.

In all other respects, Article IV shall remain the same.

4. Article V is hereby amended to read as follows:

Article V, Section A:

In the middle of the first paragraph, the words "... a reasonable time ..." are stricken and the following words are substituted therefrom:

"... thirty (30) days ..."

Article V, Section C:

A paragraph is added to Section C following the first paragraph which begins: "It is agreed....", which shall read as follows:

"Telephone Company will benefit from Electric Company's recurring tree trimming and, as such, Telephone Company agrees to pay twenty percent (20%) of Electric Company's tree trimming expense of jointly used pole lines. Electric Company will bill Telephone Company monthly for said tree trimming and said bill shall be due and payable upon receipt."

In all other respects Section C shall remain the same.

5. Article VI is hereby amended as follows:

Article VI, Section A:

After the words, "... it shall make written application therefore ..." the following words shall be inserted:

"... and include a Fifteen Dollar ($15.00) per pole application fee ..." such that same shall hereafter read: "... it shall make written application therefore and include a Fifteen Dollar ($15.00) per pole application fee ..."

Article VI, Section A is hereby further amended by adding the following paragraph following the initial paragraph which ends "... subsequently approved in writing ...":

"Whenever either party attaches to the other party's poles without written application and approval for said attachments, each party agrees to pay an unauthorized attachment fee in the amount of $250.00 plus annual pole rental retroactive to the last joint use inventory. Upon discovery of an unauthorized attachment, Licensee must file

3

application, written or electronic, with Owner for each unauthorized attachment within three (3) business days or incur an additional $25.00 per day penalty until the application(s) is received."

Article VI, Section B:

Article VI, Section B is hereby amended by adding to it the following:

"Transfers shall be completed by both parties within thirty (30) calendar days of written notice or notice through the National Joint Utility Notification System (NJUNS). Both parties agree to pay to the other party a $100.00 per day penalty for each day after the thirty (30) day transfer period that the requested transfer is not completed. Any joint use contractor which may be utilized to perform said transfers will bill each party separately for the work performed for each party.

If transfer is not completed after ninety (90) days from written notice, the pole becomes the property of the Licensee.

Attachments can be transferred by use of a joint use contractor who has been approved by both parties, each party bearing the cost to transfer its attachments."

Article VI, Section C:

Article VI, Section C is hereby amended by adding the following sentence to the end of the Section:

"Each party will be responsible to determine and install adequate guy rods for its facilities. Joint use of anchor rods will only be permissible when Licensee makes a written request and permission is granted by Owner.

In all other respects, Article VI shall remain the same..

6. Article VII is hereby amended by adding the following after Section I:

"J. Whenever it is necessary to replace a jointly used pole owned by the Electric Company, the Telephone Company authorizes the Electric Company to transfer Telephone Company attachments and service drop attachments to the new pole at the time the new pole is erected. Said transfers are at the discration of Electric Company. Telephone Company agrees to pay Electric Company $250.00 per pole for said transfers.

K. In the case where either party requests the replacement of any existing pole owned by the other party, both parties agree to pay the other party the total cost to replace the pole, including any un-depreciated value of the pole replaced;

4

1.      Each party agrees to respond to emergency situations i.e., car wrecks, fallen trees, etc. within one (1) hour of notification. The non-responding party agrees to allow the other party to take corrective action as they deem necessary if they fail to respond within the one (1) hour response period, and the non-responding party agrees to bear all costs and liability associated with corrective actions and to hold harmless the responding party."

In all other respects, Article VII shall remain the same.

7. Article VIII is hereby amended by deleting the current wording and by substituting the following:

## MAINTENANCE OF POLES AND ATTACHMENTS:

A. The Owner shall, at its own expense, maintain its joint poles in a safe and serviceable condition, and in accordance with Article IV of this Agreement and the requirements of the National Electrical Safety Code, and shall replace, subject to the provisions of Article VII, such of said poles that become defective. Beginning in 2009 and every three (3) years afterwards, Owner may, at its option, call for an NESC audit of Licensee's facilities or any part of Licensee's facilities residing on Owner's poles. Such audit shall be conducted jointly by qualified personnel selected by both parties. If the audit demonstrates that Licensee's facilities have at least a ninety-five percent (95%) compliance rate with NESC requirements, the entire cost of the audit shall be borne by the Owner. If the rate of compliance is less than ninety-five percent (95%), the entire cost of the audit shall be borne by the Licensee;

Regardless of the level of compliance, Licensee shall, at its expense, correct the NESC violations within thirty (30) days of the discovery of said violations or within thirty (30) days of written notification received from the Owner of said violations, unless an alternate time schedule is mutually agreed to. Licensee shall provide Owner with progress/completion reports regarding such work. Licensee, hereby, assumes any and all liability for all NESC violations discovered by such audits, and hereby agrees to fully indemnify and hold Owner harmless, including the costs of defense and attorneys' fees, for any claims, causes of actions and/or claims for relief made by any party for injuries or damages related to such violations.

B. Each party shall, at its own expense, at all times, maintain all of its attachments in accordance with Article IV of this Agreement and the National Electrical Safety Code and keep them in safe condition and in thorough repair.

C. Telephone Company agrees to do a comprehensive pole inspection and treatment of all jointly used Telephone Company poles within three (3) years from the effective date of this Amendment No. 4. Mere visual inspection shall not be considered

5

"comprehensive". Said inspections will be performed by a reputable contractor specializing in pole inspection, treatment, and restoration with at least ten (10) years prior experience.

D. Telephone Company shall complete an inspection of thirty-three percent (33%) of jointly used poles owned by the Telephone Company within one (1) year of the date of this Amendment, sixty-six percent (66%) after two (2) years, and one hundred percent (100%) after three (3) years. Telephone Company agrees to provide Electric Company with a copy of inspection reports within thirty (30) days after completion of each phase of the initial inspection. Telephone Company agrees to pay Electric Company $500.00 per day for each day the inspections and reports are not completed and delivered to Electric Company for each phase of the inspection.

Following said inspection over three (3) years discussed herein, Telephone Company will conduct comprehensive pole inspections and treatments on a ten (10) year or shorter rotation period and will coordinate said future pole inspections and treatment with Electric Company's pole inspection program so as to maximize the financial benefit to both parties."

8. Article XII, Section A is deleted and the following substituted in its place:

"As for the 2008 calendar year, adjustment payments per pole from the Telephone Company to the Electric Company, subject to the provisions of Article XIII, shall be Forty Dollars ($40.00) per annum. Payments from Electric Company to Telephone Company shall be Seventeen Dollars and Nineteen Cents ($17.19) per annum. The attachment rate of joint-use poles owned by Electric Company and Telephone Company shall be escalated effective January 1, 2009, and annually thereafter, based on the previous annual Handy Whitman Index for public utility construction cost."

In all other respects, Article XII shall remain the same.

9. Article XIII, Section A is hereby amended as follows:

The first two lines are deleted and the following substituted for them:

"A. At any time after January 1, 2015, and at intervals of five (5) years thereafter, the ..."

In all other respects, Article XIII shall remain the same.

6

10. Article XVII is hereby amended by deleting the current wording and by substituting the following:

## SERVICE OF NOTICES

Whenever in this Agreement notice if required to be given by either party hereto in writing or otherwise, such notice shall be directed to the designated representative of each party as follows:

Telephone Company:

_____

_____

Designated Representative

Electric Company:

_____

_____

Designed Representative

Written notice shall be given by pre-paid U.S. Mail, overnight delivery, hand-delivery, or by such other methods as the parties hereto shall hereafter agree upon."

11. The parties may want to consider deleting or revising Article XXI.

IN WITNESS WHEREOF, the parties have caused this Amendment No. Four to be executed in duplicate, and their corporate seals to be affixed by their respective representatives, effective as of the date first above written.

7

UNITED TELEPHONE SOUTHEAST d/b/a Embarq

By: _____

ATTEST: (Telephone Company)

_____

By: _____

ATTEST: (Electric Company)

# EXHIBIT 2

## AMENDMENT NO. FOUR

This Amendment No. Four ("Amendment") is entered into as of the "Effective Date" (as defined in Section 24) by and between United Telephone Southeast, LLC d/b/a Embarq, successor-in-interest to United Telephone Southeast, Inc. ("Telephone Company") and ▓▓▓▓▓▓▓▓▓▓▓▓▓▓ ("Electric Company"). Telephone Company and Electric Company may sometimes be referred to in this Amendment individually as a "party" or collectively as the "parties."

## RECITALS

WHEREAS, Telephone Company and Electric Company entered into that certain Agreement dated July 1, 1980 regarding the joint use of poles, as amended by that certain Amendment dated December 31, 1980, that certain Amendment No. Two dated December 31, 1982 and that certain Amendment No. Three dated November 13, 1995 (collectively, "Agreement"); and

WHEREAS, Telephone Company and Electric Company desire to amend the Agreement upon the terms and conditions set forth in this Amendment.

NOW THEREFORE, for good and valuable consideration, the receipt and sufficiency of which are acknowledged by the parties, Telephone Company and Electric Company amend the Agreement as follows:

1.  Article 1 B is deleted in its entirety and replaced with the following:

    "NORMAL JOINT USE POLE or NORMAL POLE or NORMAL JOINT POLE - means a pole which meets the requirements of the National Electrical Safety Code ("NESC") for support and clearance of supply and communication conductors under conditions existing at the time joint use is established, or is created under known plans of either party. Specifically, a normal joint use pole under this Agreement shall be a forty (40) foot class 4 wood pole of an agreeable treatment.

    The foregoing definition of "normal joint use pole" is not intended to preclude the use of joint poles shorter or longer or of more or less strength than the normal joint use pole in locations where such poles will meet the known or anticipated requirements of the parties hereto. The cost in place of a normal joint use pole will be used as the established normal joint use pole value for all purposes contemplated in Article VII E."

2.  The following definition is added as new items immediately after Article I F:

    "G. Service Drop - The wire connecting the distribution component of Licensee's facilities and equipment to Licensee's individual customer."

3.     The word "wooden" in the first sentence of Article II is deleted in its entirety.

4.     Article IV is deleted in its entirety and replaced with the following:

"SPECIFICATIONS: Attachments to joint use poles covered by this Agreement shall at all times be, at a minimum, in conformity with the terms and provisions of the NESC in effect as of the time the Attachment is made, or as may be agreed upon and approved in writing by the designated representatives of the Electric Company and Telephone Company.

5.     The following phrase will be inserted into the first sentence of Article VI A immediately after the words "it shall make written application therefore.":

"and include with the application a Fifteen Dollar ($15.00) per pole application fee (such fee being limited to $60.00 for any application containing a request for 10 poles or less). Licensee will not make a request to Attach to more than 10 poles in any one Application".

6.     The following paragraphs are added immediately after the first paragraph in Article VI A:

"Installation of Service Drops. When in the process of installing a Service Drop, the Licensee may attach its drop wire to owner's Normal Joint Pole without advance notice to Owner, provided the Licensee: (a) submits written notice to Owner for its Service Drop attachments within 45 days after the Service Drop has been installed; and (b) such Service Drop is made in accordance with the Specifications. So long as the Licensee complies with this process, such Service Drop will be considered an approved Attachment.

Except for Attachments involving Service Drops, whenever either party attaches to the other party's poles without written application and, approval for said Attachments, each party agrees to pay an unauthorized Attachment fee in the amount of $25.00 per unauthorized Attachment, in addition to the adjustment payment as described in Appendix A retroactive to the last Joint use Inventory. Upon discovery of an unauthorized Attachment, Licensee must file written application with Owner for each unauthorized Attachment within thirty (30) business days of Licensee's receipt of notice from Owner of such unauthorized Attachment, and failure to make such application will result in a $25.00 penalty for each additional 30 business days until the application is received. Owner will not unreasonably withhold, condition, delay or deny approval of an application for an unauthorized Attachment. An unauthorized Attachment fee will only be assessed upon completion of a Pole Attachment Inventory as defined in Article IV of this Agreement."

7.     The following is added at the end of Article VI B:

"Transfers shall be completed by both parties within ninety (90) calendar days of a party's receipt of transfer notice through the National Joint Utility Notification System (NJUNS), unless otherwise agreed to in writing by the parties. However, should Owner send Licensee a transfer notice via NJUNS and, after traveling to the transfer location, Licensee reasonably determines the transfer work cannot be done through no fault of Licensee ("Errant Dispatch"), then Owner will pay $250 to Licensee for each such Errant Dispatch. Any joint use contractor which may be utilized to perform said transfers will bill each party separately for the work performed for each party.

If transfer is not completed within ninety (90) days of Licensee's receipt of transfer notice from Owner, the Owner can transfer Licensee's Attachments at a charge of $250 for each pole at which a transfer occurs.

Attachments can be transferred at any time upon written authorization by the party being transferred. Transfer can be performed either by the party initiating the transfer request or by use of a joint use contractor who has been approved by both parties."

8. The following is added at the end of Article VI C:

"Each party will be responsible for determining the need for and installation of adequate guy rods for its facilities. Joint use of anchor rods will only be permissible when Licensee makes a written request and permission is granted by Owner."

9. The following is added to Article VII B after the phrase "may be given in cases of emergency":

"within two (2) business days following the occurrence, such writing to include a reference to whom and when such verbal notice was given),"

10. The following is added to Article VII C after the phrase "may be given in cases of emergency":

"within two (2) business days following the occurrence, such writing to include a reference to whom and when such verbal notice was given),"

11. Article VII D is deleted in its entirety and replaced with the following:

"When the parties conclude arrangements for the joint use of any new poles to be erected, due regard will be given to the desirability of avoiding mixed ownership in any given pole line."

12. Article VII G is deleted in its entirety are replaced with the following:

3

"When replacing a jointly used pole carrying aerial cable terminals, underground connections or transformer equipment, the Owner shall make a good faith effort to set the pole at a location mutually desirable to the parties. In the event Owner does not attempt to contact the other party, the Owner shall be responsible for all the other party's costs associated with moving to the new pole.

13. The following is added immediately after Article VII.E.5:

"6. In any instance where the usable space on a Normal Joint Use Pole is increased beyond 11 feet, the total cost for the increase shall be borne by the Owner, unless the additional usable space is directly attributable to expanded use by Licensee. The rest of the cost of such Normal Joint Use Pole shall be borne as provided for in the applicable proceeding paragraphs 1, 2, 3, 4 or 5."

14. The following is added immediately after Article VIII:

"J. Transfers shall be completed by both parties within ninety (90) calendar days of a party's receipt of transfer notice through the National Joint Utility Notification System (NJUNS), unless otherwise agreed to in writing by the parties. However, should Owner send Licensee a transfer notice via NJUNS and, after traveling to the transfer location, Licensee reasonably determines the transfer work cannot be done through no fault of Licensee ("Errant Dispatch"), then Owner will pay $250 to Licensee for each such Errant Dispatch. Any joint use contractor which may be utilized to perform said transfers will bill each party separately for the work performed for each party.

If transfer is not completed within ninety (90) days of Licensee's receipt of transfer notice from Owner, the Owner can transfer Licensee's Attachments at a charge of $250 for each pole at which a transfer occurs.

Attachments can be transferred at any time upon written authorization by the party being transferred. Transfer can be performed either by the party initiating the transfer request or by use of a joint use contractor who has been approved by both parties."

K. Where either party requests the replacement of any existing Normal Joint Use Pole, owned by the other party, both parties agree to pay the Owner the total cost to replace the Normal Joint Use Pole, including any un-depreciated value of the pole replaced based on a 25 year straight line depreciation schedule.

L. Each party agrees to respond to emergency situations (for e.g., car wrecks, or fallen trees) within two (2) hours of notification in accordance with Article XVII below. If a party fails to timely respond, the non-responding party will allow the other party to take corrective action as the other party deems necessary , and the non-responding party will bear all costs of any corrective action, bear all liability associated with such conducting corrective action, and hold harmless, defend and indemnify the responding party for any claims, liabilities, costs, damages,

suits, fees (including reasonable attorneys' fees) arising out of the responding party conducting the corrective action".

15. Article VIII is deleted in its entirety and replaced with the following:

"MAINTENANCE OF POLES AND ATTACHMENTS:

A. Owner shall, at its own expense, maintain its joint poles in a safe and serviceable condition, and in accordance with Article IV of this Agreement and the requirements of the National Electrical Safety Code, and shall replace, subject to the provisions of Article VII, such of said poles that become defective.

B. NESC Audit.

Either party may request, in writing, a joint inspection of Licensee's Attachments or any part of Licensee's Attachments residing on Owner's poles no more often than every five (5) years from the Effective Date of Amendment No. Four, such inspection being for the sole purpose of determining the compliance or non-compliance of Licensee's attachments with the NESC in effect at the time such Attachment was made ("NESC Audit"). Such NESC Audit shall be conducted by qualified personnel agreed upon by the parties. Each party will pay the NESC Audit cost on a pro rata basis, the total cost to be apportioned between Owner, Licensee and, if applicable, other pole attachers.

Licensee shall, at its own expense, correct its non-compliant Attachments within a timeframe that is mutually agreeable and in accordance with the severity of the non-compliant condition, but in no event will such timeframe extend past five (5) years of Licensee's receipt of written notice from Owner of such non-compliance. NESC non-compliance identified by an Owner as an immediate safety threat will be corrected by the Licensee within thirty (30) days of Licensee's receipt of written notice from Owner of said non-compliance, unless the parties agree to an alternate time schedule. Licensee shall provide Owner with progress/completion reports regarding such work. The party causing the non-compliant condition assumes any and all liability for all NESC non-compliance discovered by NESC Audits, and hereby agrees to fully indemnify and hold Owner harmless, including the costs of defense and attorneys' fees, for any claims, causes of actions and/or claims for relief made by any party for injuries or damages related to such non-compliance.

C. Pole Attachment Inventory.

At five (5) year intervals, beginning in the year 2014, the parties will jointly count the number of attachments of the parties on all jointly used poles and identify the attaching parties on those jointly used poles ("Pole Attachment Inventory"). The Pole Attachment Inventory will be conducted by a contracting firm approved by the parties, and such firm will possess the following minimum capabilities: (a) 10 years experience in conducting pole inspections; (b) technical expertise in mapping, data management, reporting and reconciliation of conflicting source

date; and (c) ability to provide inventory results in a data format acceptable to the parties.

The cost for a Joint Pole Inventory will be divided among the parties pro-rata, each party paying costs according to the quantity of poles in their ownership.

If a party determine as a result of a Pole Attachment Inventory that the actual number of poles attached to is not the same as the number reflected in a party's current records: (1) that party will share those figures with the other party; (2) the parties' records will then be revised, if applicable, to reflect the actual number of poles; and (3) a party may retroactively invoice the other party (for the previous 5 years or since the last Pole Attachment Inventory, whichever time period is less). The retroactive invoice will be based upon the difference in quantity of poles since the last Pole Attachment Inventory, based upon the assumption that the quantity changed evenly for each year, multiplied by a rate which shall be the rate applicable as the adjustment payment rate for each specific year.

D. The parties will place, maintain and operate their pole plant throughout the term of this Agreement in accordance with generally accepted industry standards.

16. Article XII is deleted in its entirety and replaced with the following:

"On or about December 1st of each year, the parties, acting in cooperation with each other, will determine the ending number of poles used by each party as Licensee. The number of poles shall be determined on or before December 31 each year. In the event the parties can not agree upon ending number of poles, the parties will use the average of the pole numbers from each of their respective pole counts.

The total adjustment payment due each party shall be determined by multiplying the ending number of poles (as indicated in the preceding paragraph), by the per pole payment referenced in Appendix A and adjusted, as appropriate, based upon the terms in Article XIII.

The smaller total adjustment payment amount calculated will be deducted from the larger total adjustment payment amount. The party to which net payment is due will then issue the net adjustment payment invoice for the period December 1 to November 30 (12 months) to the party owing the adjustment payment. The invoice will be issued no later than January 31 of the subsequent year. "

17. Article XIII is deleted in its entirety and replaced with the following:

"A. Beginning with the payment due in arrears for 2009 through the period ending 2012, the adjustment payment per pole will be modified annually based upon the change in the Handy-Whitman Index (HWI). The change will be calculated by dividing the current HWI using the most recent report issued at the time divided by the HWI for the period one year prior to this most recent report.

The result is multiplied against the adjustment payment rate from the prior year. Indexing as described here will continue for a period of four (4) years being 2009 – 2012.

B. At any time after January 1, 2013 and at intervals of five (5) years thereafter, the annual pole costs of Electric Company that make up the annual adjustment payment applicable under the Agreement will be subject to joint review, as provided for in this Appendix. Upon notice referenced in the above, joint review and revision of the adjustment payment shall commence after the next ensuing August 1, and continue until the adjustment payment is agreed to by both parties or until the next ensuing December 1 whichever occurs first.

C. For the rate reviews referenced in Article XIII B, the Electric Company's annual pole costs will be the key inputs into the annual adjustment payment. The mutual per pole payment will be equal to one-third the Electric Company's annual average pole costs.

D. In the event the Parties fail to agree to the proper annual pole cost calculations under this Article XIII, the rate will remain unchanged from the previous year and the procedures under Article XIV C will be followed."

18. The following is added to Article XIV after XIV B:

C. Notwithstanding any other dispute resolution procedures that may be set forth in this Agreement, Licensee may dispute any amount for which it was invoiced by Owner if: (a) Licensee has a reasonable good faith basis for the dispute; (b) Licensee has first paid the undisputed amount in the relevant invoice by the payment due date; and (c) prior to the payment due date, Licensee has given written notice to Owner describing in detail the dispute and its good faith basis for the dispute. If the preceding conditions are met, the parties will attempt to resolve the invoice dispute within 60 days of the payment due date. If the parties are unable to resolve the invoice dispute within such 60 day time period, a party may resort to any other right or remedy to which it is entitled under this Agreement, at law or in equity.

19. Article XVII is deleted in its entirety and replaced with the following:

"                          POINTS OF CONTACT AND NOTICE

The points of contact listed in this Article XVII ("Points of Contract") will serve as the respective Electric Company and Telephone Company representatives responsible for addressing and handling all operational issues regarding this Agreement. Except for any notice done pursuant to the NJUNS system (which will require notice to be delivered and deemed effective as is customary under that system), whenever any notice, consent, approval, request, document, demand, authorization or notice of default is required or permitted under this Agreement (collectively, "Notice"), the Notice must be in writing (except for oral notice specifically allowed under this Agreement, if any). All Notice must be delivered in person, by United States certified mail, return receipt-requested,

postage prepaid or by a nationally recognized overnight courier service to the Points of Contact at the following addresses:

Andy Ice, Manager of Engineering
101 N. Roan St.
Johnson City, TN 37601
(423) 461-7724
Andrew.F.Ice@embarq.com

Joe Lamm, Joint Use Manager
14111 Capital Blvd.
Wake Forest, NC 27587
(919) 554-5251
Joe.Lamm@embarq.com

Wayne Helm, Director of Engineering
717 McGilvary St.
Fayetteville, NC 28301
(910) 323-9052
Wayne.Helm@embarq.com

In addition, copies of all default Notice must be delivered to the parties at the following addresses:

If default Notice to Electric Company:



Attention: ▒▒▒▒▒▒▒▒▒▒▒

If default Notice to Telephone Company:

UNITED TELEPHONE SOUTHEAST LLC d/b/a Embarq
Real Estate Transactions and Analysis (RETA)
600 New Century Parkway
KSNCAA0133 – RETA
New Century, KS 66031
Attention: Real Estate Notices, ARN#▒▒▒▒▒▒▒

With a copy of such Telephone Company default Notice only (which will not constitute Notice to Telephone Company) to:

Embarq Law Department
5454 West 110th Street
Mailstop: KSOPKJ 0701
Overland Park, KS 66211
Attention: Real Estate Attorney, ARN#▒▒▒▒▒▒▒

8

If Notice is given by personal delivery, a receipt indicating that personal delivery was made must be obtained. Notice will be deemed effective on the date of receipt by the addressee as shown on the receipt if given by personal delivery; on the return receipt if Notice is given by certified mail or the confirmation of delivery form if Notice is given by overnight courier service. Rejection or refusal to accept Notice or the inability to deliver Notice because of a changed address which no Notice was given will be deemed to be receipt of the Notice as of the date of rejection, refusal or inability to deliver. Either party may change its address and contact information in this Article XVII by giving Notice of such change to the other party in the manner for giving Notice prescribed above.

20.        Except as amended in this Amendment, the terms and conditions of the Agreement remain in full force and effect. In the case of a conflict between the terms and conditions of this Amendment and those of the Agreement, the terms and conditions of this Amendment will control.

21.        This Amendment is effective on the date this Amendment is last signed by both Electric Company and Telephone Company where indicated below ("Effective Date").

22.        This Amendment may be signed in several counterparts, each of which will be fully effective as an original and all of which together will constitute one and the same instrument. Signatures to this Amendment transmitted by facsimile or electronic mail will be deemed the equivalent of delivery of an original signature, provided that the party delivering its signature by facsimile or electronic mail promptly thereafter delivers this Amendment with the original signature to the other party.

UNITED TELEPHONE SOUTHEAST LLC d/b/a Embarq

By: _____

Name: _____
Title: _____
Date: _____


By: _____
Name: _____
Title: _____
Date: _____

9

## APPENDIX A
## ADJUSTMENT PAYMENT RATES

The adjustment payment for 2008 (defined as the period from December 1, 2007 to November 30 2008) will be **$23.71** per Electric Company owned pole attached to by Telephone Company and **$23.71** per Telephone Company owned pole attached to by Electric Company.



**EXHIBIT 3**

St. Maria Hu
William C. Bovender
William C. Argabrite
Jimmie Carpenter Miller
Mark S. Dessauer
Gregory K. Haden
Michael L. Forrester
Stephen M. Darden
Edward J. Webb, Jr.
James M.L. Humphreys
Suzanne Sweet Cook
Michael S. Lattier
Scott T. Powers
Leslie Tentler Ridings
Laura A. Steel
Christopher D. Owens
Chad W. Whitfield

Meliah Lebryk
Matthew H. Wimberley
Lillian K. Abboud
Srilaya A. Goodhian
R. Lee McVey II
Meredith Bates Humbert
Nathan M. Bays
Rachel E. Ralston

Counsel
Thomas R. Wilson
Michael A. Eastridge

Kingsport Office
1212 North Eastman Road
P.O. Box 3740
Kingsport, TN 37664-0740
Phone (423) 378-8800
Fax (423) 378-8801

Johnson City Office
109 Med Tech Parkway
Suite 110
Johnson City, TN 37604
Phone (423) 283-6300
Fax (423) 283-6301

A Registered Limited Liability Partnership
**Attorneys At Law**
Established 1915
www.hsdlaw.com

PLEASE RESPOND TO:
KINGSPORT OFFICE

Writer's Direct Dial Number:
(423) 378-8858
bovender@hsdlaw.com

BTNES: 84391

February 27, 2009
*VIA EMAIL*

Wayne Mathisen, Director - Real Estate
c/o Embarq Corporation
Mailstop: KSNCAA0133-1WS498
606 New Century Parkway
New Century, KS 66031-8000

          Re:  Northeast Tennessee TVA
                Power Distributors

Dear Mr. Mathisen:

This correspondence contains the additional response of the Northeast Tennessee TVA Power Distributors ("Electric Company") to Embarq's counter-proposed Amendment No. 4. We shall address your latest letter of February 26, 2009 by separate correspondence, if necessary.

    1.  The opening paragraph ("This Amendment No. Four ...") and the RECITALS as contained in Embarq's Amendment No. 4 are acceptable.

    2.  <u>ARTICLE I, SECTION B</u>:

The Electric Company rejects Embarq's proposal because same fails to recognize the existence and use of non-wood poles as "NORMAL JOINT USE POLES". Moreover, the sentence proposed by Embarq —

      "...The cost in place of a normal joint use pole will be used as the established normal joint use pole value for all purposes contemplated in Article VII E ..." —

is an attempt to create a standard cost instead of using actual pole cost from the actual financial records. We respectfully request that the Electric Company's proposed ARTICLE I, SECTION B be adopted.

### 3. ARTICLE I, SECTION F.

While the Electric Company has no problem with adding a definition of "Service Drops", it does have serious problems with how Embarq proposes to utilize that definition in later portions of Embarq's Amendment No. 4. Service drops should not be treated differently than any other attachment. The Electric Company rejects a procedure which differentiates service drops.

### 4. ARTICLE II.

Both proposed Amendments delete the word "wooden" from this Article II. We have no problem with Embarq's version but would note same appears inconsistent with Embarq's position on ARTICLE I, SECTION B discussed above.

### 5. ARTICLE IV.

This ARTICLE concerns specifications. The Electric Company can accept Embarq's proposal as to ARTICLE IV, but it wants to add the following second sentence:

"The National Electric Code and the National Electrical Safety Code, and such revisions and amendments to same as may hereafter be made are to be used as guides in the Administration of this Agreement."

### 6. ARTICLE V, SECTION A.

Embarq's Amendment No. 4 retains the words "reasonable time" within the text of ARTICLE V, SECTION A. The Electric Company had proposed "thirty (30) days". While the Electric Company is not necessarily wed to thirty (30) days, it does seek a time certain be placed therein. We invite your proposal as to what would be an appropriate time certain.

### 7. ARTICLE V, SECTION C.

Embarq has apparently rejected the proposal of the Electric Company that would have added language to ARTICLE V, SECTION C, which imposed on Embarq a charge of twenty percent (20%) of the Electric Company's tree trimming costs.

The Electric Company should be reimbursed for tree trimming activities which benefit Embarq. The current language speaks in terms of reaching some agreement. There needs to be a formula or some method of calculation. This subject provides one illustration of why the Electric Company intervened at the TRA. Tree-trimming costs are absorbed without Embarq contribution. There is no reason to believe the merged company will be more responsible if the current language remains unaltered. Please make a concrete proposal.

8. **ARTICLE VI, SECTION A**

The Electric Company proposed a Fifteen Dollar ($15.00) per pole application fee. Embarq proposed a Fifteen Dollar ($15.00) per pole application fee with such fee being limited to Sixty Dollars ($60.00) for any application containing a request for ten (10) poles or less. Embarq also proposed to add:

"...Licensee will not make a request to attach to more than 10 poles in any one application ...".

The problem with Embarq's proposal is that it fails to recognize the location of the attachments and the fact that multiple locations significantly increase costs.

The Electric Company, thus, proposes the following:

A. Fifteen Dollars ($15.00) per pole application fee;

B. If the application requests up to ten (10) poles in the same general locality on the same work order, the fee for up to ten (10) poles will be limited to Sixty Dollars ($60.00).

C. However, if multiple locations are involved, then the Fifteen Dollars ($15.00) per pole attachment fee would apply without "discount".

ARTICLE VI, SECTION A, as proposed by the Electric Company, would add two sentences to the end of Section A which impose a Two Hundred Fifty Dollar ($250.00) penalty for unauthorized attachments "... plus annual pole rental retroactive to the last joint use inventory ...". Also, said proposal requires an application within three (3) business days or an additional penalty of Twenty-five Dollars ($25.00) per day would be assessed.

Embarq countered this proposal by proposing a Twenty-five Dollar ($25.00) penalty, a longer time for application, and, further, a lesser penalty thereafter.

We are authorized to make the following compromise proposal:

A. The unauthorized attachment fee would be One Hundred Fifty Dollars ($150.00); and

B. The application would have to be filed within seven (7) business days.

In all other respects, the Electric Company's proposal would remain the same.

9. **SERVICE DROP ISSUE**

Embarq seeks to treat Service Drops in ARTICLE VI, SECTION A as different from other attachments. As mentioned above, this is unfair and the Electrical Company cannot agree to same. Attachments to Electric Company poles are attachments – whether service drops or otherwise.

10. ARTICLE VI, SECTION B:

It should be noted that not all of the Power Distributors have a functioning NJUNS system, but all are willing, as part of these negotiations, to activate same so as to improve overall communications with Embarq.

A. The Electric Company proposed a thirty (30) day period for completion of transfers after written notice or NJUNS notice. Also, a penalty of One Hundred Dollars ($100.00) per day for each day after the proposed thirty (30) day transfer period was contained in the Electric Company's Amendment No. Four.

B. We are authorized to make a counter-proposal to Embarq's Amendment No. 4 which rejected the terms proposed by the Electric Company:

    (i)    The time periods would be forty-five (45) days instead of thirty (30) days; and

    (ii)    The per day penalty would be reduced from One Hundred Dollars ($100.00) per day to Twenty-five Dollars ($25.00) per day.

C. The Electric Company rejects Embarq's proposed language:

"However, should Owner send ... for each such Errant Dispatch."

The sentence following, "... any joint use contractor ..." is acceptable.

D. Also rejected is Embarq's proposed paragraph which reads, "... if the transfer is not completed with ..." The sum of Two Hundred Fifty Dollars ($250.00) will only sometimes reimburse the Owner for its actual costs.

11. ARTICLE VI, SECTION C:

Either the proposed addition of the Electric Company or Embarq's proposed addition is acceptable.

12. ARTICLE VII, SECTION B:

A. The Electric Company rejects the addition to ARTICLE VII, SECTION B, which reads "... within two (2) business days following the occurrence, such writing to include a reference to whom and when such verbal notice was given ..." as that requirement is unduly burdensome.

B. The Electric Company also proposes to delete the paragraph which begins "... in the case of a pole along subdivided property...".

13. ARTICLE VII, SECTION C:

For the same reason as given for the rejection of the language addition concerning "...two business days ..." which Embarq wants inserted in ARTICLE VII, SECTION B, the Electric Company rejects the similar language proposed by Embarq in ARTICLE VII, SECTION C.

14. ARTICLE VII, SECTION D:

The Electric Company did not delete the language of the original Agreement which requires each party own approximately one-half (1/2) of the total number of poles jointly used. Embarq's Amendment No. Four, drops that altogether. There is really no need to modify the existing language.

15. ARTICLE VII, SECTION E:

Embarq proposed a new paragraph, same being Paragraph 6. The Electric Company rejects the proposal as unnecessary.

16. ARTICLE VII, SECTION G:

The Electric Company can agree to the following portion of Embarq's proposal:

"When replacing a jointly used pole carrying aerial cable terminals, underground connections or transformer equipment the Owner will make a good faith effort to set the pole at a location mutually desirable to the parties."

The Electric Company rejects the last sentence of Embarq's proposal.

17. ARTICLE VII, SECTIONS J, K, AND L:

Both parties submitted additions to ARTICLE VII, same being SECTIONS J, K, and L.

A. The Electric Company rejects Embarq's proposal as to ARTICLE VII, SECTIONS J and K.

B. As to ARTICLE VII, SECTION L, the Electric Company proposes the following compromise language:

"L. Each party agrees to respond to emergency situations (i.e. car wreck, fallen trees, etc.) within ninety (90) minutes of notification. The non-responding party agrees to allow the other party to take corrective action as it deems necessary if the non-responding party fails to respond within the ninety (90) minute response period; and, the non-responding party will bear all costs of corrective actions, bear all liability associated with conducting corrective actions, and hold harmless, defend and indemnify the responsible party for any claims, liabilities, costs, damages,

suits, fees (including reasonable attorneys' fees) arising out of the responding party conducting the corrective action."

18. ARTICLE VIII:

Both parties submitted re-written language for this ARTICLE VIII. Moreover, your letter of February 23, 2009 seems to explain or modify what Embarq is proposing as to MAINTENANCE OF POLES AND ATTACHMENTS. Rather than going line-by-line, we submit the following for consideration:

A. Embarq's first paragraph of ARTICLE VIII, SECTION A, which commences "A. Owner shall . . ." is acceptable assuming Embarq accepts our proposed additional sentence to ARTICLE IV, discussed hereinabove.

19. ARTICLE VIII, SECTION B:

A. We believe the audit which Embarq proposes in the Settlement Agreement should be referenced in ARTICLE VIII, SECTION B in some manner.

B. The Electric Company can accept the joint inspection every five (5) years but rejects the word "sole" contained in this fourth line.

C. If an audit is requested by either party, the Electric Company wishes to retain the right to use its own personnel.

D. The Electric Company proposed a formula that would be tied to compliance at ninety-five percent (95%). It is open to a counter-proposal based on some percentage but rejects the "pro rata" formula contained in the Embarq proposal.

E. The Electric Company, in its SECTION A, proposed thirty (30) days to correct NESC violations discovered. Embarq would put this off to five (5) years. We are authorized to propose a compromise such that the second paragraph of the Electric Company's SECTION A would substitute one hundred eighty (180) days each for the two thirty (30) day periods contained in its original proposal.

F. Embarq deleted all references to pole inspection and treatment and merely proposed a Pole Attachment Inventory every five (5) years, beginning in 2014. The Electric Company does not understand why Embarq rejects regular pole treatment.

G. The paragraph contained in Embarq's proposed ARTICLE VIII, SECTION C, does not permit the Electric Company to participate or conduct the pole count. The Electric Company wants these rights. The pro-rata cost sharing would, thus, be affected by whether or not the Electrical Company participates/conducts the inspection.

H. ARTICLE VIII SECTION C(1).

The formula proposed in SECTION C(1) relative to the calculation of the Retroactive Invoice is rejected. The Electric Company proposed that it should be assumed all attachments have existed for five (5) years.

We recognize these comments do not lend themselves to new, comprehensive draft language. We request that you consider our comments and come back with a revised ARTICLE VIII proposal which reflects these compromise positions.

20. ARTICLE XII.

A. The Electric Company has proposed adjustment payments from Embarq at the rate of Forty Dollars ($40.00) per pole and payments from the Electric Company to Embarq at the rate of Seventeen Dollars and Nineteen Cents ($17.19). Embarq rejected the proposal of the Electric Company and proposed a rate of Twenty-three Dollars and Seventy-one Cents ($23.71) to be used for each for 2008; and, further, that the rate ($23.71) be utilized as the base rate going forward. Both proposed Amendments utilize, in some manner, the Handy-Whitman Index (HWI) for adjustments for some period of time.

B. It should be noted that the Seventeen Dollars and Nineteen Cents (hereafter, $17.19) which would be paid to Embarq by the Electric Company was calculated by a formula and ARMIS data supplied to the Electric Company by Embarq. Said formula utilizes a depreciation factor of five percent (5%), even though the Embarq poles have been fully depreciated. In actuality, the proper number to be used for Embarq should be Eight Dollars and Seventy Cents ($8.70). However, the Electric Company is willing to allow Embarq to utilize $17.19, assuming an acceptable number for the Electric Company can be agreed upon.

C. In May, 2008, Embarq provided to the Electric Company a formula that could be utilized in calculating attachment rates. Using the TVA Annual Report, the Electric Company plugged the proper numbers into Embarq's formula. Embarq did not like the result, rejected said resulting number, and proceeded to invoke the default provision of ARTICLE XIII. Then, Embarq refused to make payments using the default provision and eventually proposed $23.71. Embarq also told the Electric Company that certain factors had to be backed out of the formula it proposed in May, 2008.

D. The Electric Company has taken Embarq's May, 2008 formula, backed out the factors Embarq insisted should be backed out, and, using the 2008 TVA Annual Report, has calculated a revised sum that Embarq should pay the Electric Company per pole attachment, same being Thirty-seven Dollars and Ninety-five Cents ($37.95). The formula as applied and the 2008 TVA Annual Report are submitted herewith as Exhibits A and B.

E. As such, the Electric Company proposes a revised ARTICLE XII as follows:

"ARTICLE XII
ADJUSTMENT PAYMENTS

(A) The adjustment payment for 2008 (defined as the period from December 1, 2007 to November 30, 2008) will be Thirty-seven Dollars and Ninety-five Cents ($37.95) per Electric Company owned pole attached to by Telephone Company and Seventeen Dollars and

Nineteen Cents ($17.19) per Telephone Company owned pole attached to by Electric Company.

(B) These respective adjustment rates have been calculated for the Electric Company by using the formula attached hereto as EXHIBIT A, utilizing the 2008 TVA Annual Report, attached hereto as EXHIBIT B, and for the Telephone Company utilizing ARMIS data, attached hereto as EXHIBIT C (to be supplied by Telephone Company).

(C) Beginning with the payment due in arrears for 2009, the adjustment payment per pole will be modified annually based upon the change in the Handy-Whitman Index (HWI). The change will be calculated by dividing the current HWI using the most recent report issued at the time, divided by the HWI for the period one (1) year prior to the most recent report. The result is multiplied against the adjustment payment rate from the prior year. Indexing described herein will continue for a period of seven (7) years, 2009 – 2015.

(NOTE: If the Telephone Company does not wish to utilize HWI for the succeeding seven (7) year period, the Electric Company would propose using the modified formula (EXHIBIT A), utilizing the annual TVA Report and applicable ARMIS data.)

(D) On or about December 1st of each year each party, acting in cooperation with the other, subject to the provisions of the following paragraph of this Section, shall have ascertained and tabulated the total number of poles in use by each party as Licensee for which an adjustment payment shall be made to the other party as Owner.

(E) The total adjustment payment due each Party shall be determined by multiplying the poles owned by each party as described in this Section D of this ARTICLE, by the adjustment payment set forth in Section A of this ARTICLE, as modified by Section C of this ARTICLE. The smaller total amount covered above shall be deducted from the larger amount and the Electric Company or the Telephone Company, whichever shall owe the larger amount, shall pay to the other the difference between said two amounts as the net adjustment payment due for the year involved. Within ten (10) days after the first day of December next ensuing after the date of this agreement and within ten (10) days after the first day of December each year thereafter, during the time this agreement shall be in effect, the party to which said adjustment payment is owed, as of said first day of December, shall submit a written statement to the other party giving the correct amount owed by the other party.

The adjustment payment herein provided for shall be paid within ten (10) days after the bill has been submitted, unless said party disputes the amount of such bill within five (5) days from receipt thereof.

Any recurring cost incurred by the Owner, beyond the control of the Owner, solely because of the use of the Owner's poles by the Licensee, shall be paid by the Licensee.

(F) At intervals not exceeding five (5) years, an actual inventory of attachments shall be made by representatives of the parties. If there is any difference in the number of attachments found by the inventory and the number arrived at by tabulating those reported, correction will be made by retroactive billing for any attachments identified as being responsible for the difference, with all such attachments being assumed to have existed for five (5) years."

21. **ARTICLE XIII**

The Electric Company proposes the following modified ARTICLE XIII:

"ARTICLE XIII
PERIODIC REVISION OF ADJUSTMENT PAYMENT RATE

(A) At any time after January 1, 2015, and at intervals of five (5) years thereafter, the adjustment payment rates applicable under this Agreement shall be subject to joint review and revision, as provided for under Section 1B of this Article, upon the written request of either party. In case of revision of the adjustment payment rates as herein provided the new adjustment payment rates agreed upon shall apply, starting with the annual bill next rendered and continuing until again adjusted.

(B) Revisions of the adjustment payments shall be based on experience resulting from previous administration of this agreement. Any changes shall take into account the original cost factors pertinent to the establishing of the pole facilities involved in all joint use existing under this agreement at the time of the said review. If, within ninety (90) days after the receipt of such request, by either party from the other, the parties hereto fail to agree upon a revision of such rate, then the adjustment payment per pole so to be paid to each party shall be an amount equal to one-half of the then average annual total cost per pole, based on average in-plant cost factors of providing and maintaining the joint poles covered by this agreement. In case of a revision of the adjustment payment as herein provided, the new rate shall be applicable until again revised."

(NOTE: The Electric Company would also agree to utilize as a default provision the formula utilized to determine the base rates of $37.95 and $17.19 (EXHIBIT A) using the yearly reports or equivalents of the TVA Annual Report and ARMIS data.)

22. **ARTICLE XIV DEFAULTS**

The Telephone Company has proposed to add a Section C to this ARTICLE XIV. This proposal is merely a mechanism for avoiding payment or delaying payment and fosters needless litigation. The Electric Company believes that either party is free, under the confines of the current language, to protest a charge. But the charge should be paid and the impetus for a refund should be on the payor, not the payee.

23. **ARTICLE XVII POINTS OF CONTACT AND NOTICE**

The Electric Company accepts the revisions to ARTICLE XVII proposed by the Telephone Company.

24. ARTICLE XXI EXISTING CONTRACTS:

The language of ARTICLE XXI should be altered or the ARTICLE should be deleted, as it is subject to varying interpretations.

25. SIGNATURES:

The language of the signatures proposed by the Telephone Company language is accepted. (This follows ARTICLE XXII.)

Very sincerely yours,

HUNTER, SMITH & DAVIS, LLP

s/William C. Bovender

William C. Bovender

WCB/slb

Enclosures

cc:     Edward Phillips (via email)
        Rich Schollman (via email)
        John Weldon (via email)
        Northeast Tennessee TVA Power Distributors (via email)