# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF TENNESSEE
### AT GREENEVILLE, TENNESSEE

| | | |
|---|---|---|
| **JOHNSON CITY ENERGY AUTHORITY**<br>**d/b/a BRIGHTRIDGE,** | ) | |
| | ) | |
| **Plaintiff and Counter-Defendant,** | ) | |
| | ) | |
| **v.** | ) | **Case No. 2:20-cv-00030** |
| | ) | |
| **UNITED TELEPHONE SOUTHEAST, LLC**<br>**d/b/a CenturyLink,** | ) | |
| | ) | |
| **Defendant and Counter-Plaintiff.** | ) | |

## MEMORANDUM OF LAW IN OPPOSITION TO
## BRIGHTRIDGE'S OBJECTION TO MAGISTRATE JUDGE RULING

Comes the Defendant and Counter-Plaintiff United Telephone Southeast, LLC, d/b/a CenturyLink UTS ("CenturyLink") and submits this Memorandum of Law in Opposition to the Objection to Magistrate Judge Ruling [Doc. 55] filed by the Plaintiff and Counter-Defendant Johnson City Energy Authority d/b/a BrightRidge ("BrightRidge").

This action arises from the "Complaint for Declaratory Judgment" filed by BrightRidge. *See* Doc. 1. CenturyLink answered that Complaint and filed counterclaims against BrightRidge, including but not limited to claims for conversion or theft. *See* Doc. 7. The centerpiece of BrightRidge's Complaint is the written July 1, 1980 Agreement (the "JCPB Contract") between Johnson City Power Board ("JCPB") and United Inter-Mountain Telephone Company ("United Inter-Mountain"). *See* Doc. 7-1. In this litigation BrightRidge asserts the purported contractual rights of JCPB, while CenturyLink asserts its contractual rights through United Inter-Mountain.

The dispute revolves around access to certain allocated spaces on utility poles. Generally, there are three distinct spaces on a utility pole. The uppermost six (6) feet of the pole is known as the electric space, followed by a buffer space of forty (40) inches, which is followed by a

communications space of four (4) feet. *See* Doc. 62-1 (Edgar Depo, pp. 25-26, ll. 8-9). CenturyLink interprets the JCPB Contract as providing a license to BrightRidge for *only* the electric space on the United Inter-Mountain utility poles. BrightRidge, though, interprets the JCPB Contract as providing it a license for *not only* the electric space *but also* the communications space on the United Inter-Mountain utility poles. The Court's interpretation of the JCPB Contract will not only resolve the declaratory judgment action but it will also necessarily determine BrightRidge's liability as to CenturyLink's Counterclaims.

BrightRidge and CenturyLink have each already represented to the Court that the JCPB Contract is unambiguous. *See* Doc. 56 (PageID# 492). Nonetheless, BrightRidge seeks to conduct untimely discovery related to other electric company attachers *outside* the JCPB service territory.[1] The Magistrate Judge denied BrightRidge that discovery, and the Court should affirm that decision because: (A) CenturyLink did not violate the Court's Order regarding depositions [Doc. 3]; (B) Other attachers *outside* the JCPB service territory are not relevant; and (C) The discovery sought is not proportional to the needs of the case.

## I.    Background.

1.      On or about December 19, 2022, BrightRidge submitted a discovery dispute in this action to the Magistrate Judge primarily complaining over discovery related to United Inter-Mountain's contracts with other third-party electric attachers *outside* the JCPB service territory. *See* Doc. 65-1 (exhibits not included).

2.      CenturyLink submitted its response to BrightRidge's discovery dispute on January 5, 2023 [*see* Doc. 65-2 (exhibits not included)], which CenturyLink incorporates herein by reference. That response details the timeline of the discovery dispute. *See* Doc. 65-2.

---

[1] The JCPB service territory is now the BrightRidge service territory.

2

3.	A hearing was held by the Magistrate Judge on January 9, 2023. *See* Doc. 53. The transcript of that hearing was filed on February 1, 2023. *See* Doc. 56. The Court denied the relief requested by BrightRidge and entered a written Order on January 10, 2023. *See* Doc. 54.

4.	On January 24, 2023, BrightRidge filed its "Objection to the Magistrate Judge's Ruling." *See* Doc. 55. BrightRidge's Objection is different from the Motion and Memorandum that it submitted to the Magistrate Judge and represented that it intended to file with the Court in furtherance of the discovery dispute. *Compare* Doc. 65-1 *with* Doc. 55.

5.	On February 6, 2023, CenturyLink filed for summary judgment given the unambiguous nature of the JCPB Contract. *See* Docs. 61-62. CenturyLink's Motion demonstrates that the JCPB Contract does not give a license to BrightRidge (especially its Broadband Division which was first formed in 2017) to make attachments in the communications space on United Inter-Mountain utility poles. The four corners of the JCPB Contract and the circumstances at the time of contracting in 1980 support only one conclusion -- that the JCPB Contract provides a license to BrightRidge for *only* the electric space on the United Inter-Mountain utility poles in the JCPB service territory. The JCPB Contract only identifies JCPB as an electric company, and only allows JCPB to make attachments in the uppermost six (6) feet of a utility pole, which is commonly referred to as the electric space. The circumstances at the time of contracting in 1980 support this interpretation as: The only business JCPB was legally permitted to conduct in 1980 was electric distribution; United Inter-Mountain had a local monopoly on the communications business in 1980; and The National Electrical Safety Code ("NESC"), which governed JCPB attachments on utility poles, does not permit electric attachments in the communications space of utility poles. In fact, for at least 37 years (from 1980 to at least 2017), JCPB, as the electric company in the JCPB Contract, made its attachments only in the electric space of United Inter-Mountain poles; while

United Inter-Mountain, as the telephone company in the JCPB Contract, made its attachments in the communications space. BrightRidge's pending discovery Objection is mooted if the Court grants summary judgment; and otherwise, the Objection should be overruled.

## II. Standard of Review.

This Court has recently summarized the legal standard for considering objections to a magistrate judge's order on a non-dispositive, pretrial matter as follows:

> When considering objections to a magistrate judge's order on a non-dispositive, pretrial matter, a district court must "modify or set aside any part of the order that is clearly erroneous or contrary to law." Fed. R. Civ. P. 72(a); *see also* 28 U.S.C. 636(b)(1)(A). Applying this standard, the Court reviews factual findings for clear error and reviews conclusions of law de novo. *Bisig v. Time Warner Cable, Inc.*, 940 F.3d 205, 219 (6th Cir. 2019). A factual finding is clearly erroneous when the Court "is left with the definite and firm conviction that a mistake has been committed." *Id.* at 219 (internal citations omitted). A legal conclusion is contrary to law "when it fails to apply or misapplies relevant statutes, case law, or rules of procedure." *Bisig*, 940 F.3d at 219 (internal citations omitted).
>
> When reviewing a magistrate judge's order, the district court may consider newly developed evidence. *Banner v. City of Flint*, 99 F. App'x 29, 35 (6th Cir. 2004) ("[A]lthough the Federal Magistrate's Act does not expressly allow the district court to take new evidence in non-dispositive matters referred to a magistrate judge, 'it is not clearly forbidden either if there is good cause for revisiting the matter.' " (quoting *Conetta v. Nat'l Hair Care Ctrs., Inc.*, 236 F.3d 67 (1st Cir. 2001))); *see also Muhammad v. Close*, No. 08-1944, 2009 WL 8755520, at *2 (6th Cir. 2009). However, a district court must exercise discretion when deciding whether to consider additional evidence. *AES-Apex Emp. Servs., Inc. v. Rotondo*, 924 F.3d 857, 867 (6th Cir. 2019). A district court may consider additional evidence only when good cause exists to do so. *United States ex rel. Goodman v. Arriva Med., LLC*, 471 F. Supp. 3d 830, 844 (M.D. Tenn. 2020) (citing *Banner v. Flint*, 99 F. App'x 29, 35 (6th Cir. 2004)). Such a rule is consistent with Federal Rule of Civil Procedure 54(b) and Sixth Circuit precedent, which provides that "[t]raditionally, courts will find justification for reconsidering interlocutory orders when there is (1) an intervening change of controlling law; (2) new evidence available; or (3) a need to correct a clear error or prevent manifest injustice." *Rodriguez v. Tenn. Laborers Health & Welfare Fund*, 89 F. App'x 949, 959 (6th Cir. 2004).

*See Olah v. Unum Life Ins. Co.*, 2022 WL 2452376, *2 (Mar. 8, 2022).

## III. Argument.

## A. CENTURYLINK DID NOT VIOLATE THE COURT'S ORDER REGARDING DEPOSITIONS [DOC. 3].

4

In BrightRidge's Discovery Objection it accuses CenturyLink of violating the Court's Order governing depositions [Doc. 3] (the "Deposition Order"). *See* Doc. 55 (PageID# 372-375, 381-387). Specifically, BrightRidge contends that CenturyLink improperly instructed witnesses not to answer questions related to other attachers *outside* the JCPB service territory in violation of the Deposition Order. This Objection is without merit and should be overruled.

More particularly, the Deposition Order permits CenturyLink to instruct a witness not to answer as to a limitation on evidence directed by the Court. *See* Doc. 3. The limitation on evidence on which CenturyLink's instructions not to answer were founded was the Court's Order on other attacher discovery (the "Other Attacher Order"). *See* Doc. 32. In the Other Attacher Order the Court limited the discovery on other attachers to those *within* the JCPB service territory. The Magistrate Judge, who was the author of the Other Attacher Order, confirmed that the Court's intention with that Order was consistent with CenturyLink's interpretation, specifically, the Magistrate Judge stated during the January 9, 2023 hearing:

> THE COURT: WELL, LET ME SAY THIS, MR. HARVEY, YOU KNOW, THE COURT'S THE ONE THAT HAS TO INTERPRET ITS ORDERS, AND WHAT THE COURT RECALLS IS SAYING THAT THE COURT DID NOT FIND AS RELEVANT THESE AGREEMENTS AND WHAT WAS GOING ON OUTSIDE THE SERVICE AREA FOR THE LIMITED PURPOSE OF THE ISSUE BECAUSE THEY HAD COUNTER-FILED THAT FOR THE LIMITED PURPOSE OF THIS MARKET RATE ISSUE THAT I WAS GOING TO REQUIRE THEM TO PROVIDE DISCOVERY BECAUSE AS YOU'LL RECALL THEY TOOK THE POSITION THAT THEY DIDN'T HAVE TO PROVIDE ANY INFORMATION REGARDING ANY OTHER AGREEMENTS, AND THE COURT GRANTED RELIEF TO PLAINTIFFS AND SAID, NO, WITHIN THE SERVICE AREA YOU DO IN FACT HAVE TO PROVIDE THIS INFORMATION. SO I'M NOT SURE HOW WE GOT OUTSIDE THE SERVICE AREA WITHOUT SEEKING RELIEF FROM THE COURT . . .

*See* Doc. 56 (PageID# 490-491). The Magistrate Judge further stated during that hearing:

> GIVEN WHERE WE WERE PREVIOUSLY ON A DISCOVERY DISPUTE AND THE WAY THAT THE COURT CAREFULLY LIMITED THE INFORMATION THAT WAS DISCOVERABLE WHILE REQUIRING DEFENDANT [CENTURYLINK] TO

> PROVIDE INFORMATION IT OBJECTED TO PROVIDING, THE COURT DOES FIND THAT THIS IS AN ISSUE THAT SHOULD HAVE BEEN RAISED BEFORE THE DEPOSITIONS TOOK PLACE. THE FACT IS DEFENSE COUNSEL IN RESPONDING TO WRITTEN DISCOVERY AND IN ADDRESSING THE DEPOSITIONS MADE IT CLEAR THAT THIS IS WHERE ALL OF THIS WAS HEADED.
>
> NOW I'LL SAY THIS, HAD THE COURT NOT PREVIOUSLY ADDRESSED A DISCOVERY DISPUTE RELATED TO WHAT AGREEMENTS MIGHT BE PROVIDED, I WOULD LOOK AT THIS DIFFERENTLY IF THIS WAS THE FIRST DISCOVERY DISPUTE, BUT I THINK BASED ON WHAT THE COURT HAD RULED PREVIOUSLY THERE WAS ENOUGH THERE THAT IT SHOULD HAVE BEEN REQUIRED.

*See* Doc. 56 (PageID# 504-505). Needless to say, BrightRidge's interpretation of a Court's Order does not supersede that of the Court itself. And contrary to BrightRidge's critique that the "Magistrate Judge's Order flips this process on its head", the Magistrate Judge plainly explained that the process would be different had the Court not previously issued the Other Attacher Order. In other words, it was because of the Other Attacher Order that the burden was on BrightRidge to request an expansion thereof prior to the depositions and written discovery related to other attachers *outside* the JCPB service territory; whereas had the Other Attacher Order not already been in place then it would have been CenturyLink's burden to request a protective order.

Accordingly, CenturyLink did not violate the Court's Deposition Order and BrightRidge's criticism of the Magistrate Judge's Order is unwarranted.

## B. OTHER ATTACHERS *OUTSIDE* THE JCPB SERVICE TERRITORY ARE NOT RELEVANT.

The majority of BrightRidge's Objection is dedicated to trying to convince the Court that other attachers *outside* the JCPB service territory are relevant to the JCPB Contract. Essentially, BrightRidge's Chief Broadband Officer (namely Stacy Evans) has made a self-serving conclusion that BrightRidge now wants to litigate. Mr. Evans' conclusion is that other attachers *outside* the JCPB service territory are making attachments in the communications space of CenturyLink

6

owned poles under their respective 1980 agreements with United Inter-Mountain for no additional fees, and therefore, BrightRidge should be able to do the same. This self-serving conclusion by Mr. Evans, who was only in high school at the time of contracting in 1980, is the proverbial house of cards because: (1) The other attacher contracts are not materially identical to the JCPB Contract; (2) Course of performance is limited by each contract to a single service territory; (3) CenturyLink's Answer did not open the door to other attacher discovery; (4) The actual circumstances related to the other electric companies trigger the idiom – "Careful What You Wish For"; (5) BrightRidge's reliance on the Connecticut case of *Sedona v. Open Solutions* for the exception to the general rule of no discovery of other contracts with strangers is misplaced; and (6) BrightRidge's contradictory suggestion of an unidentified "latent" ambiguity in the JCPB Contract is unsupported.

### *1. The Other Attacher Contracts Are Not Materially Identical.*

BrightRidge mistakenly asserts that just because contracts may use the same words they are materially identical. In making that assertion, BrightRidge overlooks how the distinct electric company that is identified in each contract not only makes the contracts different but also necessarily impacts the words used, particularly as to the unique property being licensed and the unique territory to which the contract applies.

More particularly, in each of the other attacher contracts *outside* the JCPB service territory there is but one distinct electric company identified. For instance, JCPB is the electric company in the JCPB Contract, while BVU is the electric company in the BVU contract. BVU is neither a party nor a beneficiary to the JCPB Contract. *See* Doc. 7-1; *see also* Evans Depo, pp. 10-12, ll. 17-3 (attached hereto as <u>Exhibit E</u>). This identification of the electric company makes the contract dissimilar as unlike JCPB, BVU has never been regulated by the Tennessee Valley Authority and

is organized under the laws of an entirely different state. In addition, each electric company will necessarily have circumstances unique to its own business and the territory that it serves. Needless to say, had the parties wanted to include BVU, or some other electric company, into the JCPB Contract and the subsequent performance thereof so as to create a course of performance or uniformed usage of the trade as between all of them, then they could have written that into the contract and named the other electric companies as parties or beneficiaries. That did not happen. *See* Doc. 7-1.

Next, the electric company identified in each contract dictates the unique property being licensed. For example, Article II of the JCPB Contract provides:

> This agreement shall be in effect and shall cover all wooden poles of each of the parties now existing, hereinafter erected or acquired, within the common operating areas served by the parties hereto . . .

*See* Doc. 7-1. The property being licensed in the JCPB Contract is the space on the utility poles in only the JCPB service territory, which necessarily is to the exclusion of other poles such as those in another electric company's (e.g., BVU, BTES, Erwin Utilities, Greeneville Light & Power) service territory. By comparison, although the same words may appear in Article II of the BVU contract, the space on the utility poles to which the BVU contract applies are only those in the BVU service territory in Virginia. As such, the JCPB Contract and the BVU contract are dissimilar as the United Inter-Mountain poles for which JCPB contracted to attach in the electric space in the JCPB Contract are different than the United Inter-Mountain poles for which BVU contracted to attach in its contract.

In addition, the electric company identified in each contract dictates the unique territory to which the contract applies. *See* Doc. 7-1 (Article II). By comparison, although the same words may appear in both the JCPB contract and the BVU contract, the contracts are dissimilar as the

8

words actually describe a different service territory for each contract – *for e.g.*, the JCPB service territory in Tennessee versus the BVU service territory in Virginia.

**2.     *Course Of Performance Is Limited By Contract To A Single Service Territory.***

BrightRidge wants to improperly extend a course of performance or usage of trade interpretation beyond the JCPB service territory.  To do so, the Court would necessarily have to ignore the express contractual limitation in the JCPB Contract as to the territory to which the contract applies.  By its express terms, Article II of the JCPB Contract limits the course of performance in interpreting the JCPB Contract to "within the common operating areas served by the parties."  *See* Doc. 7-1 (Article II).  Although United Inter-Mountain has a larger operating area than JCPB, to which BrightRidge refers in its Objection [*see* Doc. 55 (PageID# 375)], the JCPB contract plainly limits the area to that which is common to both – specifically, the JCPB service territory (since it is the smaller of the operating areas as between the two parties to the contract).  Therefore, to the extent course of performance is used to interpret the JCPB Contract, the only service territory relevant is that which is *within* the JCPB service territory.  BrightRidge already has that discovery consistent with the Other Attacher Order.  *See* Doc. 32.

**3.     *CenturyLink's Answer Did Not Open The Door To Other Attacher Discovery.***

In its Objection, BrightRidge seems to suggest that CenturyLink's Answer to BrightRidge's Complaint opened the door to discovery related to other attachers *outside* the JCPB service territory.  *See* Doc. 55 (PageID# 378-379).  The Answer at issue is in response to the fifth and sixth sentences of Paragraph 16 of BrightRidge's Complaint for Declaratory Judgment, which Complaint provides:

> 16.     . . . CenturyLink introduced an entirely new system, product, and service within the four (4) feet labeled "Telephone" in ARTICLE I.  CenturyLink also has permitted other service providers to place equipment, lines, etc. on those portions of its poles called "Telephone".

9

*See* Doc. 1 (PageID# 6). CenturyLink's Answer to these allegations was subject to an objection which BrightRidge overlooks since it omitted it from its citation to the Court, specifically:

> 16.    . . . <u>Responding to the fifth and sixth sentences of Paragraph 16 of the Complaint, CenturyLink objects and moves for the Court to strike, pursuant to Rule 12(f) of the Federal Rules of Civil Procedure, the allegations contained therein, as they relate to an immaterial and impertinent matter. Without waiving its objection and motion</u>, to the extent that a further response is required, CenturyLink avers that is has only installed communication facilities within the designated communication space that it rented on the joint use poles owned by BrightRidge, and further avers that BrightRidge is neither a party to, nor beneficiary of, CenturyLink's agreements with other communication service providers (e.g., cable or Internet) concerning attachments in the designated communication space of poles owned by CenturyLink. CenturyLink denies that is has ever permitted any electric supply entity to attach communications facilities in the designated communication space of its poles without paying rental for that space in addition to any rental paid for attachments in the designated electric supply space on CenturyLink poles.

*See* Doc. 7 (PageID# 109-110) (underline emphasis added); *Compare with* Doc. 55 (PageID# 378-379). Thus, CenturyLink preserved its objection as to the relevance of other attacher discovery in its Answer [*see* Doc. 7 (PageID# 109-110)], with the Court's Other Attacher Order subsequently limiting that discovery to only the other attachers *within* the JCPB service territory [*see* Doc. 32].

### **_4._** **_The Actual Circumstances Related To The Other Electric Companies Trigger The Idiom – "Careful What You Wish For"._**

BrightRidge *thinks* it wants to get into the various circumstances related to the other electric company attacher contracts *outside* the JCPB service territory because it will show that those other attachers are not paying an additional fee to be in the communications space of United Inter-Mountain poles in their respective service territories and otherwise that CenturyLink has not objected to the attachments. The actual circumstances are the exact opposite of what BrightRidge thinks they are, thereby making the idiom "careful what you wish for" apropos to BrightRidge. Specifically: (1) BVU's broadband division (namely, Optinet) did pay to attach in the

communications space of United Inter-Mountain poles in the BVU service territory;[2] (2) CenturyLink has objected to other attachers such as BTES and Erwin Utilities making attachments in the communications space of United Inter-Mountain poles in their respective service territories; and (3) at least one of the other attachers (namely, Greeneville Light & Power) has self-reported that its 1980 agreement does not allow it to attach in the communications space of United Inter-Mountain poles and therefore an additional attachment fee will need to be paid by that company to CenturyLink. All of that other attacher evidence *outside* the JCPB service territory actually supports CenturyLink's position, not BrightRidge's position, in this litigation.

**FOR ONE**, BVU's broadband division (namely, Optinet) did pay to attach in the communications space of United Inter-Mountain poles in the BVU service territory. Nevertheless, BrightRidge has boldly professed to the Court that BVU did not pay for its attachments in the communications space of the United Inter-Mountain poles in the BVU service territory. For instance, after asserting the "strong character" (albeit with no citation to the record) of BrightRidge's Chief Broadband Officer (Stacy Evans), BrightRidge summarized Mr. Evans' testimony as follows:

> Mr. Evans testified during his deposition (on questioning by CenturyLink's counsel) that he was aware of how BVU "worked with CenturyLink in a joint use agreement that is practically identical" to the Joint Use Pole Agreement with BrightRidge, that CenturyLink "was very aware that [BVU made] fiber attachments . . . in the communications space of CenturyLink owned poles," and "[t]here was never opposition to the use of attachments in the communications space, never a requirement to pay additional attachment costs . . ."

*See* Doc. 55 (PageID# 381 *citing* Evans Depo, p. 40, 44). What BrightRidge does not tell the Court, however, is that at the time that Mr. Evans made these conclusions he: (a) was not testifying as a representative of BVU; (b) did not have any invoices between BVU and CenturyLink to

_____

[2] BVU sold Optinet and no longer has a broadband entity. That sale occurred before BrightRidge even had a Broadband Division.

support his conclusion of no additional fee; and (c) was only relying upon his own interpretation of the words in a copy of the BVU contract with United Inter-Mountain that he obtained via a FOIA request. *See* Evans Depo, pp. 43-44, ll. 20-18; 124, ll. 11-13 (attached hereto as <u>Exhibit E</u>). And although Mr. Evans claims to have a vivid memory of his work experience at BVU in relation to CenturyLink between 2002 and 2018, his memory was faded as to the federal felony criminal prosecutions of BVU officials during that time period and during which he was called to testify. *See, e.g. United States v. Pomrenke*, 198 F.Supp.3d 648, 658, 688-689 (W.D. Va., 2016); *Compare with* Evans Depo, pp. 120-123, ll. 16-20 (attached hereto as <u>Exhibit E</u>).

Because Mr. Evans does not know as much as he thinks he knows about the relationship between BVU and CenturyLink, his self-serving conclusions are misleading. That is, Mr. Evans has identified himself as the source of BrightRidge's knowledge related to BVU. *See* Evans Depo, pp. 132-133, ll. 15-8 (attached hereto as <u>Exhibit E</u>). Mr. Evans, though, left BVU in 2018 when it sold its broadband division to a third party, so he never saw the February 2019 invoice from BVU to CenturyLink. That invoice shows that BVU's broadband entity (Optinet) paid $25.50 per pole to be a licensee to make attachments in the communications space of United Inter-Mountain poles in the BVU service territory. *See* Feb. 2019 BVU Invoice (attached hereto as <u>Exhibit A</u>). That rate was the market rate for the BVU service territory as it was the same rate that BVU's electric utility system was charging CenturyLink for its attachments in the communications space of BVU owned poles. *Id.*

By comparison, CenturyLink's position in the case at bar has always been that BrightRidge has to pay market rate for its broadband division's attachments in the communications space of United Inter-Mountain poles, which is the same rate that BrightRidge's electric division charges CenturyLink for its attachments in the communications space of the poles owned by BrightRidge's

electric division (specifically, $37.52 as of December 2022).  Tellingly, that rate is also the very rate that BrightRidge's electric division charges BrightRidge's broadband division for its attachments in the communications space of the poles owned by BrightRidge's electric division. *See* Doc. 62-2 (Dykes Depo, pp. 48-49, ll. 7-2).  So, even though BrightRidge *thinks* that the BVU evidence would show that it owes nothing to be in the communications space because BVU purportedly paid nothing, the evidence would actually show that BVU paid market rate which is the very rate (albeit of a different amount because of the different territory, property and contract) that BrightRidge seeks to avoid paying in this action.[3]

**TWO**, CenturyLink has objected to other attachers such as BTES and Erwin Utilities making attachments in the communications space of United Inter-Mountain poles in their respective service territories.  Nevertheless, BrightRidge also boldly professed to the Court that there are other electric company attachers *outside* the JCPB service territory who have been attaching in the communications space of United Inter-Mountain poles without objection from CenturyLink, particularly BTES and Erwin Utilities.  Again, BrightRidge's source of information is Mr. Evans.  Mr. Evans though: (a) has never even worked for any of these other electric companies (e.g., BTES, Erwin Utilities); (b) does not have any documents from any of these other electric companies; and (c) relies entirely on hearsay.  *See* Evans Depo, pp. 132-135, ll. 15-7 (attached hereto Exhibit E).

---

[3] BrightRidge also cites to CenturyLink employee Andrew Ice, but the citations do not support BrightRidge's statements.  *See* Doc. 55 (PageID# 379).  Mr. Ice testified that: he never reviewed the BVU contract; he did not know that BVU attached fiber in the communications space of United Inter-Mountain poles until 2013 or 2014; he does not know how they came to make those attachments; the other employees with whom he discussed the issue did not know either and otherwise were not the ones that approved it; and he was not involved in the billing for those attachments.  *See* Ice Depo, pp. 26-28, ll. 16-5; pp. 29-30, ll. 21-19 (attached hereto as Exhibit H).

Because Mr. Evans does not know as much as he thinks he knows about the respective relationships between BTES and CenturyLink, and Erwin Utilities and CenturyLink, his self-serving conclusions are misleading. That is, CenturyLink has objected to other electric companies *outside* the JCPB service territory attaching in the communications space of the United Inter-Mountain poles in those respective territories. For instance, CenturyLink sent cease and desist letters to both BTES and Erwin Utilities concerning any attachments in the communications space of United Inter-Mountain poles. *See, e.g.,* 6/14/21 Witt Ltr to Erwin Utilities (attached hereto as Exhibit B; 6/14/21 Witt Ltr to Bristol Tennessee Essential Services (attached hereto as Exhibit C).[4]

**THREE**, at least one of the other electric companies (namely, Greeneville Light & Power) has self-reported that its 1980 agreement does not allow it to attach in the communications space of United Inter-Mountain poles and therefore an additional attachment fee will need to be paid by that company to CenturyLink. More particularly, Greeneville Light & Power has represented in writing to CenturyLink concerning the 1980 contract between it and United Inter-Mountain, in pertinent part as follows:

> The difference between this project and previous fiber extensions is that we are going to place the fiber in the communication space as the highest attachment. Our legal counsel and myself have reviewed the joint-use contract and have found no provisions that allow us to place facilities in the communication space utilizing the existing single attachment fee. It is our opinion that on these poles, GLPS needs to pay an additional attachment fee.

*See* 8/5/21 Bolton to Henley Email (attached hereto as Exhibit D).

**THEREFORE**, these other electric company attacher contracts *outside* the JCPB service territory are each riddled with unique circumstances that have no bearing on the outcome of the

---

[4] BrightRidge also cites to CenturyLink employee Andrew Ice, but the citations do not support BrightRidge's statements. *See* Doc. 55 (PageID# 380). Mr. Ice testified that he learned that BTES was deploying fiber in the electric space. *See* Ice Depo, pp. 25-26, ll. 11-2 (attached hereto as Exhibit H).

action before the court. Such unique circumstances are the very reason why the general rule has

historically been to not allow discovery into other contracts that do not involve both parties to the

contract at issue. Otherwise, the end result is that judicial and party resources are needlessly

expended for multiple minitrials on contracts and circumstances that are not at issue and which

involve third parties who are not before the Court.

A United States District Court in Indiana very recently compiled and cited several

instructive decisions from multiple jurisdictions as to this general rule:

> *See Neil Corp. v. John Paul Mitchell Sys.*, 1995 WL 217480, at \*6 (E.D. La. Apr. 12, 1995) (**"Discovery requests relating to 'contracts between an opponent and others in connection with allegations which did not involve the party seeking the discovery' is not relevant to a litigation involving claims for breach of contract,"** even if the **opponent may have treated third-parties differently under the same or similar contractual provisions**) (internal citations omitted); *Freeman v. Witco Corp.*, 1999 WL 389892 at \*1 (E.D. La. June 11, 1999) (**motion to compel seeking "documents related to contract negotiations between [party litigant] and its other clients" to show habitual conduct of said litigant was denied by district court as irrelevant to dispute concerning contractual dispute between parties to the lawsuit**); *World Wrestling Fed'n Entm't, Inc. v. William Morris Agency, Inc.*, 204 F.R.D. 263, 265 (S.D.N.Y. 2001) (**affirming magistrate judge's denial of discovery of third-party contracts, district court judge held that "[o]rdinarily, what is relevant in a breach of contract claim is the transaction between the parties to the contract. Ordinarily, contractual agreements between one of the contracting parties and third parties is irrelevant."**) (emphasis supplied); *Herman v. Seaworld Parks & Entm't, Inc.*, 2016 WL 3746421 at \*2– 3 (M.D. Fla. July 13, 2016) (**observing that discovery is broad, but its "rules do not permit the parties to go on a fishing expedition," and, relying upon a number of cases refusing to compel production of non-party contracts, the district court held that such non-party contracts not referenced in or a part of any claim or defense were irrelevant and that their production would be disproportional to the needs of the case**); *BNSF Ry. Co. v. Panhandle N. R.R. LLC*, 2018 WL 4076487 \*2–3 (N.D. Tex. Jan. 11, 2018) (**denying motion to compel, district court held that "third-party agreements and communications should not generally be discoverable" in breach of contract action, and requests for such information "are highly likely to be irrelevant and overbroad"**).

*See Mid-American Salt, LLC, v. Bob & Dave's Lawn and Landscape*, 2020 WL 1181769, \*3 (N.D.

Ind., Mar. 12, 2020); *See also Cmedia, LLC v. LifeKey Healthcare, LLC*, 216 F.R.D. 387, 390

(N.D. Tex. 2003) (**Document requests seeking "communications and agreements between [a**

third party and Defendant] as well as companies who are not party to the underlying litigation" are "facially overbroad"); *Palumbo v. Shulman*, No. 97CIV.4314(JGK)(KNF), 1998 WL 436367 at *3 (S.D.N.Y. July 27, 1998) **("Defendants' dealings with their other clients, based on separately negotiated agreements to which plaintiffs were not privy, have no bearing on this lawsuit [and] . . . [are] not relevant to the subject matter of this action and need not be provided.");**

"The general rule is that where the terms of a contract between the litigants are disputed, evidence of one party's agreements with third persons is inadmissible." *Bradley v. Bay Towing Corporation,* 199 S.E.2d 533, 534 (Va. 1973); *see, also, Mass Appraisal Services, Inc. v. Carmichael,* 404 So.2d 666, 674 (Ala. 1981). The *res inter alios acta* (transactions other than between parties to a case) rule is supported by logic and pragmatism. The maxims in this respect are: *Res inter alios acta nee prodest nec nocat* (A transaction between other parties neither benefits nor injures those not interested); and *Res inter alios acta alteri non debet*. (Things done between strangers ought not to injure those not parties to them, a part of the law of evidence.) 77 C.J.S. pp. 274, 275; *See also* 32 C.J.S. Evidence §§ 576, 577; *State v. Russell*, Tenn.Cr.App.1989, 773 S.W.2d 913; T.R.E. Rules 401, 402; *Cavallo v. University of Tennessee, Memphis*, 1992 WL 312620, at *2 (Tenn.App.,1992).

Were contracts with third parties allowed to be injected into suits on contracts between the party litigants, the trial would become one on collateral contracts involving parties that were not before the court, with the trier of fact bound to consider evidence both confusing and potentially prejudicial. *Hasbro, Inc., v. Mikohn Gaming*, 2006 WL 5989281 (D.R.I.); *See also*, *So. Cal. Gas Co. v. City of Alhambra*, CV 10-8635 PA JCX, 2011 WL 4389655 at *3 (C.D. Cal. June 6, 2011) *judgment entered sub nom. S. California Gas Co. v. City of Alhambra*, CV 10-8635 PA JCX,

2011 WL 5378072 (C.D. Cal. June 27, 2011) **("Plaintiffs' conduct in its performance of other contracts is irrelevant.")**; *Sea Star Line, LLC v. Emerald Equip. Leasing, Inc.*, 578 F. Supp. 2d 679, 695 (D. Del. 2008) **("Agreements between Sea Star and non-parties are not relevant to this dispute, and should not be considered in the context of adjudicating the parties' rights and responsibilities under the Rental Agreement.")**; *Sherman, LLC v. DCI Telecommunications, Inc.*, No. 01 CIV. 2907 (BSJ), 2002 WL 31255011, at *3 (S.D.N.Y. Oct. 8, 2002) ("**As this Court has concluded, prior agreements . . . are unrelated and irrelevant to the validity of the [agreement] in this action.**"); *Capital Properties, Inc. v. United States*, 49 Fed. Cl. 607, 612 (2001) **("The meaning of [the same] terms in other contracts to which [non-party] Amtrak is a party is not relevant to this dispute.")**.

The above cited authorities are the very authorities that were cited by CenturyLink to the Magistrate Judge during the discovery dispute from which BrightRidge's pending Objection arose. *See* Doc. 65-2. Therefore, the Magistrate Judge was necessarily referring to these authorities when she referenced the authorities in the record in her Order. *See* Doc. 54. And although BrightRidge seeks to take the Magistrate Judge to task for not specifically enumerating these cases in the Court's Order, it is really BrightRidge that should be taken to task as when BrightRidge first submitted its discovery dispute to the Court it only relied upon two cases -- *Public Service Enterprise Group v. Philadelphia Electric Company*, 130 F.R.D. 543 (D. N.J., 1990), and *Paragon Resources v. Nat'l Fuel Gas Distribution*, 695 F.2d 991, 997 (5th Cir. 1983) -- neither of which applied and neither of which are referenced anywhere in BrightRidge's Objection. *Compare* Doc. 65-1 *with* Doc. 55.

**5.** **_BrightRidge's Reliance On The Connecticut Case of Sedona v. Open Solutions For The Exception To The General Rule Is Misplaced._**

BrightRidge's reliance on *Sedona Corp. v. Open Solutions, Inc.*, 249 F.R.D. 19, 20 (D. Conn. 2008) to show relevance as to other attacher discovery *outside* the JCPB service territory is misplaced. *See* Doc. 55 (PageID# 19-22). *Sedona* is an outlier case that found the circumstances to warrant application of the exception to the general rule that other contracts with strangers to the contract at issue are not discoverable. In the context of BrightRidge's discussion around *Sedona*, BrightRidge cites to a number of Tennessee cases, but those merely assert general propositions as to course of performance between the *same* parties to a contract, with none of them either citing to *Sedona* or applying the discovery exception in *Sedona*. *See* Doc. 55 (PageID# 390-392).

*Sedona* is readily distinguishable. In *Sedona*, the other third-party contracts that were deemed to be discoverable all related to the exact same property – namely, Defendant's software product. In contrast, the other attacher contracts *outside* the JCPB service territory each relate to different property and different exclusive service territories. In addition, *Sedona* is a Connecticut case seeking to interpret Pennsylvania law, whereas the case at bar is a Tennessee case with the Tennessee Tax Code treating utility poles as real property, with it being well settled Tennessee law that each piece of real property is unique from another. In contrast, the software in *Sedona* is personal property and therefore is not unique in that it is simply duplicated for each transaction.

### 6. BrightRidge's Contradictory Suggestion Of An Unidentified "Latent" Ambiguity Is Unsupported.

During the Magistrate Judge's January 9, 2023 hearing from which BrightRidge's Objection arose, both parties confirmed to the Court that the JCPB Contract was unambiguous. BrightRidge specifically represented:

> THE COURT: ALL RIGHT. MR. HARVEY, LET ME ASK YOU BECAUSE I WANT TO MAKE SURE WHAT I HEARD FROM YOU AND THEN SEE WHAT YOU HAVE TO SAY ABOUT THE DEFENDANT'S POSITION. DID I HEAR FROM YOU THAT YOUR CLIENT TAKES THE POSITION THAT THE CONTRACT IS UNAMBIGUOUS?

> MR. HARVEY:  YES, YOUR HONOR, WE DO.  WE THINK THE CONTRACT IS UNAMBIGUOUS AND THAT THE LANGUAGE PLAINLY ALLOWED BRIGHTRIDGE TO MAKE ATTACHMENTS ONTO THE POLES (UNINTELLIGIBLE).

*See* Doc. 56 (PageId# 492).  Meanwhile, CenturyLink specifically represented:

> THE COURT:  MR. EDWARDS, DOES YOUR CLIENT TAKE THE POSITION THAT IT'S UNAMBIGUOUS JUST WITH A DIFFERENT INTERPRETATION?
> * * * * *
> MR. EDWARDS:  . . . YES, WE TAKE THE POSITION THAT IT'S UNAMBIGUOUS.

*Id.*  CenturyLink has since filed a motion for summary judgment on the ground that the JCPB Contract is unambiguous, which it incorporates herein by reference.  *See* Docs. 61-62.

Nonetheless, BrightRidge has taken the position in its Objection that there might be a latent ambiguity in the JCPB Contract, and therefore, it should be allowed to conduct discovery as to other attachers *outside* the JCPB service territory.  *See* Doc. 55 (PageID# 23-24).  BrightRidge, though, cannot identify any such latent ambiguity, but yet contends that it should be allowed to go on a discovery fishing expedition to see if it can uncover one, which is well beyond the scope of Rule 26.  *See Steede v. General Motors*, 2013 WL 142484, *7 (W.D. Tenn., Jan. 11, 2013) (a plaintiff is not permitted to use the rules of discovery to "go fishing") (*citing Surles ex rel. Joyhnson v. Greyhound Lines,* 474 F.3d 288, 305 (6th Cir. 2007)); *Herman,* 2016 WL 3746421 at *2–3  (discovery "rules do not permit the parties to go on a fishing expedition").

## C.     THE DISCOVERY SOUGHT IS NOT ONLY IRRELEVANT BUT ALSO NOT PROPORTIONAL TO THE NEEDS OF THE CASE.

In its Objection, BrightRidge "requests the Court to: (a) re-open two depositions [Andrew Chong and Marcia Buckles] at CenturyLink's expense; (b) compel CenturyLink to produce its Joint Use Pole Agreement(s) with BVU; (c) reasonably extend the discovery period for 60 days; and, at least, (d) vacate dicta in the Order that could be stretched beyond its intent and have

19

unintended consequences on the merits of the case." *See* Doc. 55 (PageID# 371). With regard to relief "(d)", BrightRidge never specifies the "dicta" that it wants vacated. Regardless, the Court's finding as to relevance is not *dicta*, and instead is a required finding under Rule 26.

As summarized by one United States District Court in Tennessee:

> "A district court does not abuse its discretion in denying discovery when the discovery requested would be irrelevant to the underlying issue to be decided."
>
> * * * * *
>
> . . . it is well-established that "[t]he legal tenet that relevancy in the discovery context is broader than in the context of admissibility should not be misapplied so as to allow fishing expeditions in discovery. "Generally, district courts enjoy discretion to employ reasonable limits on the discovery of relevant information to prevent a fishing expedition. The Sixth Circuit has held that "although a plaintiff should not be denied access to information necessary to establish her claim, neither may a party be permitted to go fishing and a trial court retains discretion to determine that a discovery request is too broad and oppressive.

*Steede v. General Motors*, 2013 WL 142484, *7 (W.D. Tenn., Jan. 11, 2013).

Using this standard as the yardstick for Rule 26 discovery determinations, the Magistrate Judge properly evaluated the relevance of other attacher contracts *outside* the JCPB service territory (*see, e.g.*, Argument "B" above), which is not *dicta*, and did not err in denying the relief requested by BrightRidge related to those other attachers.

### *1.* *The Magistrate Judge Did Not Err In Denying BrightRidge's Request To Re-Open The Deposition of Andrew Chong.*

In BrightRidge's Objection it seeks to have the deposition of Andrew Chong re-opened. The deposition of Andrew Chong occurred on December 1, 2022, in Orlando, Florida. That deposition had been previously scheduled for November 9, 2022, but while CenturyLink's counsel was in enroute to that deposition on November 8, 2022, BrightRidge's counsel had an emergency

arise, which resulted in Mr. Chong's deposition being rescheduled to the December 1, 2022 date.[5]

During Mr. Chong's deposition, BrightRidge elicited the following testimony:

> Q.   Are you aware of other companies in the northeast Tennessee area who have attached their Internet lines in the 4-foot telephone zone?
> A.   No.
> Q.   So if I told you that a company known as BTES did so, would that be information that you didn't previously have?
> A.   That's correct.
> Q.   If I told you that company known as BVU did so, would that also be information that you didn't previously have?
> A.   Correct.

*See* Chong Depo, pp. 66-67, ll. 16-2 (attached hereto as <u>Exhibit F</u>).

* * * * *

> Q.   All right.  Are you familiar with an agreement that CenturyLink had with a company known as BVU?
> A.   No.
> Q.   Have you ever seen the joint use pole agreement between BVU and CenturyLink?
> A.   No.
> Q.   All right.  Well, let me cure that.  I'm going to hand you Exhibit 24.
> Q.   All right.  So I've just handed you Exhibit 24, sir, which, if you look at the top indicates that it is a joint use pole agreement entered into in 1980 between the Bristol Virginia Utilities Board and United Inter-Mountain Telephone Company?
> A.   Correct.
> Q.   Now, have you ever seen this before?
> A.   This agreement?
> Q.   Yes.
> A.   No.

*See* Chong Depo, pp. 144-145, ll. 20-16 (attached hereto as <u>Exhibit F</u>).  Thus, not only is the discovery sought from Mr. Chong related to other attachers *outside* the JCPB service territory beyond the scope of permissible discovery under Rule 26 and the Court's prior Other Attachers Order, but also there is not even a foundation that Mr. Chong has any knowledge of any attachments by non-party attachers *outside* the JCPB service territory (including BVU and BTES)

---

[5] Although BrightRidge requests to reconvene Mr. Chong's deposition at CenturyLink's expense, BrightRidge has never reimbursed CenturyLink for its expenses associated with the cancelled November 9, 2022 deposition of Mr. Chong.

in the communications space of CenturyLink owned poles, or of any BVU contract purportedly related thereto; but yet, BrightRidge brought the discovery dispute complaining that Mr. Chong's deposition should be reconvened so that its counsel could go on a fishing expedition on hypotheticals about purported attachments of which Mr. Chong testified he was unaware and a purported BVU contract of which Mr. Chong testified he had never seen. As noted by a court in a case cited by BrightRidge in the underlying discovery dispute – "we need not waste the litigants' money and effort, nor our own time, dealing with issues of a hypothetical nature." *See Public Service Enterprises Group v. Philadelphia Electric Company*, 130 F.R.D. 543, 548 (D. N.J., 1990) *cited by* BrightRidge at Doc. 65-1 (BrightRidge's Motion to Compel at p. 4 (¶ 14)). As such, the Magistrate Judge did not err in ruling that this deposition should not be re-opened.

> ## 2. *The Magistrate Judge Did Not Err In Denying BrightRidge's Request To Re-Open The Deposition of Marcia Buckles.*

In BrightRidge's Objection it seeks to have the deposition of Marcia Buckles re-opened. The deposition of Marcia Buckles occurred on November 30, 2022, the day before Mr. Chong's deposition, in Johnson City, Tennessee. Ms. Buckles was never identified as a person with knowledge in this case by either party until BrightRidge belatedly identified her as its witness on October 3, 2022, asserting that she had information related to BVU purportedly attaching in the communications space of CenturyLink owned poles *outside* the JCPB service territory; even though BrightRidge had apparently never actually spoken with Ms. Buckles as to her actual knowledge (if any). During Ms. Buckles' deposition, BrightRidge elicited the following testimony:

> Q.    At any point during your time as an engineer have you ever had responsibility for the Bristol area?
> A.    Yes.
> Q.    And when was that?
> A.    2004 to about 2020.

> Q.    Other than forwarding on pole attachments requests, do you have any other duties related to pole attachments?
> A.    I'm not sure what you're asking.
> Q.    In the design work you do, do you – are you designing where people will attach, where different attachers place their attachments on joint use poles?
> A.    No.  There's a certain – I'm not sure.  Everybody knows where they're supposed to attach.  We're supposed to keep a certain distance between attachers and everyone is aware of that.

*See* Buckles Depo, p. 20, ll. 4-18 (attached hereto as <u>Exhibit G</u>).   Thus, not only is the discovery sought from Ms. Buckles related to other attachers *outside* the JCPB service territory beyond the scope of permissible discovery under Rule 26 and the Court's prior Other Attachers Order, but also the testimony elicited by BrightRidge was that Ms. Buckles did not have any authority over the Bristol service territory at the time of any contracting in 1980 or at present (as Ms. Buckles was only involved with the Bristol service territory from 2004 to 2020), and that Ms. Buckles was not involved in the design as to where different attachers are to attach on joint use poles in the Bristol service territory; but yet, BrightRidge brought this discovery dispute complaining that Ms. Buckles' deposition should be reconvened so that its counsel can go on a fishing expedition related to BVU as set forth in his subsequent questions to her related to BVU that are found on pages 55-63 of the transcript to Ms. Buckles' deposition, and to which Ms. Buckles was instructed not to answer.  *See* Doc. 55-8.  As such, the Magistrate Judge did not err in ruling that this deposition should not be re-opened.

### <u>3.    The Magistrate Judge Did Not Err In Denying BrightRidge's Request To Order CenturyLink To Produce United Inter-Mountain's Contract With BVU.</u>

In BrightRidge's Objection it seeks to have the Court order CenturyLink to produce United Inter-Mountain's contract with BVU.  Not only is the discovery production sought related to an other attacher *outside* the JCPB service territory which is beyond the scope of permissible discovery under Rule 26 and the Court's prior Other Attachers Order, but at no time during the

nearly three (3) years that this action has been pending, or prior to BrightRidge's discovery dispute

letter to the Court dated December 19, 2022, did BrightRidge ever request any depositions of, or

serve any subpoena on, any third parties (e.g., other attachers *outside* the JCPB service territory

such as BVU, or even BTES or Erwin Utilities) concerning the contract for which it seeks to

compel production. After filing its December 19, 2022, discovery dispute BrightRidge did serve

a subpoena on BVU, with a response deadline of January 3, 2023 (which was after this Court's

discovery cutoff), showing that BrightRidge was aware of other discovery mechanisms for

obtaining the same contract that BrightRidge sought from CenturyLink in the BVU written

discovery request at issue. It should also strike the Court as odd that despite BrightRidge having

obtained the BVU contract via not only a FOIA request to BVU but also a subpoena to BVU, and

despite BrightRidge repeatedly citing to that BVU contract in its pending Objection, that it still

requests that the Court order CenturyLink to produce that irrelevant contract. This begs the

question of when is enough ever enough for BrightRidge? As such, the Magistrate Judge did not

err in denying BrightRidge's request that CenturyLink be ordered to produce United Inter-

Mountain's contract with BVU.

### <u>4.</u> <u>*The Magistrate Judge Did Not Err In Finding That After Completion of the Depositions on January 13, 2023 that Discovery Was Closed, Thereby Denying BrightRidge's Request To Extend The Discovery Cutoff.*</u>

In BrightRidge's Objection it requests that the Court re-open discovery for an additional

sixty (60) days. Other than a general reference to a Rule 30(b)(6) deposition of CenturyLink,

BrightRidge neither enumerates any other discovery that it thinks it needs nor explains why it did

not timely complete that discovery.

As for a Rule 30(b)(6) deposition of CenturyLink, BrightRidge did initially request that

deposition, but during a meet and confer between counsel on December 8, 2022, it was discussed

that BrightRidge would send an Amended Notice of topics and that the deposition would be scheduled on one of the early January 2023 dates that had been set aside (and which ran through Friday, January 13, 2023). BrightRidge, though, never timely sent that Amended Notice of topics, and the deposition was not scheduled. Prior to that December 8, 2022 meet and confer, CenturyLink's counsel had written BrightRidge's counsel on November 3, 2022 concerning a 30(b)(6) deposition of CenturyLink as follows:

> With regard to a 30(b)(6) deposition of CenturyLink, we will need topics in advance to identify the appropriate representative/s to testify as to the topics for which there is not an objection. That deposition will have to occur in December or early January.

*See* Doc. 65-2 (PageID# 922). BrightRidge did not send its Amended Notice for a Rule 30(b)(6) deposition until COB on January 6, 2023, which was after BrightRidge had been served with CenturyLink's January 5, 2023 opposition to BrightRidge's discovery dispute and after the Court's December 23, 2022 discovery cutoff.

Thus, the Magistrate Judge did not err when she found during the January 9, 2023 hearing on the discovery dispute as follows:

> SO I BELIEVE THAT UNDER THE POSTURE THAT THE MATTER IS IN, DISCOVERY HAS CLOSED, YOU'RE READY TO MOVE FORWARD WITH NEXT STEPS IN THIS LITIGATION . . .

*See* Doc. 56 (PageID# 506). CenturyLink agrees with that finding and does not believe that a further extension of the discovery cutoff is warranted.

## IV. CONCLUSION.

WHEREFORE, for the foregoing reasons and other good cause, CenturyLink requests that BrightRidge's Objection to the Magistrate Judge's Ruling be overruled.

DATED this 15th day of February 2023.

25

Respectfully submitted,

**UNITED TELEPHONE SOUTHEAST, LLC,**
**d/b/a CENTURYLINK UTS**

s/ Misty Smith Kelley
Misty Smith Kelley, Esq. (TN Bar No. 19450)
BAKER, DONELSON, BEARMAN
CALDWELL & BERKOWITZ, P.C.
633 Chestnut Street, Suite 1900
Chattanooga, Tennessee 37450
423-209-4148 (phone)
423-756-3447 (fax)
mkelley@bakerdonelson.com
           and
Gary L. Edwards, Esq. (TN Bar No. 20058)
BAKER, DONELSON, BEARMAN,
CALDWELL & BERKOWITZ, P.C.
100 Med Tech Parkway, Suite 200
P.O. Box 3038
Johnson City, TN  37602
(423) 928-0181 (phone)
(423) 928-5694 (fax)
gedwards@bakerdonelson.com

*Counsel for United Telephone Southeast, LLC,*
*d/b/a CenturyLink UTS*

## CERTIFICATE OF SERVICE

I hereby certify that on February 15, 2023, a copy of the foregoing document was served on the following counsel of record via electronic mail and/or U.S. postal mail, postage prepaid:

William C. Bovender, Esq.
Stephen M. Darden, Esq.
Joseph B. Harvey, Esq.
HUNTER, SMITH & DAVIS, LLP
1212 N. Eastman Road
P.O. Box 3740
Kingsport, TN 37664
bovender@hsdlaw.com
sdarden@hsdlaw.com
jharvey@hsdlaw.com

s/ Gary L. Edwards___
Gary L. Edwards, Esq.

26