# EXHIBIT E

**Page 1**

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TENNESSEE
AT GREENEVILLE

JOHNSON CITY ENERGY AUTHORITY   *
d/b/a BRIGHTRIDGE,        *
  Plaintiff/Counter-Defendant,  *
             *  CASE NO.
VS.             *   2:20-cv-00030
             *
UNITED TELEPHONE SOUTHEAST, LLC,  *
d/b/a CENTURYLINK,       *
  Defendant/Counter-Plaintiff.  *

DEPOSITION OF
STACY DEAN EVANS
(Taken December 19, 2022)

APPEARANCES:
COUNSEL FOR BRIGHTRIDGE: STEPHEN M. DARDEN
          HUNTER, SMITH & DAVIS
          100 Med Tech Parkway, Ste. 110
          Johnson City, TN 37604
COUNSEL FOR CENTURYLINK: GARY L. EDWARDS
          BAKER DONELSON
          602 Sevier Street, Ste. 300
          Johnson City, TN 37604
ALSO APPEARING:     JEFF DYKES (by telephone)
          Chief Executive Officer
          BrightRidge

COURT REPORTING AND VIDEO SERVICES
P. O. Box 7481       TELEPHONE: (423) 230-8000
Kingsport, TN 37664        REBECCA@COURTREP.NET

1

**Page 2**

I N D E X  O F  E X H I B I T S
DEPOSITION OF STACY DEAN EVANS

EXHIBIT #1: "Our History" taken from BrightRidge website.
    Page Introduced: 51
EXHIBIT #2: "Location & Service" taken from BrightRidge
  website.
    Page Introduced: 71
EXHIBIT #3: BrightRidge Fiber Construction Make-Ready
  PowerPoint dated 8/16/18, Bates stamped BR001375 -
  BR001381.
    Page Introduced: 76
EXHIBIT #4: Tennessee Comptroller of the Treasury letter to
  Jeff Dykes dated 6/21/18.
    Page Introduced: 80
EXHIBIT #5: Tennessee Comptroller of the Treasury regulations
  for municipal broadband systems.
    Page Introduced: 100
EXHIBIT #6: BrightRidge Broadband Division Executive Summary.
    Page Introduced: 107
EXHIBIT #7: Curriculum vitae of Stacy D. Evans.
    Page Introduced: 117
EXHIBIT #8: CenturyLink pole attachments and make-ready
  discussions, Bates stamped BR0074.
    Page Introduced: 127
EXHIBIT #9: E-mail from Stacy Evans, Bates stamped BR00132.
    Page Introduced: 138
EXHIBIT #10: E-mails dated 9/12/18, 9/5/18, 8/31/18, 8/30/18,
  Bates stamped CL0072 - CL0075.
    Page Introduced: 144
EXHIBIT #11: E-mails dated 11/16/18, 11/12/18, 9/5/18,
  8/31/18, 8/30/18, Bates stamped BR0008.
    Page Introduced: 148

2

**Page 3**

I N D E X  O F  E X H I B I T S (cont.)
DEPOSITION OF STACY DEAN EVANS

EXHIBIT #12: Letter to Andy Ice from Stacy Evans dated
  11/26/18, Bates stamped CL0076 - CL0077.
    Page Introduced: 148
EXHIBIT #13: Letter to Andy Ice from Stacy Evans dated
  12/18/18, Bates stamped CL0080.
    Page Introduced: 150
EXHIBIT #14: E-mails dated 12/20/18, Bates stamped BR0072 -
  BR0073.
    Page Introduced: 152
EXHIBIT #15: E-mail dated 1/17/19, Bates stamped BR00131.
    Page Introduced: 155
EXHIBIT #16: Letter to Andy Ice from Stacy Evans dated
  3/1/19, Bates stamped CL00136 - CL00137.
    Page Introduced: 161
EXHIBIT #17: E-mails dated 5/28/19, 5/22/19, Bates stamped
  BR00322.
    Page Introduced: 162
EXHIBIT #18: Five black and white photographs showing poles,
  Bates stamped CL00141 - CL00145.
    Page Introduced: 166
EXHIBIT #19: Version 1 - 8/29/18 joint use pole make-ready
  discussions between CenturyLink and BrightRidge, Bates
  stamped CL00497.
    Page Introduced: 167
EXHIBIT #20: Version 2 - 8/29/18 joint use pole make-ready
  discussions between CenturyLink and BrightRidge, Bates
  stamped CL00492.
    Page Introduced: 169
EXHIBIT #21: Version 3 - 8/29/18 joint use pole make-ready
  discussions between CenturyLink and BrightRidge, with E-
  mail dated 9/5/18, Bates stamped CL00413 - CL00416.
    Page Introduced: 169

3

**Page 4**

C A P T I O N

  The deposition of STACY DEAN EVANS was taken pursuant to notice in the Johnson City, Tennessee law offices of Hunter, Smith & Davis beginning at 8:58 a.m. on Monday, December 19, 2022, for use at any trial, hearing or proceeding involving this matter, and for any purpose allowable by and pursuant to the Federal Rules of Civil Procedure.

  The witness was sworn by Rebecca Overbey, Licensed Court Reporter in and for the State of Tennessee. It is agreed that Rebecca Overbey, Licensed Court Reporter, may take this deposition by electronic recording equipment; transcribe the same to typewriting, using computer technology; and procure the signature of the witness through counsel.

  All other formalities are waived.

4

Case 2:20-cv-00030-KAC-CRW   Document 67-5   Filed 02/15/23   Page 2 of 10   PageID #: 960

1  STACY DEAN EVANS, the witness, having first been duly
2  sworn, testified as follows:
3  DIRECT EXAMINATION BY MR. GARY L. EDWARDS:
4  Q.  Good morning, Mr. Evans.
5  A.  Good morning.
6  Q.  My name is Gary Edwards.  I represent CenturyLink in a
7      lawsuit that has been filed against them by BrightRidge.
8      Of course, CenturyLink filed a countersuit, so we're here
9      today to ask you some questions about what you know.  You
10     have been identified as a witness.  Have you ever given a
11     deposition before?
12 A.  I have not.
13 Q.  Okay.  So this will be the first -- the first time.  Just
14     a couple of general guidelines.  If you'll verbalize your
15     answers, because nods of the heads, uh-huhs, and huh-uhs
16     are hard for the court reporter to pick up.
17 A.  Sure.
18 Q.  Okay.  And if at any time I ask a question and you don't
19     understand it, I'll ask you to -- you can ask me to
20     rephrase it and I will try to rephrase it for you.
21     Otherwise, I will assume that you understood my question.
22     Is that fair?
23 A.  Yes.
24 Q.  Okay.  If you would, state your full name for the record.
25 A.  Sure.  Stacy Dean Evans.

5

1  Q.  Mr. Evans, who is your current employer?
2  A.  BrightRidge.
3  Q.  And what is your job title at BrightRidge?
4  A.  Chief broadband tech' -- chief broadband and technology
5      officer.
6  Q.  As chief broadband and tech officer -- technology officer,
7      what are your job duties?
8  A.  I manage the IT department that serves the majority of the
9      electric section of our business, and then also the
10     broadband department that deploys fiber-optic services and
11     fixed wireless to provide broadband telephone and video
12     services to our customers.
13 Q.  How long have you been in that position?
14 A.  June 4th, 2018.
15 Q.  And when did you start with BrightRidge?
16 A.  That was when I started, that date.
17 Q.  So you have held the same title and same job duties?
18 A.  Well, I did not have the IT portion of being the
19     technology officer initially.  That was added on.  I don't
20     have that date.  I'll refer you to fall to my resume on
21     that date.
22 Q.  Okay.  And did you have any prior employment with
23     BrightRidge or any of its predecessors and interests such
24     as Johnson City Power Board?
25 A.  I did not.

6

1  Q.  Okay.  To whom, if anyone, do you report at BrightRidge?
2  A.  I report to our CEO, Jeff Dykes.
3  Q.  Obviously, you're aware that BrightRidge has sued
4      CenturyLink in this action.  Why did BrightRidge sue
5      CenturyLink?
6  A.  We understood from the CenturyLink team that they had
7      planned to take legal action, and we basically said we
8      think we've got a good position here and we lobbied a
9      lawsuit.
10 Q.  So you decided to take action first?
11 A.  Correct.
12 Q.  Okay.  And when you say your legal team, who is that?
13 A.  Hunter, Smith & Davis would be our attorneys.
14 Q.  And that's the firm that's representing you in this
15     action?
16 A.  Yes.
17 Q.  And what is your understanding of the relief that
18     BrightRidge seeks in this action?
19 A.  I don't know if I know all the details of what we've asked
20     legally.  At the end of the day, we would like to be able
21     to continue offering our broadband services using the
22     joint use agreement that we have in place to attach to the
23     poles that are owned by CenturyLink, as well as our own.
24 Q.  Do you like CenturyLink?
25 A.  I have no problem with CenturyLink.

7

1  Q.  Okay.  Do you think the 1980 agreement between Johnson
2      City Power Board and United Inter-Mountain Telephone
3      Company allows BrightRidge to make attachments in the comm
4      space of poles that CenturyLink owns?
5  A.  Yes.
6  Q.  Why?
7  A.  I could cite from memory, because I'm very familiar with
8      the contract.  I have worked with it in some form since
9      2002.  But if you would like for me to provide an example,
10     I could spell those out if you have a copy of the
11     agreement, or I can do it from memory.
12 Q.  I would just like you to do it from memory, please.
13 A.  Okay.  If you look at the second "whereas" in the
14     contract, it basically -- it basically spells out that
15     each company can judge their own character and use of the
16     circuits on the poles.  This contract historically was
17     made as a boilerplate template that would be used by
18     Bristol Virginia Utilities, Elizabethton Electric, Bristol
19     Tennessee Electric at the time, Erwin Utilities,
20     Greeneville Light & Power, Holston Electric, all these
21     groups, and of course Johnson City Power Board.  And its
22     intention was to not duplicate poles out there to make it
23     unsightly and, you know, a problem for the customers that
24     live in these areas, to take the poles owned by each party
25     so that we can jointly use those poles, so it wasn't made

8

| | |
|---|---|
| 1     to inhibit anybody from offering services. And it very | 1     involved in that particular agreement. |
| 2     much says in that "whereas" that we can judge the use for | 2   Q. Are there any beneficiaries to this 1980 agreement between |
| 3     our own services, so it basically says we can do that. If | 3     -- that originated from Johnson City Power Board and |
| 4     you go down to Article I, it spells out normal space used. | 4     United Inter-Mountain Telephone Company? |
| 5     For the electric company, it defines the upper six foot | 5   A. I don't know if I know the legal term beneficiaries and |
| 6     space for their use. There is a gap, typically 40 inches, | 6     how you're using it. Can you explain that? |
| 7     for safety space. And then it defines a four foot -- | 7   Q. That's not a term you're familiar with? |
| 8     excuse me -- a four foot space for the telephone company. | 8   A. I mean, I know beneficiaries if you've got a will and |
| 9     There's also, in that Article I right above those two | 9     you've got things like that, but I'm not sure what that |
| 10    outlines of the normal space, there is an exception that | 10    means in this context, if you could explain. |
| 11    says if -- as long as it adheres to the National Electric | 11   Q. Well, someone else that would benefit under this -- under |
| 12    Code Requirements that one party can use space in the | 12    this contract between these two parties. Is there anyone |
| 13    other -- in the other normal space of the other, so it's | 13    you can think of? |
| 14    very spelled out right there. And in addition to that, | 14   A. I mean, it's for the joint use of those two parties. I |
| 15    Article III talks about that we -- the normal use pole, we | 15    can't think of anything offhand. |
| 16    can use any pole owned by the other party. Article VI | 16   Q. Okay. |
| 17    gives the process for requesting use of nonreserved space, | 17   A. I guess, can I amend to that? |
| 18    how we go about that, and there's an application fee | 18   Q. Sure. |
| 19    required, which BrightRidge applied before. If you go to | 19   A. The benefit -- the benefit would actually be to the |
| 20    Article IX -- let me think about what it's got in there | 20    property owners, the consumers, the people or residents of |
| 21    for a second. One less thing you've got to remember. But | 21    this area because that means there's half the number of |
| 22    Article IX has got some information as well about | 22    poles out there, so there is a benefit there. I guess I |
| 23    adjustments, attachments, and how those are to come about. | 23    should have phrased it that way. |
| 24    So, to me, it looks like the contract is very plain. And | 24   Q. So are you saying the consuming public is a beneficiary? |
| 25    again, this was interpreted the same way, the same | 25   A. Absolutely. |
|                                       9 |                                      11 |
| 1     contract, minus the parties involved and names -- maybe | 1   Q. Would that be the consuming public there in the |
| 2     there's one redacted statement, I guess -- that was used | 2     BrightRidge service area? |
| 3     by Bristol Virginia Utilities when I was there. Basically | 3   A. Correct. |
| 4     it was used from 2000 to the fall of 2018 when they sold | 4   Q. When was the first time that you saw the 1980 agreement |
| 5     the communication division. | 5     between Johnson City Power Board and United Inter-Mountain |
| 6   Q. Does that cover it? | 6     Telephone Company? |
| 7   A. I think that's a good basis, yes, sir. | 7   A. I started June 4th of 2018 there, so it would have been -- |
| 8   Q. Now, who are the parties to the 1980 agreement between | 8     it would have been probably in the month of late June or |
| 9     Johnson City Power Board and United Inter-Mountain | 9     early July time period when we were putting our plans |
| 10    Telephone Company. | 10    together for deploying the services. |
| 11 MR. DARDEN: Objection to the form of the question. When I do | 11   Q. That would be late June or early July of 2018? |
| 12    that, Mr. Evans, that does not mean I'm instructing you | 12   A. 2018, yeah. Now, if I can amend to that, I will say that, |
| 13    not to answer. I'm just inserting an objection for the | 13    again, it is a boilerplate from the one I worked with at |
| 14    record. | 14    BVU from 2002 to 2018. |
| 15   A. Sure. And your question again, who are the parties | 15   Q. Well, the question is when was the first time that you saw |
| 16    involved in the 1980 agreement between... | 16    the agreement between Johnson City Power Board and United |
| 17   Q. So my question is who are the parties to the 1980 | 17    Inter-Mountain Telephone Company. |
| 18    agreement between Johnson City Power Board and United | 18   A. Yes. |
| 19    Inter-Mountain Telephone Company? | 19   Q. And was the first time that late June or early July of |
| 20   A. Well, today, Johnson City Energy Authority doing business | 20    2018? |
| 21    as BrightRidge, that has been assumed, that contract, by | 21   A. That's correct. |
| 22    BrightRidge. The other party, I understand that was | 22   Q. When was the first time that you sought legal advice |
| 23    United Inter-Mountain Telephone, has had multiple name | 23    concerning the 1980 agreement between Johnson City Power |
| 24    changes, but I think it's owned by Apollo Group or Connect | 24    Board and United Inter-Mountain Telephone Company? |
| 25    Holdings at this time. So those are the two parties | 25   A. It would have been in the fall of 2018. I don't have an |
|                                      10 |                                      12 |

1   entitled to find out what expert opinions...
2 A. Okay.
3 Q. ...that you intend to offer in the litigation. So my
4    question to you is what expert opinions have you
5    formulated with regards to this case? And you have
6    mentioned one, you said that the knowledge of previous
7    organizations, such as BVU. Any other expert opinions?
8 MR. DARDEN: Same objection.
9 A. I mean, I have many other thoughts that probably will come
10   out before the legal case, but I have not put time into
11   thinking through all of those at this given time.
12 Q. What documents, if any, do you rely upon in support of
13   your expert opinions?
14 A. As far as this case, the 1980 joint use agreement and
15   proceeding amendments are the basis, primary basis.
16 Q. I'm trying to make a list of the documents that you rely
17   upon as an expert witness in this case. One of them that
18   you just identified was the 1980 agreement between Johnson
19   City Power Board and United Inter-Mountain Telephone
20   Company. Are there any other documents?
21 A. Definitely the same 1980 agreement between Bristol
22   Virginia Utilities Board at that time and United Inter-
23   Mountain Telephone Company.
24 Q. Any others?
25 A. Probably would go to -- probably a reference to the Edison

41

1   publication that's referenced in the 1980 agreement. It's
2   dealing with joint use pole agreements in general.
3   Documentation as to basically the advancements in
4   technologies. I do not have specific documentation I
5   would reference right now. Information about
6   CenturyLink's own deployment of fiber networking and
7   related services. I really haven't formulated all those
8   others, so I would have to say that would come before the
9   court case.
10 Q. Now, with regards to the 1980 agreement between BVU and
11   United Inter-Mountain that you referenced, what exactly do
12   you have document wise related to that agreement?
13 A. We did a FOIA request and we have a copy of that agreement
14   with applied amendments to it.
15 Q. To whom did you serve a FOIA request on?
16 A. What was formerly Bristol Virginia Utility Board, now BVU
17   Authority.
18 Q. When did you serve that FOIA request?
19 A. Let me see if I can think back to the date here. It would
20   have been in '22. I do not remember the exact date. Let
21   me pause one second. It says the microphone is not
22   working.
23 MR. DARDEN: Okay. We're going to just press on.
24 A. That's fine.
25 Q. Has BrightRidge produced in this action the 1980 BVU and

42

1   United Inter-Mountain agreement that you referenced?
2 A. I know we have it identified. I do not know if it's been
3   provided to the opposing party. I don't know.
4 Q. Is the BVU agreement that you're referencing, is it signed
5   by anyone?
6 A. The copy that I saw did not have a signature.
7 Q. How many amendments to the 1980 BVU agreement have you
8   seen?
9 A. While working there, I know that there were at least --
10   let me think here for a second. I think there were five
11   amendments that I'm aware of. I do not know if the copy I
12   have contains all of those amendments.
13 Q. And my question is with regard to the documents that
14   you've relied upon to formulate your expert opinions, how
15   many amendments, if any, to this 1980 BVU agreement have
16   you relied upon?
17 A. I'm not sure what amendments it had with that one. The
18   basis of our -- of what we're looking at in the contract
19   is consistent in the base agreement itself.
20 Q. And when you say the base agreement itself, that's the
21   original 1980 agreement?
22 A. Yes, sir.
23 Q. And that's the aspect of the BVU agreement upon which
24   you've relied upon in formulating your expert opinions?
25 A. That is definitely a document I would use for expert

43

1   opinion.
2 Q. Any other BVU documents that you've relied upon in
3   formulating your expert opinion?
4 A. From knowledge, not a document I could point to today that
5   I have a copy of. From knowledge, I know how we were
6   invoiced from CenturyLink for joint use pole agreements.
7   I know that there were at least three pole audits
8   performed during that 18 and a half year period.
9   CenturyLink was very aware that fiber attachments were
10   made in the communications space of CenturyLink owned
11   poles.
12 Q. So the question is with regard to documents that you rely
13   upon for your expert opinions in this case, okay?
14 A. Okay.
15 Q. Besides this base 1980 agreement with BVU, are there any
16   other documents that you've relied upon?
17 A. Not at this time. Not to say that I may not add some
18   things to that.
19 Q. You also referenced the Edison agreement that's referenced
20   in the 1980 agreement between Johnson City Power Board and
21   United Inter-Mountain Telephone Company. What particular
22   reference are you talking about in that Edison document?
23 A. I mean, I have a copy of that book actually with Edison
24   information in it. I do not have specific areas I could
25   point you to right now that I would use.

44

1  Q.  You have to lease that fiber because of the Tennessee
2      Comptroller of the Treasury regulations, right?
3  A.  I don't know if there's a requirement to force it to be
4      leased.  It's an option, for certain.
5  Q.  So can the two divisions cross-subsidize each other?
6  A.  No.
7  Q.  I didn't think so.
8  A.  I don't understand.  I'm not saying -- I'm just saying we
9      don't have to use that fiber.  If we use it, obviously,
10     we've got to pay a lease for it, but we do not have to use
11     that fiber.
12 Q.  Well, you've already testified though that the broadband
13     division is leasing fiber that is attached in the electric
14     space of CenturyLink poles from the electric division,
15     correct?
16 A.  Of course.
17 Q.  Let me show you what we'll mark as Exhibit 7.
18 EXHIBIT #7:  Curriculum vitae of Stacy D. Evans.
19 Q.  Mr. Evans, Exhibit 7 is your CV that has been produced in
20     this case.  Is that correct?
21 A.  It is.  Let me point that there is one error there on the
22     termination date at Bristol Virginia Utilities.  I see it
23     says "to present".  That would have ended June 2nd, 2018.
24 Q.  Any other corrections that need to be made to your CV
25     marked as Exhibit 7?

                                                              117

1  A.  automated 30 of their manufacturing plants' warehousing
2      for bar code systems, computerization, monitoring
3      inventory, tracking, day-to-day operations.
4  Q.  And that was through the use of a computer system?
5  A.  Computer system and networking, yes, sir.
6  Q.  And then if we go on up from there, it looks like starting
7      in March of 1992 you worked for Fingerhut, correct?
8  A.  Correct.
9  Q.  And you have under here one of the bullet points is
10     telecommunications/networking.
11 A.  Uh-huh (Affirmative).
12 Q.  And you've got a reference there to cabling, fiber-optic.
13     Tell me about that.
14 A.  Yes, we used fiber-optic cabling within our facility.  It
15     was a million square foot facility, 72 dock doors, six
16     miles of conveyor system, so we had an extensive network
17     with fiber-optic and copper connectivity between devices
18     in that facility.
19 Q.  And that was under your telecommunications/networking
20     bullet point here for Fingerhut in 1992?
21 A.  Yes.  Can I make one more point?  I do not have it on this
22     CV, but I also had working experience prior to CBM on this
23     internship with Cherry Tree Software doing computer --
24     computer work and networking as well.
25 Q.  Okay.  And when was that?

                                                              119

1  A.  Not that I -- not that I'm aware of.
2  Q.  Any additions that need to be made to your CV marked as
3      Exhibit 7?
4  A.  Not that I'm aware of.
5  Q.  And if we turn to the second page there of your CV marked
6      as Exhibit 7 and we look at down under education and
7      degrees, it indicates that from 1980 to 1986, that's when
8      you attended high school, correct?
9  A.  Yes.
10 Q.  So when the 1980 agreement between Johnson City Power
11     Board and United Inter-Mountain Telephone Company was
12     being negotiated, you were at R.B. Worthy High School,
13     correct?
14 A.  I was.
15 Q.  Now, if we go on up under your experience, you've got an
16     indication there starting in it looks like June of 1988 at
17     CBM Technologies, correct?
18 A.  Correct.
19 Q.  And it says "senior computer technician," right?
20 A.  Correct.
21 Q.  Tell me about what is senior computer technician?  What
22     were you doing in 1988 for CBM Technologies in that
23     position?
24 A.  Subcontractor with E.I. DuPont, who was a textile
25     manufacturer in the United States.  We, as a contractor,

                                                              118

1  A.  That would have been from '87 until June of '88.
2  Q.  Okay.  And what did you say the company's name was?
3  A.  Cherry Tree Software.  They were located in Bristol,
4      Virginia.
5  Q.  And what type of software were they doing at that time?
6  A.  They were doing custom software for companies like
7      pharmaceutical Beecham, the coal industry, various ones.
8      I was involved with computer setup, installation,
9      connecting those together via networks.
10 Q.  Would that have used fiber-optic cabling as well?
11 A.  At that time, it would not have.
12 Q.  Now, you've got on here from April 22, 2022, and you've
13     corrected the date to June 2nd or June 2, 2018, Bristol
14     Virginia Utilities/BVU Authority, correct?
15 A.  Yes.
16 Q.  Did employees of BVU go to jail while you were employed
17     there?
18 A.  There were some employees that were incarcerated, yes.
19 Q.  Which ones?
20 A.  The chief financial officer, I think the CEO.  I'm not
21     sure who all the others were because I'm not sure who
22     actually served time or didn't, to be honest with you.
23     There were other people involved.
24 Q.  Who all was charged?
25 A.  I don't know all of those, to be honest with you, but

                                                              120

1    there were multiple people.
2  Q. Tell me the names of the ones you do know.
3  A. Wes Rosenbalm, the CEO; Stacey Pomrenke as CFO.  Actually,
4    Jim Kelley, he was no longer employed there, but I know
5    there were charges lobbied against him.  There were
6    probably some other people involved, but that's the ones
7    that come to mind.
8  Q. Did you work under any of these individuals?
9  A. Yes, I worked under, not directly, but a level below Mr.
10   Rosenbalm, Wes Rosenbalm.
11 Q. So was Mr. Rosenbalm involved with the broadband of BVU?
12 A. He managed the entire organization of BVU, which had a
13   division that was broadband.
14 Q. And who was your direct report at BVU?
15 A. There were multiples.
16 Q. Well, you said there was a layer between you and Wes
17   Rosenbalm.
18 A. Right.
19 Q. Who was that layer is what I'm trying to figure out.
20 A. Well, we'd have to look at the time period you're talking
21   about.  During the investigation you're referring to?
22 Q. Yeah.
23 A. Let me see, who did we have at that time?  Scott Moehnke
24   was a level between me and the CEO at a given time, but
25   with some of this being influx as you said, some of those
121

1    layers of management were eliminated, so it's according to
2    what given time you're referring to.
3  Q. Were you ever interviewed in relation to any of those
4    investigations?
5  A. Yes.
6  Q. Who interviewed you?
7  A. Multiple FBI agents, an IRS agent, Zach Lee who was -- I
8    forget the attorney position there with the federal
9    government.
10 Q. Why were you being interviewed?
11 A. As a witness.  I was responsible for all of the IT
12   records, being E-mail systems and data, that was
13   subpoenaed.  I had to attest to the validation of that
14   material and provide that to the entities.
15 Q. And what was the wrongdoing that was asserted as it
16   related to that investigation?
17 A. You know, there were multiple charges.  I do not know all
18   of those charges, to be honest with you.  I'm sure the
19   records are publically available.
20 Q. What are the charges that you are aware of?
21 A. I know that the CEO may have misappropriated gifts from
22   vendors.
23 Q. Anything else?
24 A. I'm sure there were, but I don't really have knowledge of
25   that right at this point in time.
122

1  Q. So you claim to have knowledge related to BVU, but you
2    don't have knowledge related to a criminal investigation
3    that led to a number of high officials going to jail?
4  A. These people were no longer employees by the time they
5    were prosecuted.  It was not a company related thing other
6    than me providing evidence as requested for certain date
7    periods as the investigators requested those.
8  Q. How soon after they were sentenced did you leave BVU?
9  A. I didn't leave until -- I think they were sentenced
10   probably about, what, 2016?  I'm trying to go from memory
11   there.  So I was over there for a couple more years later.
12 Q. And what did you do from 2016 on at BVU after these
13   individuals left?
14 A. I continued to manage the network engineering and outside
15   plant engineering teams.  I also took on additional
16   responsibilities in operations as people were absent that
17   had had some of those responsibilities before.
18 Q. When you left BVU, did you take any BVU documents with
19   you?
20 A. I mean, no documents, no.
21 Q. With whom at CenturyLink, if anyone, have you ever had
22   discussions related to BVU?
23 A. I didn't really have firsthand interface with the group.
24   I know that Marcy Buckles was a primary that my staff
25   dealt with.
123

1  Q. Did you ever have any conversations with Buckles?
2  A. Not that I'm aware of.
3  Q. Anybody else at CenturyLink with whom you've ever had any
4    conversations with related to BVU?
5  A. There were technicians at times.  I do not remember names.
6    Typically, for the joint pole use agreement, it was
7    exchanged through our accounting department.  I reviewed
8    that, reviewed it with the outside team, any type of
9    audits that were performed, and then would approve the
10   adjustment payments that were made accordingly.
11 Q. Are you appearing here today on behalf of BVU as a
12   representative of BVU?
13 A. No.  You asked me the question, sir.
14 Q. And my question was actually have you had any
15   conversations with anyone at CenturyLink related to BVU.
16   And I think your answer to that is no, correct?
17 A. I thought -- you're not saying while I worked there?  I
18   don't understand your context.
19 Q. Let's start with while you worked at BVU.
20 A. Okay.
21 Q. Did you have any conversations with anyone at CenturyLink?
22 A. Not directly that I recall.
23 Q. Okay.  Since you've left BVU, have you had any
24   conversations with anyone at CenturyLink related to BVU?
25 A. No.
124

1    CLEC (competitive local exchange carrier). Stacy
2    explained that BrightRidge did not plan to become a CLEC
3    and asked for the rate for other communication
4    attachments." End quote. Did I read that correctly?
5 A. Yes.
6 Q. And the reference to Stacy there, that's you?
7 A. Yes, that would be.
8 Q. All right. So tell me what you're writing about here.
9 A. Basically, by this time we had received objection from
10    CenturyLink about our right to attach to their poles in
11    the communications space. I was outlining internally,
12    from my understanding of the conversations and positions
13    of CenturyLink associated with that, and then provided
14    some options to review.
15 Q. And it's true that you noted that you had indicated that
16    BrightRidge did not plan to become a CLEC, correct?
17 A. At that time we didn't have a reason to.
18 Q. And as we stated today, you're still not a registered CLEC
19    as it relates to being regulated by the FCC, correct?
20 A. We are registered as a competitive local exchange carrier,
21    we are.
22 Q. So now you are regulated by the FCC?
23 A. We do not, doing business through that CLEC option, but we
24    are licensed.
25 Q. So you are a licensed CLEC, but you feel like you don't

129

1    BrightRidge is making in the communications space of
2    CenturyLink owned poles, correct?
3 A. Yes.
4 Q. And if we look at "5 b" of your document here that's
5    marked as Exhibit 8, does that accurately reflect what
6    BrightRidge's argument was at the time?
7 A. Well, that was a stance that we understood and we
8    presented that. CenturyLink had made additional
9    attachments beyond the telephone services at that time,
10    including fiber and additional copper cables to it. It
11    was no different than us under the same agreement making
12    additional attachments as well.
13 Q. Well, what you wrote in "5 b" was, quote, "BrightRidge
14    argument against this is that when United
15    Telephone/Sprint/Embarq/CenturyLink established the joint
16    use pole agreement, that the service was for telephone
17    services. Since that time, CenturyLink has expanded their
18    attachments to include fiber-optic and additional copper
19    cables to facilitate the delivery of broadband services.
20    This is no different than BrightRidge originally providing
21    only electricity and now adding the broadband services.
22    Thus we should not pay for additional attachments any more
23    than CenturyLink did when their service offerings
24    changed." End quote. Did I read that correctly?
25 A. Yes.

131

1    have the regulations of the FCC on you, right?
2 A. We don't act through that particular arm. We have direct
3    agreements through bandwidth.com for our telephone
4    services and haven't had the need to do a local tandem
5    interchange connection.
6 Q. So you have this CLEC license, but you're not actually
7    using it?
8 A. Correct. We're really not acting upon that today. That's
9    right.
10 Q. Okay. And when you say that you're not acting on it
11    today, that would include the deployment by the
12    BrightRidge Broadband division of attachments in the
13    communications space of CenturyLink owned poles, correct?
14 A. That could be an option.
15 Q. Well, I mean, as we're sitting here today, BrightRidge
16    Broadband division is putting attachments in the comm
17    space of CenturyLink owned poles, right?
18 A. Yes.
19 Q. Okay. And as we sit here today, BrightRidge Broadband is
20    not acting on its CLEC.
21 A. Because we have a joint use agreement that already
22    provides for that.
23 Q. Well, and you understand that there is a disagreement
24    between the parties as to whether the 1980 agreement
25    applies to the attachments that the broadband division of

130

1 Q. And that's what you stated as the BrightRidge argument was
2    in relation to the timing of this document marked as
3    Exhibit 8, right?
4 A. Again, this was for internal discussions among our group
5    is what it was. There's obviously other arguments based
6    on the agreement as well.
7 Q. And who did you send this document to?
8 A. This would have went to Jeff Dykes, I'm certain, our CEO.
9    I'm not sure if anybody else was on that E-mail or not.
10 Q. So do you think this was attached to an E-mail?
11 A. Yes, I would be -- well, you know, it could have been --
12    it could have been an agenda for the discussions meeting.
13    I do not know. I would say I do not know the answer on
14    that one.
15 Q. And number six of Exhibit 8 you write, quote, "Neighboring
16    utilities (BVU, BTES, Erwin Utilities) have not paid
17    CenturyLink separately for attaching fiber-optic lines in
18    the communication zone on poles where electric line
19    attachments were already in place." End quote. Did I
20    read that correctly?
21 A. Yes.
22 Q. What was -- who was the source for that entry on number
23    six?
24 A. Well, I would have put the reference having worked at BVU,
25    I knew the situation there. I know very well the staff,

132

1    such as Mike Parker and Clayton Dowell at Bristol
2    Tennessee Essential Services. Then Erwin Utilities, John
3    Fredericks.
4  Q. So the only -- the only source for this information at
5    BrightRidge is yourself?
6  A. Well, I mean, I knew it. I stated this as internal
7    communications, so I stated it from my known interaction
8    with it, yes.
9  Q. Did anybody else claim to have that knowledge who was
10   employed by BrightRidge?
11 A. I didn't ask, but David Addington, he worked at BVU before
12   as well, so he would have the knowledge. He was not -- he
13   was not involved with this conversation that I recall.
14 Q. So number six -- the entry you've got on number six came
15   from you?
16 A. Yes, me in communication with the other two parties. Yes.
17 Q. Have you ever been employed by BTES?
18 A. No, but I just told you the source.
19 Q. Have you ever been employed by Erwin Utilities?
20 A. No.
21 Q. Have you ever spoken with anyone at CenturyLink regarding
22   BTES?
23 A. I am not sure.
24 Q. Have you ever spoken with anyone at CenturyLink related to
25   Erwin Utilities?

133

1 A. I'm not sure of that one either.
2 Q. Do you have any documents related to Erwin Utilities and
3   CenturyLink?
4 A. I personally do not. I understand the contract is
5   consistent with what we have.
6 Q. Have you reviewed any contract between Erwin Utilities and
7   CenturyLink?
8 A. I think I have seen a copy before.
9 Q. When?
10 A. That I'm not sure of. I would say probably -- I'm not
11   sure. It would have been probably within the past four
12   years.
13 Q. Well, have you seen a copy of any agreement between Erwin
14   Utilities and CenturyLink or have you not?
15 A. I've seen information I think was an agreement. Whether
16   it was signed, I don't know. I'm not sure.
17 Q. Who would have provided you with this?
18 A. I'm not sure because we would have looked internal and had
19   discussions. Obviously, we have relationships between the
20   various utilities. I may have asked for it, I can't
21   recall, but I'm not sure.
22 Q. What is the relationship between the various utilities?
23 A. As far as, you know, if we're all part of the TVA, there's
24   mutual meetings that we would attend together and things
25   like that.

134

1 Q. What type of mutual meetings have you had in relation to
2   CenturyLink?
3 A. Oh, not about CenturyLink, no. But you said what kind of
4   relationship.
5 Q. Have you ever reviewed any documents between BTES and
6   CenturyLink?
7 A. I'm not sure.
8 Q. Now, in this Exhibit 8, you put Option 1 and Option 2 for
9   BrightRidge, right?
10 A. Yes.
11 Q. Why two options?
12 A. Let me take a second to look at that. We were presented
13   from Andy Ice an application for a pole attachment
14   agreement. I wanted to make sure that our CEO and team
15   were aware of the opportunities we had. I outlined those
16   as two options. We felt like the agreement as it stood
17   today, the 1980 agreement as amended, provided us Option 1
18   and the path forward. If we wanted to engage in the
19   secondary offer, a pole attachment agreement, then Option
20   2 outlined how we understood that to occur.
21 Q. And what option did BrightRidge choose?
22 A. We chose Option 1.
23 Q. And when BrightRidge chose Option 1, it knew that that
24   would likely result in a legal challenge, right?
25 A. Based on information provided from CenturyLink, since they

135

1   said the contract did not provide for it, it sounded
2   likely.
3 Q. And if we look under Option 1, Number 3, it says, "The
4   BrightRidge legal team thinks that the likelihood of an
5   injunction stopping BrightRidge is low." Isn't that what
6   you wrote?
7 A. It does say that.
8 Q. And the BrightRidge legal team is who?
9 A. That would be Hunter, Smith & Davis.
10 Q. And then if we go down to Option 2, which is the option
11   that BrightRidge did not choose, and this would have been
12   the one where BrightRidge would have entered into a
13   separate agreement with CenturyLink to make attachments in
14   the communications space of CenturyLink poles, right?
15 A. Yes.
16 Q. Under number two, point two under that Option 2 you write,
17   second sentence says, quote, "This may also set a
18   precedence for future situations involving the joint use
19   agreements." End quote. Did I read that correctly?
20 A. Yes.
21 Q. What precedence are you talking about there?
22 A. We have an existing joint use pole agreement and this
23   would be working around that existing format.
24 Q. So what is this setting precedence for?
25 A. That basically the joint use agreement does not apply as

136

1  Q.  Have you had any conversations with a Marcy Buckles at
2      CenturyLink other than what we've already discussed?
3  A.  Since being at BrightRidge?  Is there a context to your
4      question?
5  Q.  Yeah.  Have you -- since you've been -- with regards to
6      the BrightRidge lawsuit, the BrightRidge issue of wanting
7      to -- the broadband division wanting to attach in the
8      communications space of CenturyLink poles, have you had
9      any conversations with Marcy Buckles about that?
10 A.  No.
11 Q.  What about a Maggie Burgoyne?  Have you had any
12     conversations with her?
13 A.  Not that I'm aware of.  And I'm answering that way because
14     I don't know if some of them could have been on a
15     conference call or something with the other group.  I just
16     don't recall.
17 Q.  And I'm just trying to figure out if you have any
18     knowledge of speaking with any of them.  If you don't have
19     any knowledge of it, so be it.
20 A.  We really used Andy Ice and Andrew Chong as our interface
21     in working through the situation.
22 Q.  Okay.  And I take it that's true too with regards to a
23     Steve Hastings.  You haven't had any conversations with
24     him about the BrightRidge dispute?
25 A.  Not that I'm aware of.

177

1  Q.  Okay.  Let's go off the record a minute.
2                  ***OFF THE RECORD***
3  DIRECT EXAMINATION CONTINUES BY MR. EDWARDS:
4  Q.  Let's go back on.  Mr. Evans, are you an engineer at all?
5  A.  I do have certifications in network engineering
6      professions.
7  Q.  Are you a licensed engineer with the State of Tennessee?
8  A.  No.
9  Q.  Are you a licensed engineer with the Commonwealth of
10     Virginia?
11 A.  Not as a PE or anything like that, no.
12 Q.  When you talk about network engineering, outside of the
13     context of holding a professional engineering license,
14     what do you mean?
15 A.  The industry for technology has engineering certifications
16     that you can obtain by taking certain tests that prove
17     your abilities to work with those network designs, and
18     standards, and design systems.
19 Q.  Do you plan on giving any expert testimony in this case
20     regarding the concept of general engineering services?
21 A.  You know, I'll have to admit that I have not formulated
22     that portion of it.  I'll be very honest with you.  I
23     mean, that is a part of my background, so there definitely
24     could be a case, but I can't give you an example right now
25     of what that would be.

178

1  Q.  Okay.  And I asked you at the beginning of your deposition
2      if you recall, you know, what were the expert opinions
3      that you had generated for purposes of this case.  We're
4      now here at the end of the deposition.  Are there any
5      expert opinions that you have generated for this case that
6      we haven't already discussed?
7  A.  I can't think of anything that has been added to it since
8      our initial discussions.
9  Q.  Okay.  Thank you.  That's all the questions I have.  Mr.
10     Evans, thank you for your time today.
11 A.  Thank you.
12     AND FURTHER THE DEPONENT SAITH NOT.
13                              STACY DEAN EVANS
14
15
16
17
18
19
20
21
22
23
24
25

179

1
2                  C E R T I F I C A T E
3
4      I, Rebecca Overbey, Licensed Court Reporter in and for
5  the State of Tennessee, do hereby certify that the
6  foregoing deposition of STACY DEAN EVANS was taken at the
7  time and place and for the purpose as stated in the
8  Caption; that the witness was duly sworn by me before
9  deposing; that the said deposition was recorded
10 electronically and was later transcribed to typewriting,
11 using computer technology; and that the foregoing is a true
12 and accurate transcript of the proceedings to the best of
13 my knowledge, ability and understanding.
14     WITNESS my hand and official seal at my office in
15 Kingsport (Sullivan County) Tennessee on this the 4th day
16 of January, 2023.
17
18                              Rebecca Overbey
19                         LICENSED COURT REPORTER
20                         St ate o f   Tennessee
21                              LCR #078
22
23 My License Expires:
24     June 30, 2024
25
       ***CERTIFIED ONLY IF AFFIXED SEAL IS GREEN***

180

Case 2:20-cv-00030-KAC-CRW   Document 67-5   Filed 02/15/23   Page 10 of 10   PageID #:
968