# EXHIBIT F

Johnson City Energy Authority (Brightridge)

vs.

United Telephone Southeast

---

Deposition of:

Andrew Chong

December 01, 2022

*Vol 01*



IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TENNESSEE
AT GREENEVILLE, TENNESSEE

CASE NO.: 2:20-cv-00030

JOHNSON CITY ENERGY AUTHORITY,
D/B/A BRIGHTRIDGE,

        Plaintiff and Counter-Defendant,

vs.

UNITED TELEPHONE SOUTHEAST, LLC,
D/B/A CENTURYLINK,

        Defendant and Counter-Plaintiff.

_____/

DEPOSITION OF

ANDREW CHONG

Pages 1 through 195

Thursday, December 1, 2022
9:28 a.m. – 3:21 p.m.

Baker, Donelson, Bearman, Caldwell & Berkowitz, PC
200 South Orange Avenue, Suite 2900
Orlando, Florida 32801

Stenographically Reported By:
Alison Hawk, RPR

Job No.: 285861

Case 2:20-cv-00030-KAC-CRW   Document 67-6   Filed 02/15/23   Page 3 of 8   PageID #: 971
www.phippsreporting.com
(888) 811-3408

```
                                                    Page 2
 1   APPEARANCES:
 2   On behalf of Plaintiff:
 3        Hunter, Smith & Davis, LLP
          100 Med Tech Parkway, Suite 110
 4        Johnson City, Tennessee 37604
          423-283-6300
 5        BY:  Stephen M. Darden, Esquire
               sdarden@hsdlaw.com
 6
 7   On behalf of Defendant:
 8        Baker Donelson
          602 Sevier Street, Suite 300
 9        Johnson City, Tennessee 37604
          423-928-0181
10        BY:  Gary L. Edwards, II, Esquire
               gedwards@bakerdonelson.com
11
12
     ALSO PRESENT VIA ZOOM: William Bovender, BrightRidge
13                          Joseph Harvey, BrightRidge
                            Jeff Dykes, BrightRidge
14
15
16
17
18
19
20
21
22
23
24
25
```

```
                                                    Page 3
 1                      I N D E X
 2   Testimony of ANDREW CHONG
     Direct Examination By Mr. Darden              5
 3
     Certificate of Oath                         194
 4   Certificate of Reporter                     195
 5
 6                      EXHIBITS
 7   EXHIBIT   DESCRIPTION                       PAGE
 8      1     1980 Agreement                      116
 9      2     Amendment No. One                   133
10      3     Amendment No. Two                   133
11      4     Amendment No. Three                 133
12      5     Amendment No. Four                  133
13      6     Amendment No. Five                  133
14      7     Bates BR00000012- BR00000013 and    71
              BR00000413 - BR00000414) Email Chain
15            Re: Joint Use Make-Ready Discussions
16      8     Bates BR00000003-BR00000005 Email   82
              Chain
17
        9     Bates BR00000040-BR00000041 November 90
18            26, 2018, Letter from S. Evans
19     10     Bates BR00000347-BR00000360         100
              Make-Ready Requests
20
       11     Bates BR00000457 12-18-2018 Letter to 187
21            Andrew Ice from Stacy Evans
       12     Bates BR000446-BR000453 Transfer    153
22            Request - 12-21-2018
23
       13     Bates BR000444-BR000445 Make Ready - 156
24            12-21-2018
       14     Bates BR000455-BR000462 Transfer    157
25            Request - 12-21-2018
```

```
                                                    Page 4
 1                      I N D E X
                        (Continued)
 2
       15     Bates BR000389-000391Make Ready -   159
 3            12-21-2018
       16     Bates BR000392-BR000400 12-21-18    164
 4            Transfer Request
 5
       17     Bates BR000415-BR000416; BR000429   166
 6            Make Ready - 02-19-2019
       18     Bates BR000401-BR000414 Make Ready - 166
 7            02-19-2019
 8
       19     Bates BR000379-BR000380 Make Ready - 168
 9            02-19-2019
10     20     Bates BR000417-BR000427 Transfer    169
              Request - 02-20-2019
11
       21     Bates BR000430-BR000443 Transfer    169
12            Request - 02-20-2019
13     22     Bates BR000000142-BR00000143        170
              03-01-2019 Letter to Andrew Ice
14
       23     Disclosure - Andrew Chong            59
15
       24     1980 Agreement Bvu and United       145
16            Inter-mountain Telephone
17     25     Amendment No. Three - 1980 Agreement 152
              BVU and United Inter-mountain
18            Telephone
19     26     Bates CL00487-CL00496 Centurylink's 106
              Supplemental Document Production
20
       28     Complaint for Declaratory Judgment  178
21
       29     CenturyLink's Responsive Pleadings  181
22
       30     Brightspeed Job Description          50
23            (Not received/attached herein.)
24            (STENOGRAPHER'S NOTE: Exhibits
              attached herein unless noted
25            otherwise above.)
```

```
                                                    Page 5
 1        The following proceedings began at 9:28 a.m.:
 2            STENOGRAPHER:  Please raise your right
 3        hand.
 4            Do you swear or affirm the testimony you
 5        are about to give will be the truth, the whole
 6        truth, and nothing but the truth?
 7            THE WITNESS:  Yes.
 8                      ANDREW CHONG,
 9   having been first duly sworn or affirmed, as
10   hereinafter certified, testified as follows:
11                   DIRECT EXAMINATION
12   BY MR. DARDEN:
13        Q    Good morning, again, Mr. Chong.  As you
14   know, my name is Steve Darden.  I am one of the
15   attorneys representing BrightRidge in the lawsuit
16   with CenturyLink.  You know from our preliminaries
17   just, sort of, the conversations in advance.
18   Mr. Edwards and I know each another.  We practice
19   law in the same town.  Here we are in Orlando,
20   Florida, to take your deposition, correct?
21        A    Correct.
22        Q    Are you doing okay today?
23        A    Yes, sir.
24        Q    All right.  Would you please state your
25   full name for the record?
```

Case 2:20-cv-00030-KAC-CRW   Document 67-6   Filed 02/15/23   Page 4 of 8   PageID #: 972
www.phippsreporting.com
(888) 811-3408

Page 66

1  Q  Do you have any idea when the company that
2  used to be known as United Inter-Mountain Telephone
3  Company began offering bright -- Internet service of
4  any nature?
5  A  I don't know the timing on it.
6  Q  So you wouldn't know when it went from
7  copper to dial-up or any other technology that
8  required a different type of plant, correct?
9  A  Correct.
10  Q  Do you know when my client began being
11  known as the Johnson City Energy Authority?
12  A  No.
13  Q  So you don't know when it began providing
14  Internet service, correct?
15  A  Correct.
16  Q  Are you aware of other companies in the
17  northeast Tennessee area who have attached their
18  Internet lines in the 4-foot telephone zone?
19  A  No.
20  Q  So if I told you that a company known as
21  BTES did so, would that be information that you
22  didn't previously have?
23  A  That's correct.
24  Q  If I told you the company known as BVU did
25  so, would that also be information that you didn't

Page 67

1  previously have?
2  A  Correct.
3  Q  Do you know -- are you familiar with the
4  history of and the current pricing for fees charged
5  for attachments in the 4-foot telephone zone on
6  BrightRidge-owned poles?
7  A  I have no idea.
8  Q  Do you know what your company charges for
9  attachment rates?
10  A  No.
11  Q  Do you know the history of those rates?
12  A  No.
13  Q  So if you were called on to testify about
14  those things at trial, you'd have to learn them
15  between now and the trial, correct?
16  A  Correct.
17  Q  Do you have information about the specific
18  make-ready procedures and requirements for
19  attachments in the telephone zone of poles owned by
20  BrightRidge -- owned by -- excuse me, Brightspeed in
21  the BrightRidge territory, as well as the make-ready
22  costs that are to be paid by BrightRidge?
23  A  Make-ready costs, no, it's on a
24  case-by-case basis. Our vendor will provide that --
25  the costs.

Page 68

1  Q  Okay. And how about the make-ready
2  procedures and requirements for attachments?
3  A  Can you repeat that?
4  Q  Do you know -- do you have information
5  about the make-ready procedures and requirements for
6  attachments in the telephone zone of poles owned by
7  Brightspeed in the BrightRidge territory?
8  A  I'm not sure I'm interpreting your
9  question properly, so can you rephrase?
10  Q  Okay. Sure. Regarding the make-ready
11  procedures -- let's just talk about that.
12    Regarding the make-ready procedures in the
13  BrightRidge territory.
14  A  Okay.
15  Q  Okay. I'm talking about poles owned by
16  Brightspeed.
17  A  Okay.
18  Q  Do you know what those make-ready
19  procedures are there?
20  A  Oh, okay. So they would need to apply
21  to -- through the inbound program to Brightspeed for
22  permission to attach in the communications space.
23  Q  Very good. And do you know who the
24  vendors are who perform the make-ready tasks?
25  A  Make-ready engineering or make-ready

Page 69

1  construction?
2  Q  I'm talking about the contractors who
3  work -- who actually do the rearranging on the
4  poles?
5  A  Okay. That's make-ready construction.
6  Q  Construction, thank you.
7  A  In the Tennessee area, I would have to see
8  who is the current contractor in that area.
9  Q  Okay. Can you name one?
10  A  We have Lamberts we use, I think Star is
11  another one. I know Lamberts is all of North
12  Carolina. I don't know who is the contractor for
13  Tennessee.
14  Q  Okay. Are you in the position to offer an
15  opinion or testimony about damages that your company
16  has incurred?
17  A  No.
18  Q  Do you know anything about NESC
19  requirements for attachments in the telephone zone
20  of poles owned by Brightspeed in the BrightRidge
21  territory?
22  A  Yes.
23  Q  What do you know?
24  A  That NESC, I think, is 32 ruling, and I
25  refer to my cheat sheet every time, and I have to,

Case 2:20-cv-00030-KAC-CRW   Document 67-6   Filed 02/15/23   Page 5 of 8   PageID #: 973
www.phippsreporting.com
(888) 811-3408

```
                                          Page 142
 1      A    Yes.
 2      Q    Okay.  Now, who typed that?
 3      A    Donald.
 4      Q    Okay.  Now, he's talking about a situation
 5   involving Las Vegas, Nevada power, right?
 6      A    Yes.
 7      Q    And then it says, after the first
 8   paragraph, it says, "Oregon, Tom went to court."
 9   Now, is there something missing in that white space
10   above that sentence?
11           Do you see what I'm talking about?
12      A    Yeah.  Nothing is missing.  "Oregon, Tom
13   went to court."  Tom was the manager before Brian
14   Sikes.
15      Q    Okay.  And what's Tom's last name?
16      A    McGowan.  He no longer works for
17   CenturyLink.
18      Q    Tom McGowan?
19      A    Yeah.
20      Q    It says, "Tom went to court," et cetera,
21   et cetera.  And the next to last sentence says
22   something that I'm wondering if you have any
23   perspective on.  It says, "Having the fiber in the
24   com space tells me they may be looking to rent it
25   out."
```

```
                                          Page 143
 1           "Having the fiber in the com space tells
 2   me they may be looking to rent it out."  What's
 3   being alluded to there?  Do you have any idea?
 4      A    No, that's Donny's opinion.  I think what
 5   he's saying is that if the fiber is in the com
 6   space, then whoever is placing that fiber is going
 7   to lease it out to another company like Comcast or
 8   Charter or whoever, to lease the fibers, the dark
 9   fibers.
10      Q    Okay.  Or you think that's what he means?
11      A    I think that's what he means.
12      Q    Well, assuming that is what he means,
13   what's the significance of that, how does that
14   matter with regard to the interpretation of the 1980
15   joint use pole agreement?
16      A    I don't know if it has any bearing on the
17   joint use of the 1980 agreement.
18      Q    Okay.  So, Mr. Chong, if CenturyLink had
19   two identically situated parties and both were
20   parties to joint use agreements that had the same
21   provisions, okay, different joint use pole
22   agreements, but they're the same language.
23           Do you follow me?
24      A    Okay.
25      Q    Would CenturyLink apply those joint use
```

```
                                          Page 144
 1   agreements in the same manner?
 2           MR. EDWARDS:  Objection; hypothetical,
 3      calls for opinion.
 4      A    I would say no.  Each agreement is between
 5   two parties and it's -- it has to stay between those
 6   two parties.
 7   BY MR. DARDEN:
 8      Q    But if the language were the same, would
 9   you treat one joint use partner one way and another
10   joint use partner differently?
11           MR. EDWARDS:  And my objection is
12      continuing.
13      A    I would say no because that's giving
14   preferential treatment.  Everybody is treated the
15   same way.
16   BY MR. DARDEN:
17      Q    Okay.  You're applying the language
18   identically?
19      A    Yes.
20      Q    All right.  Are you familiar with an
21   agreement that CenturyLink had with a company known
22   as BVU?
23      A    No.
24      Q    Have you ever seen the joint use pole
25   agreement between BVU and CenturyLink?
```

```
                                          Page 145
 1      A    No.
 2      Q    All right.  Well, let me cure that.  I'm
 3   going to hand you Exhibit 24.
 4           (Exhibit 24 identified for the record.)
 5   BY MR. DARDEN:
 6      Q    All right.  So I've just handed you
 7   Exhibit 24, sir, which, if you look at the top,
 8   indicates that it is a joint use pole agreement
 9   entered into in 1980 between the Bristol Virginia
10   Utilities Board and United Inter-Mountain Telephone
11   Company?
12      A    Correct.
13      Q    Now, have you ever seen this before?
14      A    This agreement?
15      Q    Yes.
16      A    No.
17      Q    Does it look to be the same as the
18   agreement entered into at the same time between
19   Johnson City Power Board and United Inter-Mountain
20   Telephone company?
21           MR. EDWARDS:  I would object, and instruct
22      not to answer for reasons previously discussed
23      prior to the deposition and emails.  We would
24      also add the objection there is no foundation
25      with this witness related to this agreement.
```

Case 2:20-cv-00030-KAC-CRW   Document 87-6   Filed 02/15/23   Page 6 of 8   PageID #: 974
www.phippsreporting.com
(888) 811-3408

Page 190

1  the parties' agreements, and he says it's not
2  relevant. So my question to you -- do you see that,
3  first of all?
4     A   Yes, yes.
5     Q   So my question to you, sir, is: You've
6  had a chance to review Exhibit 1 multiple times
7  today, and you've done so multiple times today.
8         Do you recall seeing the phrase
9  "fundamental change" in the 1980 agreement?
10    A   No.
11    Q   Do you recall seeing the phrase
12 "incremental change" in the 1980 agreement?
13    A   No.
14    Q   To your knowledge, do either phrases
15 appear, "fundamental change" or "incremental
16 change"?
17    A   No.
18    Q   So that's something that someone has come
19 up with apart from or external to the agreement
20 itself, right?
21    A   Okay.
22    Q   And by saying "okay," you're saying you
23 agree with that?
24    A   Yes. But there's a difference between the
25 two words, right, incremental and fundamental.

Page 191

1     Q   Right, but neither one of them appear in
2  the 1980 agreement?
3     A   Correct.
4     Q   And back to art -- Exhibit 29, sir,
5  Paragraph 18, four lines down, it says "In
6  construing that agreement" -- and that means the
7  1980 agreement, right?
8     A   Yeah.
9     Q   The Court is constrained to looking within
10 the four corners of the 1980 agreement as amended as
11 a whole, right?
12    A   Correct.
13    Q   And when the Court does that, it will not
14 entertain the word "rental" if it sticks to that,
15 right?
16        MR. EDWARDS: Objection; foundation, calls
17    for speculation.
18 BY MR. DARDEN:
19    Q   Well, what do you understand "four corners
20 of the agreement" means?
21        MR. EDWARDS: I'm going to make a
22    continuing objection, seeks into legal
23    conclusion stuff.
24        MR. DARDEN: That's fine.
25

Page 192

1  BY MR. DARDEN:
2     Q   What do you understand that means? I
3  would suggest to you what your lawyers are saying,
4  when they crafted this answer, is you look at the
5  language and the wording that's inside that 1980
6  agreement.
7     A   All of it as a whole, yes.
8     Q   All of it as a whole. Which means
9  incremental change, fundamental change, rental,
10 electric company rental space, telephone company
11 rental space, since they're not within the four
12 corners of that agreement, it's not to be relied
13 upon, right?
14    A   That's not my opinion. That's nothing for
15 me to decide or call on. The Court will decide what
16 it is.
17    Q   Well, if the Court is looking to the
18 wording of the agreement only, then those words and
19 phrases that don't appear in the agreement won't
20 carry the day, right?
21    A   I don't have an opinion on that, I don't
22 know.
23        MR. DARDEN: I tell you what, I think I'm
24    done, but I need just a couple minutes to think
25    about that.

Page 193

1     (Recess held from 3:18 p.m. to 3:20 p.m.)
2         MR. DARDEN: Ms. Hawk, thank you for your
3  service today. That will conclude my
4  questioning.
5     Mr. Chong, thank you for your presence
6  today, and I wish you and your family happy
7  holidays.
8         THE WITNESS: Thank you. Same to you.
9         MR. DARDEN: Thank you.
10        STENOGRAPHER: Do you want to order the
11 transcript at this time?
12        MR. DARDEN: Yes, please.
13        STENOGRAPHER: Are you going to get a
14 copy?
15        MR. EDWARDS: Yes, I'll take a copy.
16    (Proceedings concluded at 3:21 p.m.)

Case 2:20-cv-00030-KAC-CRW   Document 87-6   Filed 02/15/23   Page 7 of 8   PageID #: 975
www.phippsreporting.com
(888) 811-3408

Page 194

CERTIFICATE OF OATH

STATE OF FLORIDA
COUNTY OF ORANGE

I, the undersigned authority, certify that ANDREW CHONG remotely appeared before me and was duly sworn on the 1st day of December, 2022.

Signed this 15th day of December, 2022.

*Alison Hawk*

ALISON HAWK, RPR
Notary Public, State of Florida
My Commission No. HH 252987
Expires:  04/22/2026

[Notary Public State of Florida — Alison Hawk — My Commission HH 252987 — Exp. 4/22/2026]

Page 195

CERTIFICATE OF REPORTER

STATE OF FLORIDA
COUNTY OF ORANGE

I, ALISON HAWK, RPR, do hereby certify that I was authorized to and did stenographically report the foregoing deposition of ANDREW CHONG; pages 1 through 193; that a review of the transcript was not requested; and that the transcript is a true record of my stenographic notes.

I FURTHER CERTIFY that I am not a relative, employee, attorney, or counsel of any of the parties, nor am I a relative or employee of any of the parties' attorneys or counsel connected with the action, nor am I financially interested in the action.

Dated this 15th day of December, 2022.

*Alison Hawk*
ALISON HAWK, RPR

Case 2:20-cv-00030-KAC-CRW   Document 67-6   Filed 02/15/23   Page 8 of 8   PageID #: 976
www.phippsreporting.com
(888) 811-3408