# EXHIBIT G

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TENNESSEE
AT GREENEVILLE

| | |
|---|---|
| JOHNSON CITY ENERGY AUTHORITY d/b/a BRIGHTRIDGE, Plaintiff/Counter-Defendant, VS. UNITED TELEPHONE SOUTHEAST, LLC, d/b/a CENTURYLINK, Defendant/Counter-Plaintiff. | CASE NO. 2:20-cv-00030 |

COMPRESSED COPY

DEPOSITION OF

## MARCIA BUCKLES

(Taken November 30, 2022)

APPEARANCES:

COUNSEL FOR BRIGHTRIDGE:  JOSEPH B. HARVEY
WILLIAM C. BOVENDER
HUNTER, SMITH & DAVIS
1212 North Eastman Road
Kingsport, TN  37664

COUNSEL FOR CENTURYLINK:  GARY L. EDWARDS
BAKER DONELSON
602 Sevier Street, Ste. 300
Johnson City, TN  37604

ALSO APPEARING:  JEFF DYKES
Chief Executive Officer
BrightRidge

*COURT REPORTING AND VIDEO SERVICES*

P. O. Box 7481
Kingsport, TN  37664

TELEPHONE: (423) 230-8000
REBECCA@COURTREP.NET

## Page 1

IN THE UNITED STATES DISTRICT COURT  
FOR THE EASTERN DISTRICT OF TENNESSEE  
AT GREENEVILLE

JOHNSON CITY ENERGY AUTHORITY  
d/b/a BRIGHTRIDGE,  
   Plaintiff/Counter-Defendant,

VS.         CASE NO.  
            2:20-cv-00030

UNITED TELEPHONE SOUTHEAST, LLC,  
d/b/a CENTURYLINK,  
   Defendant/Counter-Plaintiff.

DEPOSITION OF  
MARCIA BUCKLES  
(Taken November 30, 2022)

APPEARANCES:  
COUNSEL FOR BRIGHTRIDGE: JOSEPH B. HARVEY  
         WILLIAM C. BOVENDER  
         HUNTER, SMITH & DAVIS  
         1212 North Eastman Road  
         Kingsport, TN 37664

COUNSEL FOR CENTURYLINK: GARY L. EDWARDS  
         BAKER DONELSON  
         602 Sevier Street, Ste. 300  
         Johnson City, TN 37604

ALSO APPEARING:  JEFF DYKES  
         Chief Executive Officer  
         BrightRidge

COURT REPORTING AND VIDEO SERVICES  
P. O. Box 7481   TELEPHONE: (423) 230-8000  
Kingsport, TN 37664   REBECCA@COURTREP.NET

## Page 2

INDEX OF EXHIBITS  
DEPOSITION OF MARCIA BUCKLES

EXHIBIT #1: 1980 joint use agreement between Johnson City Power Board and United Inter-Mountain Telephone Company.  
  Page Introduced: 26

EXHIBIT #4: 1980 agreement between Bristol Virginia Utilities Board and United Inter-Mountain Telephone Company.  
  Page Introduced: 58

EXHIBIT #5: Amendment Number Four.  
  Page Introduced: 71

## Page 3

1                C A P T I O N  
2  
3    The deposition of MARCIA BUCKLES was taken pursuant to  
4 notice in the Johnson City, Tennessee law offices of Baker  
5 Donelson beginning at 9:00 a.m. on Wednesday, November 30,  
6 2022, for use at any trial, hearing or proceeding involving  
7 this matter, and for any purpose allowable by and pursuant to  
8 the Federal Rules of Civil Procedure.  
9    The witness was sworn by Rebecca Overbey, Licensed Court  
10 Reporter in and for the State of Tennessee. It is agreed that  
11 Rebecca Overbey, Licensed Court Reporter, may take this  
12 deposition by electronic recording equipment; transcribe the  
13 same to typewriting, using computer technology; and affix the  
14 signature of the witness hereto.  
15    All other formalities are waived.

## Page 4

1   MARCIA BUCKLES, the witness, having first been duly sworn,  
2 testified as follows:  
3 DIRECT EXAMINATION BY MR. JOSEPH B. HARVEY:  
4 Q. Good morning, Ms. Buckles. We met just a moment ago off  
5    the record. Again, my name is Joe Harvey, and I am one of  
6    the attorneys who is representing BrightRidge in the  
7    lawsuit between BrightRidge and CenturyLink, and I'm going  
8    to be taking your deposition this morning. For the  
9    record, would you please state your full name?  
10 A. Marcia Buckles.  
11 Q. And what is your current business address?  
12 A. 2501 1st Street, Johnson City.  
13 Q. And is that where your office is located?  
14 A. Yes.  
15 Q. And what is your current home address?  
16 A. 712 Summer Sound Road, Piney Flats, Tennessee.  
17 Q. Ms. Buckles, have you ever been deposed before?  
18 A. Yes.  
19 Q. How many times have you had your deposition taken?  
20 A. Once.  
21 Q. When you had your deposition taken previously, was that  
22    related to your employment with CenturyLink?  
23 A. Yes.  
24 Q. What was the nature of that case?  
25 A. It was about a road project in Abingdon, Virginia and VDOT

**Page 17**

1. Q. Other than Ms. Burgoyne, who else is in the group that
2.    processes pole attachment?
3. A. I don't know.
4. Q. Where is Ms. Burgoyne located, her office?
5. A. I don't know.
6. Q. Do you work with Ms. Burgoyne on a regular basis?
7. A. Not very often.
8. Q. Just let me make sure I understand. So if BrightRidge
9.    were to approach you to ask about making an attachment to
10.   a CenturyLink pole, all you would do is forward that to
11.   the group that processes pole attachments?
12. A. Yes. It's usually a piece of paper. They send a piece of
13.    paper and then we just forward it on.
14. Q. Do you do anything with that paper? Do you process it or
15.    analyze it in any way before you forward it on or do you
16.    just forward it?
17. A. Just forward it on.
18. Q. After you have forwarded that paper to the group that
19.    processes pole attachment requests, do you have any
20.    further involvement in the process?
21. A. No.
22. Q. They don't come back to you for any reason to ask your
23.    input on the attachment?
24. A. They haven't. I haven't had one in a while.
25. Q. When was the last time you think you had a request?

**Page 18**

1. A. I couldn't say.
2. Q. More than a week?
3. A. Oh, yes.
4. Q. More than a month?
5. A. Yes.
6. Q. Has it been more than a year do you think?
7. A. No, probably not.
8. Q. Do you have any specific duties related to joint use
9.    poles? And let me back up a little bit. Do you know what
10.   a joint use pole is?
11. A. It's a pole that either company -- one company owns it,
12.    but other companies can attach.
13. Q. Okay. You know, we've talked about pole attachments and
14.    your duties on that is just forwarding the request to the
15.    pole attachment group. Do your duties involve any other
16.    issues related to joint use poles?
17. A. I'm not sure I understand. We get requests from other
18.    entities asking to attach to the poles and we process
19.    those as well.
20. Q. Okay. If you get a request from another entity to attach
21.    to a pole, what do you do with that request?
22. A. Well, usually they've looked at the pole and they tell us
23.    if we need to make any adjustments. We're the bottom
24.    attacher on the pole and sometimes we have to lower to
25.    make room for them to keep the proper separation. I would

**Page 19**

1.    forward that on to the group that does that and then send
2.    the attachment request so it can be recorded.
3. Q. And is that a different process from the process you
4.    described with BrightRidge?
5. A. Not really.
6. Q. It's the same process for other attachers?
7. A. Uh-huh (Affirmative).
8. Q. And who are the other entities from whom you receive...
9. A. It could be Charter. It could be Comcast. Those are the
10.   main ones. I deal in areas other than Johnson City, so it
11.   could be other power companies.
12. Q. Are there other TVA distributors who make pole attachment
13.    requests?
14. A. American Electric Power might.
15. Q. What about BTES?
16. A. BTES.
17. Q. What about BVU?
18. A. I don't work in Bristol, so -- but yes, they could.
19. Q. You make a good point about not working in Bristol. What
20.    area do you have? Do you have responsibility for a
21.    specific area?
22. A. Uh-huh (Affirmative). Kingsport, Blountville, Bluff City,
23.    and Gray -- just part of Gray.
24. Q. Do you have a counterpart at CenturyLink who is
25.    responsible for the Bristol area?

**Page 20**

1. A. Yes.
2. Q. And who is that person?
3. A. Richard Howard.
4. Q. At any point during your time as an engineer have you ever
5.    had responsibility for the Bristol area?
6. A. Yes.
7. Q. And when was that?
8. A. 2004 to about 2020.
9. Q. Other than forwarding on pole attachment requests, do you
10.   have any other duties related to pole attachments?
11. A. I'm not sure what you're asking.
12. Q. In the design work you do, do you -- are you designing
13.    where people will attach, where different attachers will
14.    place their attachments on joint use poles?
15. A. No. There's a certain -- I'm not sure. Everybody knows
16.    where they're supposed to attach. We're supposed to keep
17.    a certain distance between attachers and everyone is aware
18.    of that.
19. Q. What is that order?
20. A. We're on the bottom. Cable tv would be above us, or any
21.    other attachers would be, and power is usually at the very
22.    top.
23. Q. Do you have any duties -- in your current position as an
24.    engineer at CenturyLink, do you have any duties or
25.    responsibilities related to make-ready work?

```
 1     taller pole. If it were our pole, we would ask for a
 2     taller pole, and whoever was asking for the new attachment
 3     would be notified, hey, we've got -- in order to
 4     accommodate your request, we've got to go with a taller
 5     pole.
 6  Q. So you're not personally aware of any situation where
 7     CenturyLink has said to someone who wanted to attach to a
 8     CenturyLink pole, sorry, we can't make that attachment?
 9  A. I'm not aware of it. I'm not aware of it.
10  Q. Just let me -- let me go ahead and get my full question
11     out. You're not aware of a situation where CenturyLink
12     has said to someone who wanted to make an attachment to a
13     CenturyLink pole, I'm sorry, we can't allow you to attach
14     because there's not enough space because BrightRidge has
15     made an attachment?
16  A. I am not aware of that.
17  Q. Do you have any opinion or knowledge related to what
18     damages CenturyLink has suffered from BrightRidge's
19     attachments to CenturyLink's pole?
20  A. I don't know.
21  Q. To your knowledge, has CenturyLink incurred any increased
22     maintenance or service costs due to BrightRidge's
23     attachments?
24  A. I don't know.
25  Q. Are you aware of any safety hazards that have been caused
                                                              53
 1     by BrightRidge's attachments to CenturyLink poles?
 2  A. I don't know of any.
 3  Q. You're not personally aware of any?
 4  A. No.
 5  Q. Are you aware of any NESC violations that have been caused
 6     by BrightRidge's attachments to CenturyLink poles?
 7  A. I don't know of any.
 8  Q. Do you know how many joint use poles CenturyLink owns in
 9     the BrightRidge territory?
10  A. No.
11  Q. Do you know how many joint use poles BrightRidge owns in
12     the BrightRidge territory?
13  A. No.
14  Q. Do you know roughly the ratio of the number of poles that
15     CenturyLink owns and the number of poles that BrightRidge
16     owns?
17  A. No.
18  Q. Are you familiar with BVU?
19  A. Yes.
20  Q. If I refer to BVU, you'll understand I'm referring to the
21     utility provider in Bristol, Virginia, correct?
22  A. Yes.
23  Q. Does CenturyLink own utility poles in the BVU service
24     territory?
25  A. Yes.
                                                              54
 1  Q. Did BVU deploy broadband or high-speed internet equipment
 2     in its territory?
 3  MR. EDWARDS: Objection. I instruct the witness not to answer
 4     related to other attachers outside of the BrightRidge
 5     service territory, and that's continuing.
 6  Q. Are you going to answer the question?
 7  A. No.
 8  Q. Are you going to follow your attorney's instruction...
 9  A. Yes.
10  Q. ...not to answer the question?
11  A. Yes.
12  Q. And can you explain the basis for your objection?
13  MR. EDWARDS: I have repeatedly explained the basis for our
14     objection. It's set forth in written correspondence with
15     you all, which we would incorporate herein. I do not have
16     to make my arguments in front of the court before you
17     without the judge present, but you are well aware of it.
18     We have engaged in E-mail exchanges that plainly set that
19     forth.
20  Q. And again, you're going to follow your attorney's -- are
21     you going to follow your attorney's instruction not to
22     answer that question?
23  A. Yes.
24  Q. Do you understand that if you refuse to answer that
25     question, we may file a motion with the court and ask that
                                                              55
 1     you be compelled to answer that question, and as a part of
 2     that motion we may request that CenturyLink be responsible
 3     for our attorney's fees and sanctions in connection with
 4     that motion?
 5  A. Yes.
 6  Q. And are you still going to refuse to answer the question?
 7  A. Yes.
 8  Q. When did BVU deploy broadband or high-speed internet
 9     equipment in its service territory?
10  MR. EDWARDS: Same objection. We have indicated we're not
11     having the witness -- we're instructing the witness not to
12     answer as to any questions related to broadband of any
13     other attachers, including these electric utilities,
14     outside of the BrightRidge service territory. That
15     applies to all this line of questioning, whether it be
16     BVU, BTES, whoever else you want to ask outside of the
17     BrightRidge service territory.
18  Q. Are you going to follow your attorney's instruction not to
19     answer that question?
20  A. Yes.
21  Q. What type of equipment did BVU attach to CenturyLink owned
22     poles?
23  MR. EDWARDS: Same objection.
24  Q. Are you going to answer that question?
25  A. No.
                                                              56
```

**Page 57**

1  Q. What was your role with CenturyLink when BVU deployed its
2     internet equipment?
3  MR. EDWARDS: Same objection.
4  Q. Are you going to answer that question?
5  A. No.
6  Q. You're not going to answer the question what was your role
7     with CenturyLink when BVU deployed its internet equipment?
8  MR. EDWARDS: Same objection.
9  A. No.
10 Q. Are you refusing to answer that question?
11 A. Yes.
12 Q. Did you work with BVU on behalf of CenturyLink during the
13    time that BVU was installing its internet attachments?
14 MR. EDWARDS: Same objection.
15 Q. Are you refusing to answer that question?
16 A. Yes.
17 Q. Let me show you what we've marked as Exhibit 24.
18 COURT REPORTER: Do you want to make this number two to her
19    deposition?
20 Q. Let's just make it -- if it's all right with you, we're
21    going to have a uniform numbering system so all the
22    exhibits have a consistent number throughout all the
23    depositions.
24 MR. EDWARDS: That's fine.
25 Q. They may not be sequential.

**Page 58**

1  EXHIBIT #24: 1980 agreement between Bristol Virginia
2     Utilities Board and United Inter-Mountain Telephone
3     Company.
4  Q. I'm handing you what we've marked as Exhibit 24. I
5     understand that's not sequential, but we're going to use a
6     consistent numbering system through all the depositions.
7     I'll give you a minute to look at what we've marked as
8     Exhibit 24. Just let me know when you're ready.
9  A. I'm ready.
10 Q. Do you recognize what we've marked as Exhibit 24?
11 MR. EDWARDS: Objection. I'm instructing the witness not to
12    answer as it relates to BVU's contract with CenturyLink
13    for which BrightRidge is not a party or a beneficiary.
14 Q. Are you refusing to answer that question?
15 A. Yes.
16 Q. Before 2018, did CenturyLink or the telephone company have
17    any agreement with BVU related to BVU's internet
18    attachments to CenturyLink owned poles?
19 MR. EDWARDS: Same objection.
20 Q. Are you refusing to answer that question?
21 A. Yes.
22 Q. Did CenturyLink or the telephone company ever have any
23    agreement with BVU for BVU's attachments to CenturyLink
24    owned poles besides what we've marked as Exhibit 24?
25 MR. EDWARDS: Same objection.

**Page 59**

1  Q. Are you refusing to answer that question?
2  A. Yes.
3  Q. Other than what we've marked as Exhibit 24, are you aware
4     of any agreements between the telephone company and BVU
5     related to pole attachments?
6  MR. EDWARDS: Same objection.
7  Q. Are you refusing to answer that question?
8  A. Yes.
9  Q. Does the telephone company have an agreement with any
10    entity for internet attachments to CenturyLink poles in
11    the BVU service territory?
12 MR. EDWARDS: Same objection.
13 Q. Are you refusing to answer that question?
14 A. Yes.
15 Q. Are you aware that BVU attached its internet equipment in
16    the communications zone of CenturyLink owned poles?
17 MR. EDWARDS: Same objection.
18 Q. Are you refusing to answer that question?
19 A. Yes.
20 Q. CenturyLink was aware that BVU attached its internet
21    equipment in the telephone zone of CenturyLink owned
22    poles, correct?
23 MR. EDWARDS: Same objection.
24 Q. Are you refusing to answer that question?
25 A. Yes.

**Page 60**

1  Q. Did CenturyLink perform pole attachment audits between
2     2000 and 2018?
3  MR. EDWARDS: What area are you referencing?
4  Q. Any area.
5  MR. EDWARDS: I would instruct the witness to limit it to the
6     BrightRidge service area.
7  A. So what time frames?
8  Q. Well, that's not my question. My question is did
9     CenturyLink perform any pole attachment audits between
10    2000 and 2018.
11 MR. EDWARDS: And my objection is I'm instructing the witness
12    not to answer as to any service area outside of the
13    BrightRidge service territory.
14 A. As it pertains to BrightRidge, I am aware of pole
15    attachment audits in the BrightRidge footprint in that
16    time frame.
17 Q. Are you aware of pole attachment audits in the BVU service
18    territory in the 2000 to 2018 time frame?
19 MR. EDWARDS: Same objection.
20 Q. Are you refusing to answer that question?
21 A. Yes.
22 Q. Did CenturyLink require BVU to enter into a new agreement
23    separate from the 1980 joint use agreement before BVU
24    attached its internet equipment on CenturyLink poles in
25    the telephone zone?

**Page 61**

1 MR. EDWARDS: Same objection.
2 Q. Are you refusing to answer that question?
3 A. Yes.
4 Q. BVU did not pay an additional attachment fee to
5    CenturyLink for attachments to CenturyLink's poles other
6    than the yearly attachment fee required by the 1980
7    agreement, correct?
8 MR. EDWARDS: Same objection.
9 Q. Are you refusing to answer that question?
10 A. Yes.
11 Q. CenturyLink did not invoice BVU separately for its
12    internet attachments in the telephone zone of CenturyLink
13    owned poles, correct?
14 MR. EDWARDS: Same objection.
15 Q. Are you refusing to answer that question?
16 A. Yes.
17 Q. Were you involved at all in invoices that were sent to
18    entities who had attachments on CenturyLink poles?
19 MR. EDWARDS: We would instruct the witness not to answer to
20    the extent that question relates outside of the
21    BrightRidge service territory.
22 Q. All right. Do you accept the limitation that your counsel
23    has given?
24 A. I do.
25 Q. And are you refusing to answer the question that I asked

**Page 62**

1    without that limitation?
2 A. Yes, I'm refusing to answer that without that limitation.
3 Q. Okay. Go ahead and answer.
4 A. So ask it again now.
5 Q. Sure. Are you -- can you read the question back? It's
6    related to invoices.
7 COURT REPORTER: Since I'm digitally recording, it will take a
8    little while.
9 Q. Okay.
10 COURT REPORTER: I'm sorry.
11 Q. Were you involved in sending invoices to any entities who
12    had attachments on CenturyLink owned poles?
13 A. With regard to Brightspeed, I'm not involved with
14    invoicing for attachment fees.
15 Q. And you said Brightspeed. Is that...
16 A. BrightRidge.
17 Q. You meant -- you meant BrightRidge?
18 A. I meant BrightRidge.
19 Q. You just got Brightspeed and BrightRidge confused?
20 A. No, no. It's a lot of tech' -- a lot of conflicting
21    questions asked in different ways and it's got me a little
22    flustered.
23 Q. Okay. My intent is not to get you flustered at all, so I
24    don't want you to be flustered. If we need to take a
25    break, or slow down, or anything, you just let me know.

**Page 63**

1    It's not my intent to cause you any distress.
2 A. Okay.
3 Q. To your knowledge, did CenturyLink and BVU have a separate
4    agreement for BVU's internet attachments on CenturyLink
5    poles that was separate from the contract for BVU's
6    electric attachments?
7 MR. EDWARDS: Same objection.
8 Q. Are you refusing to answer that question?
9 A. Yes.
10 Q. Was BVU required to pay a separate attachment fee for its
11    internet attachments in the telephone zone of CenturyLink
12    owned poles?
13 MR. EDWARDS: Same objection.
14 Q. Are you refusing to answer?
15 A. Yes.
16 Q. Did BVU sell it's broadband or high-speed internet
17    system?
18 MR. EDWARDS: Same objection.
19 Q. Are you refusing to answer that question?
20 A. Yes.
21 Q. What, if anything, do you know about BrightRidge's
22    corporate formation?
23 A. Nothing.
24 Q. Are you familiar with the Tennessee Energy Authority Act?
25 A. No.

**Page 64**

1 Q. What, if anything, do you know about BrightRidge's
2    corporate structure?
3 A. Nothing.
4 Q. Do you know if BrightRidge has any parent or subsidiary
5    organizations?
6 A. I don't.
7 Q. Do you know if BrightRidge has different divisions or
8    departments?
9 A. I don't.
10 Q. Do you know what services BrightRidge is authorized to
11    supply to its customers?
12 A. I don't.
13 Q. Are you familiar with the Johnson City Power Board?
14 A. The name and that they are the power company.
15 Q. Do you believe that there's any difference between the
16    Johnson City Power Board and BrightRidge?
17 A. I don't know.
18 Q. Are you familiar with the Johnson City Energy Authority?
19 A. No.
20 Q. Are you aware of any difference between the Johnson City
21    Energy Authority and BrightRidge?
22 A. No.
23 Q. Are you aware of any distinction between BrightRidge
24    broadband and BrightRidge electric service from a
25    corporate standpoint?

**Page 73**

1  Q. Are you familiar with BTES's high-speed internet service?
2  MR. EDWARDS: Objection, instruct the witness not to answer
3     for the reasons -- the same objection previously
4     discussed.
5  Q. Are you refusing to answer that question?
6  A. Yes.
7  Q. Does any portion of BTES's internet system pass through
8     the telephone zone on CenturyLink owned poles?
9  MR. EDWARDS: Same objection.
10 Q. Are you instructing the witness not to answer?
11 MR. EDWARDS: Yeah, that's the objection.
12 Q. Are you refusing to answer?
13 A. Yes.
14 Q. Are you involved at all with the attachment fees that
15    CenturyLink charges to BTES for its attachments?
16 MR. EDWARDS: Same objection.
17 Q. Are you instructing the witness not to answer?
18 MR. EDWARDS: Yeah. When I say that, that's what that means.
19 Q. Okay. Are you refusing to answer?
20 A. Yes.
21 Q. If you turn to Page 5 of Exhibit 5, using the court's
22    pagination is PageID #147, in Article VII, Section K,
23    which is Section 14, about an eighth of the way down the
24    page, it says, quote, "K. Each party agrees to respond to
25    emergency situations (i.e. care wreck, fallen trees, etc.)

**Page 74**

1     within 90 minutes of notification." Do you see that?
2  A. I do.
3  Q. Does CenturyLink respond to emergency situations within 90
4     minutes?
5  A. We certainly try to.
6  Q. Has there ever been an occasion where CenturyLink did not
7     respond to an emergency situation within 90 minutes?
8  A. I don't know.
9  Q. Are you personally familiar with any situations where
10    CenturyLink has responded to an emergency within 90
11    minutes?
12 A. Yes. Sometimes I will get the call instead of the 800
13    number and I will immediately call and dispatch our
14    contractors.
15 Q. Are you aware of situations where CenturyLink has not
16    responded to emergency situations in 90 minutes?
17 A. I am not.
18 Q. If you'll go down to the next paragraph, which is
19    Paragraph 15, Article VIII, Section A, it says, quote, "A.
20    Owner shall, at its own expense, maintain its joint poles
21    in a safe and serviceable condition, and in accordance
22    with Article IV of this agreement and the requirements of
23    the National Electric Safety Code; and shall replace,
24    subject to Article VII, such of said poles that become
25    defective." Do you see that?

**Page 75**

1  A. I do.
2  Q. Does CenturyLink recognize that obligation?
3  A. Yes.
4  Q. How many poles did CenturyLink replace in 2021 under this
5     provision?
6  A. I couldn't tell you.
7  Q. Do your duties in engineering involve orders for
8     replacement of poles?
9  A. Yes.
10 Q. Roughly how many pole replacements did you handle in
11    2021?
12 A. I don't know. Many.
13 Q. More than 500?
14 A. I wouldn't say that many.
15 Q. More than 100?
16 A. Possibly.
17 Q. More than 50?
18 A. Definitely.
19 Q. Can we take about a five minute break? I think we're
20    about ready to wrap up.
21               ***OFF THE RECORD***
22 DIRECT EXAMINATION CONTINUES BY MR. HARVEY:
23 Q. Ms. Buckles, thank you for your time this morning. I
24    don't have any further questions, so unless Mr. Edwards
25    has questions, we're done.

**Page 76**

1  MR. BOVENDER: Thank you.
2  A. You're welcome.
3  AND FURTHER THE DEPONENT SAITH NOT.
4                              MARCIA BUCKLES
5
6
7                      BY:     Rebecca Overbey
8                              Licensed Court Reporter

CERTIFICATE

I, Rebecca Overbey, Licensed Court Reporter in and for the State of Tennessee, do hereby certify that the foregoing deposition of MARCIA BUCKLES was taken at the time and place and for the purpose as stated in the Caption; that the witness was duly sworn by me before deposing; that the said deposition was recorded electronically and was later transcribed to typewriting, using computer technology; and that the foregoing is a true and accurate transcript of the proceedings to the best of my knowledge, ability and understanding.
    WITNESS my hand and official seal at my office in Kingsport (Sullivan County) Tennessee on this the 5th day of December, 2022.

                            Rebecca Overbey
                        LICENSED COURT REPORTER
                          State of Tennessee
                              LCR #078

My License Expires:
   June 30, 2024

       ***CERTIFIED ONLY IF AFFIXED SEAL IS GREEN***

77

EXHIBIT #1:  1980 joint use agreement between Johnson City Power Board and United Inter-Mountain Telephone Company.
            Page Introduced:  26
EXHIBIT #24: 1980 agreement between Bristol Virginia Utilities Board and United Inter-Mountain Telephone Company.
            Page Introduced:  58
EXHIBIT #5:  Amendment Number Four.
            Page Introduced:  71

78