# EXHIBIT H

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TENNESSEE
AT GREENEVILLE


JOHNSON CITY ENERGY AUTHORITY          *
d/b/a BRIGHTRIDGE,                     *
    Plaintiff/Counter-Defendant,      *
                            *          CASE NO.
VS.                                    *     2:20-cv-00030
                            *
UNITED TELEPHONE SOUTHEAST, LLC,       *
d/b/a CENTURYLINK,                     *
    Defendant/Counter-Plaintiff.      *


COMPRESSED COPY

DEPOSITION OF

## ANDREW "ANDY" ICE

(Taken December 14, 2022)


APPEARANCES:

COUNSEL FOR BRIGHTRIDGE:        WILLIAM C. BOVENDER
                               JOSEPH B. HARVEY
                               HUNTER, SMITH & DAVIS
                               1212 North Eastman Road
                               Kingsport, TN  37664

COUNSEL FOR CENTURYLINK:       GARY L. EDWARDS
                               BAKER DONELSON
                               602 Sevier Street, Ste. 300
                               Johnson City, TN  37604

ALSO APPEARING:                JEFF DYKES
                               Chief Executive Officer
                               BrightRidge

---

### COURT REPORTING AND VIDEO SERVICES

P. O. Box 7481                                TELEPHONE: (423) 230-8000
Kingsport, TN 37664                   REBECCA@COURTREP.NET

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TENNESSEE
AT GREENEVILLE

JOHNSON CITY ENERGY AUTHORITY    *
d/b/a BRIGHTRIDGE,    *
    Plaintiff/Counter-Defendant,    *
                   *    CASE NO.
VS.                 *    2:20-cv-00030
                   *
UNITED TELEPHONE SOUTHEAST, LLC,    *
d/b/a CENTURYLINK,    *
    Defendant/Counter-Plaintiff.    *

DEPOSITION OF
ANDREW "ANDY" ICE
(Taken December 14, 2022)

APPEARANCES:
COUNSEL FOR BRIGHTRIDGE: WILLIAM C. BOVENDER
                   JOSEPH B. HARVEY
                   HUNTER, SMITH & DAVIS
                   1212 North Eastman Road
                   Kingsport, TN 37664
COUNSEL FOR CENTURYLINK: GARY L. EDWARDS
                   BAKER DONELSON
                   602 Sevier Street, Ste. 300
                   Johnson City, TN 37604
ALSO APPEARING:         JEFF DYKES
                   Chief Executive Officer
                   BrightRidge

COURT REPORTING AND VIDEO SERVICES
P. O. Box 7481        TELEPHONE: (423) 230-8000
Kingsport, TN 37664
                     REBECCA@COURTREP.NET

1

I N D E X   O F   E X H I B I T S (cont.)
DEPOSITION OF ANDREW "ANDY" ICE

EXHIBIT #17: Make-ready request E-mail dated 2/19/19.
               Page Introduced: 138
EXHIBIT #18: Make-ready request E-mail dated 2/19/19.
               Page Introduced: 140
EXHIBIT #19: Make-ready request E-mail dated 2/19/19.
               Page Introduced: 140
EXHIBIT #20: Letter from Ken Edgar to Andy Ice dated 2/20/19.
               Page Introduced: 144
EXHIBIT #21: Letter from Ken Edgar to Andy Ice dated 2/20/19.
               Page Introduced: 145
EXHIBIT #22: Letter from Stacy Evans to Andy Ice dated
    3/1/19.
               Page Introduced: 145
COLLECTIVE EXHIBIT #26: E-mails dated 8/31/18, 8/30/18,
    9/12/18, 9/5/18 and invitation for Skype meeting dated
    9/18/18.
               Page Introduced: 147

3

I N D E X   O F   E X H I B I T S
DEPOSITION OF ANDREW "ANDY" ICE

EXHIBIT #1: 1980 joint use agreement between Johnson City
    Power Board and United Inter-Mountain Telephone Company.
               Page Introduced: 39
EXHIBIT #5: Amendment Number Four.
               Page Introduced: 62
EXHIBIT #6: Amendment Number Five.
               Page Introduced: 65
EXHIBIT #7: E-mails dated 9/5/18, 8/31/18, 8/30/18.
               Page Introduced: 101
EXHIBIT #8: E-mails dated 9/12/18, 9/5/18, 8/31/18.
               Page Introduced: 118
EXHIBIT #9: Letter to Andy Ice from Stacy Evans dated
    11/26/18.
               Page Introduced: 124
EXHIBIT #10: Make-ready request E-mails dated 11/30/18.
               Page Introduced: 129
EXHIBIT #11: Letter to Andy Ice from Stacy Evans dated
    12/18/18.
               Page Introduced: 131
EXHIBIT #12: Letter from Ken Edgar to Andy Ice dated
    12/21/18.
               Page Introduced: 134
EXHIBIT #13: Make-ready request E-mail dated 12/21/18.
               Page Introduced: 136
EXHIBIT #14: Letter from Ken Edgar to Andy Ice dated
    12/21/18.
               Page Introduced: 136
EXHIBIT #15: Make-ready request E-mail dated 12/21/18.
               Page Introduced: 137
EXHIBIT #16: Letter from Ken Edgar to Andy Ice dated
    12/21/18.
               Page Introduced: 137

2

C A P T I O N

    The deposition of ANDREW "ANDY" ICE was taken pursuant to notice in the Johnson City, Tennessee law offices of Baker Donelson beginning at 8:32 a.m. on Wednesday, December 14, 2022, for use at any trial, hearing or proceeding involving this matter, and for any purpose allowable by and pursuant to the Federal Rules of Civil Procedure.

    The witness was sworn by Rebecca Overbey, Licensed Court Reporter in and for the State of Tennessee. It is agreed that Rebecca Overbey, Licensed Court Reporter, may take this deposition by electronic recording equipment; transcribe the same to typewriting, using computer technology; and affix the signature of the witness hereto.

    All other formalities are waived.

4

Case 2:20-cv-00030-KAC-CRW   Document 67-8   Filed 02/15/23   Page 3 of 7   PageID #: 988

1    ANDREW "ANDY" ICE, the witness, having first been duly
2 sworn, testified as follows:
3 DIRECT EXAMINATION BY MR. WILLIAM C. BOVENDER:
4 Q. State your name and current business address for the
5    record.
6 A. My name is Andrew Ice. I go by Andy. My work address is
7    101 North Roan Street here in Johnson City, Tennessee.
8 Q. Is that the location of the telephone company?
9 A. Yes, sir.
10 Q. All right. I'll sometimes call it the telephone company,
11    sometimes call it CenturyLink. We may even talk about
12    United Telephone.
13 A. Okay.
14 Q. What's your home address?
15 A. 1700 Fairway Drive here in Johnson City.
16 Q. Okay. Have you ever been deposed?
17 A. One time about 20 some odd years ago. It was in Kansas
18    City. It wasn't anywhere close to here. It was another
19    job, another issue.
20 Q. Okay. Have you ever testified in court?
21 A. No, sir.
22 Q. If I ask you a question and you don't understand it, just
23    tell me and I'll restate it.
24 A. Okay.
25 Q. If you need a break at any time, let me know and we'll

5

1    stop. That probably won't be a problem for you because
2    I'll probably be stopping and taking breaks before you'll
3    need them, to be honest with you.
4 A. All right.
5 Q. I'm getting over some surgery and I take breaks
6    frequently. Are you on any kind of medication or
7    otherwise that would in any way impair your ability to
8    understand my questions or to answer my questions?
9 A. No.
10 Q. Do you know why you're here today?
11 A. Partly because of a request to attach cables into the data
12    space on our poles.
13 Q. All right.
14 A. And our understanding that isn't what the agreement says.
15 Q. Okay. Your understanding is that's what the agreement
16    says, are you referring to the 1980 agreement?
17 A. Yes, I'm referring to the 1980 agreement.
18 Q. And who told you that BrightRidge was not supposed to
19    attach in the data area of the pole?
20 A. That's what the current agreement between BrightRidge and
21    ourselves states. It's the agreement for them to have the
22    top six feet of the pole, a safety separation, and we get
23    the next four feet.
24 Q. Okay. What did you do to prepare for your deposition
25    today?

6

1 A. I went back through some old E-mails from the 2018 window
2    when this started.
3 Q. Did you get those yourself or were you supplied them?
4 A. No, those are mine.
5 Q. Well, did you bring them out yourself or did somebody
6    instruct you to find them and look at them?
7 A. No, no one instructed me.
8 Q. Okay. E-mails in 2018. Anything else?
9 A. No, just those documents for that window.
10 Q. Did you review...
11 A. There was some in 2019 as well. It was that window of the
12    time I was involved with it until the attorneys got
13    involved, then I wasn't involved nearly as much.
14 Q. Okay. Other than speaking with your attorneys in advance
15    of this deposition, did you speak with anyone else in the
16    company or former employees of the company about this
17    deposition?
18 A. I had a brief conversation with Marcy Buckles. She had
19    her deposition a week or so ago.
20 Q. What did she tell you about her deposition?
21 A. That she was nervous, that she at times got flustered
22    because she was nervous. She said there were questions
23    asked about her work career and different titles and
24    positions she held. There were -- a lot of the questions
25    she said she didn't have any knowledge of, so there wasn't

7

1    anything she could offer or provide. It was a brief
2    conversation just to see how things went.
3 Q. Did she discuss with you anything she testified about
4    relative to the 1980 agreement?
5 A. No, sir.
6 Q. Are you nervous today?
7 A. I'm uneasy.
8 Q. Okay.
9 A. It's a new procedure for me, so yeah, I would say maybe a
10    little nervous.
11 Q. Well, you need not be nervous.
12 A. Okay.
13 Q. This is not a water boarding or anything like that.
14 A. Right. Once again, it's new and different to me.
15 Q. We're just asking some questions. It's not like being in
16    court even. Did you -- have you had occasions to see any
17    of the transcript of Ms. Buckles' deposition?
18 A. No, sir.
19 Q. Have you talked to Andrew Chong about his deposition?
20 A. No, sir.
21 Q. How about Josh Freeman?
22 A. No, sir.
23 Q. How about Mr. Honeycutt?
24 A. No, sir.
25 Q. Did you know that Freeman, and Honeycutt, and Chong had

8

1    their poles in their service territory after you came back
2    in 2008?
3  A.  That wouldn't have been until 2019.
4  Q.  Were there telephone company -- BrightRidge attachments on
5    the telephone company poles in the power company service
6    territory when you came back in 2008?
7  A.  There was -- in the electric zone, there was that fiber
8    that I mentioned before to connect their substations.
9  Q.  Yeah.
10  A.  And that was the only thing that I was aware of.
11  Q.  All right.  And were you also working with BTES when you
12    came back?
13  A.  I did have some interactions with BTES, yes, sir.
14  Q.  Did BTES have any type of fiber internet attachments on
15    its poles when you came back in 2008?
16  MR. EDWARDS:  Let me just state a continuing objection, and it
17    will be continuing for the deposition, related to
18    questions related to any other attachers outside of the
19    BrightRidge service territory for the reasons previously
20    circulated in E-mails and discussed with counsel.
21  Q.  Okay.  Thank you.
22  A.  I was told that they were deploying fiber and they were
23    placing it in the power zone.
24  Q.  Okay.  Was there any other TVA distributor in the area you
25    had responsibility for that was doing the same thing that

25

1    you can remember in 2008?
2  A.  Not in 2008, no, sir.
3  Q.  Okay.  You've mentioned your fiber attachments.  What kind
4    of fiber attachments did you have in 2008 when you came
5    back on your poles or the poles of the power board?
6  A.  It varied in size depending on when they were initially
7    deployed.  It could have been anything from a 6 fiber, to
8    a 12 fiber, to a 24, to a 48, to a 144, 72.  We had all
9    sizes.
10  Q.  Was that an overlashing situation or were they in a
11    separate cable that was an additional attachment to your
12    copper attachments on those poles that belonged to the
13    power board?
14  A.  We had both.  We had both overlashing and separate
15    attachments.
16  Q.  Okay.  Now, let's talk a little bit about BVU, subject to
17    Mr. Edwards' objection.  When you came back, are you aware
18    in 2008 that BVU had internet connections in the telephone
19    zone?
20  A.  I was not aware of it.  I heard they had deployed fiber,
21    but I was not aware where the fiber was placed on the
22    poles.
23  Q.  At what point in time did you learn that they -- that BVU
24    had placed internet connections in the telephone zone?
25  A.  That wasn't until several years later.

26

1  Q.  How do you define several years?
2  A.  Probably the 2013 window or 2014 window.  It was several
3    years later.  I didn't realize that they were in the data
4    zone.
5  Q.  What did you learn about their internet connections in the
6    telephone zone?
7  A.  I learned that's where they had attached their cables was
8    in the data zone.  I asked questions about why they were
9    in the data zone and how they received permission to be in
10    the data zone.  There was -- the people who had made those
11    arrangements had all retired and left, so I didn't get
12    good replies to my questions.
13  Q.  Did you take it upon yourself to do any additional
14    investigation?
15  A.  I did some.  I asked our administrators of our joint use
16    poles if there had been permission granted for them to be
17    in the data zone.  I asked...
18  Q.  And what was the answer to that question?
19  A.  They didn't have an answer for me.  Either A, the people I
20    talked to weren't aware of it, or B, had not granted
21    permission.
22  Q.  How did you make that assumption?
23  A.  They told me they didn't have any information about it or
24    they told me that they had not granted permission.  There
25    was nothing in the contract that we had with them that

27

1    changed that would allow them to do so.
2  Q.  Okay.  Who were you talking to?
3  A.  Several different people.  Some of them are retired.  Some
4    of them are still here.  Ryan Sikes was one that I spoke
5    with.
6  Q.  All right.
7  A.  And he'll -- I guess you've got him lined up for some
8    discussions next time or -- I don't know when.  I heard
9    his name was on the list.  I don't know if you're going to
10    talk to him or not.
11  Q.  So you had conversations with Ryan Sikes about the BVU
12    internet attachments in the telephone zone when you came
13    back.
14  A.  Uh-huh (Affirmative).
15  Q.  Have you had any conversations with Ryan Sikes recently?
16  A.  Not about that topic.
17  Q.  How do you know about his deposition?
18  A.  I'm sorry?  He told me yesterday that he was on the list.
19  Q.  Okay.
20  A.  I'm sorry, I didn't mean to point.  I apologize.
21  Q.  Well, did you take -- attempt to take any action against
22    BVU for the attachments they made in the telephone space?
23  A.  That's still something we're investigating.  That's not
24    something that's concluded.
25  Q.  Well, you're aware that BVU no longer owns -- they sold

28

Case 2:20-cv-00030-KAC-CRW  Document 67-8  Filed 02/15/23  Page 5 of 7  PageID #: 990

1    that off. You're aware of that, aren't you?
2 A.  I had heard that, but that was only recent information
3    that I received.
4 Q.  Who gave you that information?
5 A.  Actually, Mr. Bowman, the chairman at BVU. I was on the
6    phone with him about some things and he mentioned that
7    they don't own that service anymore.
8 Q.  Don Bowman, is that who you're talking about?
9 A.  Yes, sir.
10 Q.  So you didn't know that that had been sold off?
11 A.  No, sir.
12 Q.  Have you had very much communications with Stacy Evans who
13    was at BVU and is now at BrightRidge?
14 A.  When he was at BVU, no, I don't remember any
15    conversations. Since he's been at BrightRidge, it got
16    started in August of '18. Counting forward, I've had
17    conversations -- probably more communications in that fall
18    window of '18 and then after the January, February, March
19    window of '19. Then it kind of dried up again and I guess
20    I haven't had as much conversations.
21 Q.  Did you, yourself, initiate any activity to force BVU to
22    pay any additional fees because their internet was
23    attached in the telephone zone?
24 A.  I asked some questions about it, but I didn't -- but I
25    didn't take any action or force any action to be taken. I

29

1    don't -- I'm not involved in the billing, so I don't have
2    any responsibility for that. That's taken care of by
3    others. I can bring it to their attention. I can request
4    that they look into it, but I can't bill anyone.
5 Q.  So however they got there, they got there, and that
6    remained the status quo until they were sold off to
7    somebody else. Is that correct?
8 A.  I guess I'm trying to make sure I understand your
9    statement. How it got there, I don't know. I wasn't
10    involved with that.
11 Q.  Okay.
12 A.  When it was sold off, yeah, now there's a different entity
13    that probably -- I say probably. I assume there's an
14    agreement with that company to have attachments with us
15    and those attachments would be covered underneath that
16    agreement.
17 Q.  Did you ever review the agreement between BVU and the
18    telephone company, the original agreement?
19 A.  No, sir.
20 Q.  After you -- when you came back, bring me up to date now
21    on what jobs you've held since you came back in 2008.
22 A.  I was manager of engineering, as I mentioned, of...
23 Q.  Outside.
24 A.  ...outside plant. Then I picked up additional
25    responsibilities. I picked up western North Carolina,

30

1    South Carolina, and Georgia. That lasted until the end of
2    '14. In 2014, I switched jobs to take care of our core
3    network. That was taking care of all of the essential
4    office equipment from Texas to Jersey. I was in that job
5    until the spring of '17. Then I came back to running the
6    outside plant and the core network for..
7 Q.  What network?
8 A.  Core, our central office core network that connects all
9    our central offices. I had that job, let's see, probably
10    until -- well, until current. I have added and subtracted
11    pieces and parts since, but it's essentially been the
12    same. I've had outside plant and core for those states
13    since 2017.
14 Q.  Outside what?
15 A.  Outside plant.
16 Q.  Plant.
17 A.  OSP, outside plant.
18 Q.  Okay. And is that your current job?
19 A.  Yes, sir.
20 Q.  And you say it's for what states?
21 A.  I have Tennessee, South Carolina, and Georgia.
22 Q.  Who has Virginia?
23 A.  That's taken care of by one of my peers that has all of
24    the state of Virginia.
25 Q.  What about western North Carolina?

31

1 A.  That's taken care of by another peer that has -- there's
2    three different managers in North Carolina that take care
3    of those areas.
4 Q.  Was Mr. Sikes here when you came?
5 A.  No, sir.
6 Q.  Has he always been in the Carolinas?
7 A.  Yes, sir, as far as I know. I mean, I don't know where
8    he's lived, but my interactions with him were when he was
9    in North Carolina.
10 Q.  And when you say the Carolinas, are you talking about
11    United Telephone of the Carolinas?
12 A.  I was talking about North Carolina itself. I don't know
13    the entity he was working for or with or a subsidiary. I
14    just know he lived in the Carolinas.
15 Q.  Okay. When you had responsibility for western North
16    Carolina, did that include Central Telephone?
17 A.  Central Telephone?
18 Q.  Yeah. Have you ever heard of that?
19 A.  No, sir.
20 Q.  Okay. I'm sorry, this may be a duplicate question. I
21    don't remember your answer. Did you -- I want to ask you
22    again to make sure. Have you ever seen the original
23    contract between BVU and the telephone company?
24 A.  I've never read it, no, sir.
25 Q.  Okay. Have you read any amendments, if any, that there

32

Case 2:20-cv-00030-KAC-CRW  Document 67-8  Filed 02/15/23  Page 6 of 7  PageID #: 991

**Page 153**

1   Q.  Okay.
2   A.  So Ryan checked with his peers, as I mentioned, and this
3       is one of the replies.
4   Q.  So you're referring to Page CL491.
5   A.  Yes, sir.
6   Q.  Donnie response.
7   A.  Uh-huh (Affirmative).
8   Q.  Did you ever discuss this with Donnie?
9   A.  I did not.
10  Q.  So was he on the Skype call or anything like that? Where
11      did that come from?
12  A.  I don't -- his name is on it, I think. Donnie response.
13      I think that's the same Donnie, but I don't see a last
14      name here, so...
15  Q.  Okay.
16  A.  ...I'm not entirely sure.
17  Q.  All right.
18  A.  I can't tell you if he was on that call or not. I don't
19      remember discussing it.
20  Q.  Have you been shown a document -- an expert report
21      document from a David Brevitz?
22  A.  That name is not familiar to me, no.
23  Q.  Okay. Let me talk with Mr. Harvey here for just a minute.
24  A.  Okay, sure.
25            ***OFF THE RECORD***

**Page 154**

1  DIRECT EXAMINATION CONTINUES BY MR. BOVENDER:
2   Q.  The Donnie we were talking about...
3   A.  Uh-huh (Affirmative).
4   Q.  Did you discuss Donnie's reply with anybody?
5   A.  No.
6   Q.  Did Donnie discuss his reply with you?
7   A.  No.
8   Q.  Who shared in Donnie's reply, if you recall? It doesn't
9      seem to be documented.
10  A.  Who shared -- I'm sorry?
11  Q.  Who else saw Donnie's reply?
12  A.  Oh, I don't know. I mean, the note was from Andrew, I
13      assume, so I don't know who he shared it with.
14  Q.  Okay. Do you have anything? Okay. That is all.
15  A.  That's it? Okay.
16  Q.  Thank you very much.
17  A.  Thank you. I appreciate it.
18      AND FURTHER THE DEPONENT SAITH NOT.
19                      ANDREW "ANDY" ICE
20
21
22            BY:     Rebecca Overbey
23                Licensed Court Reporter
24
25

**Page 155**

CERTIFICATE

   I, Rebecca Overbey, Licensed Court Reporter in and for the State of Tennessee, do hereby certify that the foregoing deposition of ANDREW "ANDY" ICE was taken at the time and place and for the purpose as stated in the Caption; that the witness was duly sworn by me before deposing; that the said deposition was recorded electronically and was later transcribed to typewriting, using computer technology; and that the foregoing is a true and accurate transcript of the proceedings to the best of my knowledge, ability and understanding.
   WITNESS my hand and official seal at my office in Kingsport (Sullivan County) Tennessee on this the 28th day of December, 2022.

                      Rebecca Overbey
                 LICENSED COURT REPORTER
               St ate o f   Tennessee
                    LCR #078

My License Expires:
June 30, 2024

    ***CERTIFIED ONLY IF AFFIXED SEAL IS GREEN***

**Page 156**

EXHIBIT #1:  1980 joint use agreement between Johnson City
    Power Board and United Inter-Mountain Telephone
    Company.
              Page Introduced:   39
EXHIBIT #5:  Amendment Number Four.
              Page Introduced:   62
EXHIBIT #6:  Amendment Number Five.
              Page Introduced:   65
EXHIBIT #7:  E-mails dated 9/5/18, 8/31/18, 8/30/18.
              Page Introduced:  101
EXHIBIT #8:  E-mails dated 9/12/18, 9/5/18, 8/31/18.
              Page Introduced:  118
EXHIBIT #9:  Letter to Andy Ice from Stacy Evans dated
    11/26/18.
              Page Introduced:  124
EXHIBIT #10:  Make-ready request E-mails dated 11/30/18.
              Page Introduced:  129
EXHIBIT #11:  Letter to Andy Ice from Stacy Evans dated
    12/18/18.
              Page Introduced:  131
EXHIBIT #12:  Letter from Ken Edgar to Andy Ice dated
    12/21/18.
              Page Introduced:  134
EXHIBIT #13:  Make-ready request E-mail dated 12/21/18.
              Page Introduced:  136
EXHIBIT #14:  Letter from Ken Edgar to Andy Ice dated
    12/21/18.
              Page Introduced:  136
EXHIBIT #15:  Make-ready request E-mail dated 12/21/18.
              Page Introduced:  137
EXHIBIT #16:  Letter from Ken Edgar to Andy Ice dated
    12/21/18.
              Page Introduced:  137