**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF TENNESSEE**
**AT GREENEVILLE, TENNESSEE**

| | | |
|---|---|---|
| JOHNSON CITY ENERGY AUTHORITY, | ) | |
| d/b/a BRIGHTRIDGE | ) | |
| | ) | |
|     Plaintiff and Counter-Defendant, | ) | |
| | ) | CASE NO.: 2:20-cv-30-KAC-CRW |
| v. | ) | |
| | ) | |
| UNITED TELEPHONE SOUTHEAST, LLC, | ) | |
| d/b/a CENTURYLINK, | ) | |
| | ) | |
|     Defendant and Counter-Plaintiff. | ) | |

**PLAINTIFF BRIGHTRIDGE'S REPLY BRIEF IN SUPPORT OF ITS OBJECTION TO MAGISTRATE JUDGE'S RULING**

Plaintiff and Counter-Defendant Johnson City Energy Authority d/b/a BrightRidge ("BrightRidge") respectfully submits the following Reply Brief in Support of its Objection to Magistrate Judge's Ruling (Doc. 55) and in reply to CenturyLink's "Memorandum of Law in Opposition to BrightRidge's Objection to Magistrate Judge Ruling." (Doc. 67 (CenturyLink's "Response").) For the reasons explained below, and those in BrightRidge's Objection to Magistrate Judge's Order (Doc. 55), BrightRidge's Objection should be granted.

**I.**     <u>**CenturyLink Misrepresents the BVU Invoice to CenturyLink Which Actually Proves BrightRidge's Allegation that BVU Did Not Pay an Additional Fee**</u>

In its attempt to convince this Court to ignore evidence directly relevant to CenturyLink's understanding of the parties' Joint Use Pole Agreement, CenturyLink has grossly misrepresented an invoice that it disclosed for the first time as an exhibit to its Response. (Doc. 67-1.) CenturyLink represented to this Court that a January 2019 Invoice from BVU to CenturyLink demonstrates that BVU paid CenturyLink an additional fee for placing fiber attachments in the telephone space of joint use poles. (Doc. 67, Page ID#: 935.) This <u>representation is false</u>. The BVU invoice does

1

not show that BVU paid CenturyLink an additional fee for placing fiber attachments in the telephone space of joint use poles owned by CenturyLink. It actually shows the opposite, and proves BrightRidge's position that the per-pole adjustment fee required by the parties' Agreement covers all of the electric company's attachments on a joint use pole owned by CenturyLink, including fiber attachments in the telephone space.

Stacy Evans was employed by BVU from April 2002 to June 2018. (Ex. 1, Affidavit of Stacy Evans ("Evans Aff."), ¶ 2.) During his employment with BVU, Mr. Evans had primary responsibility for, and overall supervision of, BVU's development and installation of a fiber broadband network to provide internet services to BVU's customers. (*Id.* at ¶¶ 2-3.) While employed with BVU, Mr. Evans was also responsible for reviewing the annual adjustement fee invoices between CenturyLink and BVU, and he approved the inter-division charges (cost allocations between BVU's electric division and its broadband division referred to as "OptiNet"). (*Id.*) Due to his duties and responsibilities as an employee of BVU for sixteen years, he has firsthand knowledge of the construction and operation of BVU's fiber broadband system from its initial stages in April 2002, through June, 2018. (*Id.* at ¶ 4.) And, as a result of his employment with BVU, Mr. Evans has direct, firsthand knowledge of the invoices for adjustment payments that were made based on BVU's attachments to joint use poles owned by CenturyLink, and CenturyLink's attachments to joint use poles owned by BVU. (*Id.*)

According to Mr. Evans, who has direct, firsthand knowledge of the relationship and dealings between BVU and CenturyLink related to fiber attachments on joint use poles, "[t]he January 29, 2019 Invoice Number PR1103 from BVU to CenturyLink … does not show that BVU's broadband division (known as BVU OptiNet) paid a separate, additional fee to attach its fiber in the telephone space of joint use poles owned by CenturyLink." (Ex. 1, Evans Aff., ¶ 12.)

Instead, Mr. Evans explains that the January 2019 Invoice shows adjustment payments for three different attachment scenarios:

(a) Joint use poles owned by BVU on which CenturyLink had attachments – 7,286 poles;

(b) Joint use poles ownd by CenturyLink on which BVU had electric *or* electric <u>and</u> fiber attachments – 2,709 poles (one fee per pole for all attachments); and

(c) Joint use poles ownd by CenturyLink on which BVU had <u>only</u> fiber attachments – 88 poles.

"The 88 poles in the third category of the January 2019 Invoice are joint use poles on which BVU had fiber attachments *only* and no electric attachments." (Ex. 1, Evans Aff., ¶ 12.)  Mr. Evans is aware that "The majority of these [88] poles were near Abingdon, Virginia, outside of BVU's electric service territory where BVU did not provide electric service." (*Id.*)  BVU "reported these 'fiber-only' joint use poles under the annual Joint-Use adjustment calculation because [BVU] understood that the existing Joint Use Pole Agreement between BVU and CenturyLink covered both attachment types."[1] (*Id.*)  Mr. Evans further explains that "[f]or the remaining 2,700 poles on which BVU had electric attachments, or *both* electric attachments in the electric space *and* fiber attachments in the telephone space, BVU made only <u>one</u> adjustment payment per pole, even though it had attachments in *both* the electric *and* telephone space." (*Id.*)  Thus, Mr. Evans concludes in a sworn affidavit that "the January 2019 Invoice does *not* show that BVU paid a separate fee for 88 fiber attachments in the telephone space of joint use poles owned by CenturyLink *in addition to* a payment for electric attachments.  Rather, BVU made *one* adjustment payment per pole on which it had one or more attachments (electric or fiber)." (*Id.*)

---

[1] CenturyLink's conduct demonstrates that CenturyLink had the same understanding of the parties' Agreement, which is one of the reasons why CenturyLink's response to BVU placing fiber attachments in the telephone space of joint use poles owned by CenturyLink is relevant.

3

Mr. Evans is confident in his conclusions "because by October 2017, BVU OptiNet had attachments on over 10,000 joint use poles (both BVU and CenturyLink poles), which included attachments on over 2,700 joint use poles owned by CenturyLink." (Ex. 1, Evans Aff., ¶ 13.) Mr. Evans further explains that CenturyLink's interpretation of the January 2019 Invoice "would mean that, in 2018, BVU OptiNet had attachments on only 88 joint use poles owned by CenturyLink which is simply wrong." (*Id.*) By the time of the January 2019 Invoice, "BVU had been providing broadband services for up to 16 years – since 2002 – and by 2018 had approximately 12,500 customers." (*Id.*) To suggest "that BVU had fiber attachments on only 88 joint use poles owned by CenturyLink is incorrect and very misleading." (*Id.*)[2]

Notably, CenturyLink did not present deposition testimony, an affidavit, or any other sworn testimony to support its misrepresentation of the January 2019 Invoice from BVU. While CenturyLink used the invoice as an exhibit with its counsel's arguments, no witness has testified to CenturyLink's interpretation of the invoice – perhaps because CenturyLink's interpretation is incorrect. In contrast, Mr. Evans, who was responsible for reviewing invoices as part of his duties as an employee at BVU, has provided a sworn affidavit explaining, with factual detail, why the January 2019 Invoice does not show that BVU paid a separate fee for its fiber attachments to CenturyLink's poles. It is also notable that CenturyLink did not provide as exhibits the annual adjustment fee invoices from BVU for the years 2003 to 2017. CenturyLink's unsworn, incomplete, and demonstrably false spin on the January 2019 Invoice should be disregarded.

---

[2] CenturyLink's attempt to question Mr. Evans's memory of his work duties at BVU based on his lack of knowledge regarding criminal prosecutions of other individuals at BVU is weak and the explanation is obvious. Naturally, Mr. Evans is more familiar with his day-to-day responsibilities for BVU's internet operations, than he was with the prosecutions of other persons regarding matters that did not involve him nor pertain to his duties.

4

The January 2019 Invoice supports BrightRidge's claims in two ways: (1) BVU did not pay a separate attachment fee to CenturyLink for its fiber attachments in the telephone space of joint use poles owned by CenturyLink beyond the contractual adjustment payment; and (2) CenturyLink's conduct under its joint use agreement with BVU is directly relevant because it demonstrates CenturyLink's understanding of the Agreement, the custom and usage in the industry, and CenturyLink's discriminatory treatment of BrightRidge, while operating under materially identical contractual language. First, rather than proving that BVU's experience is irrelevant, the January 2019 Invoice demonstrates the opposite – the same facts and circumstances were at issue with BVU and CenturyLink's conduct demonstrates "the construction placed on the contract by the parties in carrying out its terms." *Silva v. Buckley*, No. M2002-00045-COA-R3-CV, 2003 WL 23099681, at *2 (Tenn. Ct. App. Dec.31, 2003); *In re HC Liquidation, Inc.*, 609 B.R. 731, 752 (Bankr. E.D. Tenn. 2019) ("Tennessee follows the rule of practical construction, which provides that 'the interpretation placed upon a contract by the parties thereto, as shown by their acts, will be adopted by the court ….'"). Second, the January 2019 Invoice is evidence of usage and custom in the industry, which, by 2019, established that BVU had been paying a single adjustment payment for all attachments on joint use poles (including fiber attachments in the telephone space) for over ten years. *See Tackett v. M & G Polymers USA, LLC*, 811 F.3d 204, 208 (6th Cir. 2016) ("a court may look to known customs or usages in a particular industry to determine the meaning of a contract"). Third, the January 2019 invoice is relevant to the issue of whether CenturyLink has complied with its duty of good faith and fair dealing that is implied in every contract under Tennessee law. *Dick Broad. Co. of Tennessee v. Oak Ridge FM, Inc.*, 395 S.W.3d 653, 661 (Tenn. 2013) ("Tennessee courts have consistently applied the principle that Tennessee law recognizes an implied covenant of good faith and fair dealing in every contract.").

5

BrightRidge assumes that CenturyLink's misinterpretation of the January 2019 Invoice was a good faith error on CenturyLink's part and not an intentional effort to misrepresent facts that would fall short of its obligations to the Court. Nonetheless, to suggest to the Court that the January 2019 Invoice reflects BVU's payment of an additional "attachment fee" for fiber attachments in the telephone space is a distortion of the facts.

## II. CenturyLink's Letters To BTES and Erwin Utilities Demonstrate CenturyLink's Understanding of the Contractual Language at Issue in this Case

Similarly, CenturyLink's June 2021 "cease and desist letters" to Bristol Tennessee Essential Services ("BTES") and Erwin Utilities, which CenturyLink revealed for the first time as exhibits to its Response (Docs. 67-2, 67-3), are also evidence that directly supports BrightRidge's assertion regarding CenturyLink's interpretation of the contract language at issue in this case, which language also appears in CenturyLink's joint use pole agreements with BTES and Erwin Utilities. The letters prove BrightRidge's position in two ways: (1) CenturyLink's letters demonstrate, as alleged in BrightRidge's Complaint, that other electric companies in the region placed attachments in the telephone space of joint use poles owned by CenturyLink; and (2) CenturyLink's letters demonstrate that CenturyLink took no action to oppose BTES's and Erwin Utilities' attachments in the telephone space of joint use poles until June 2021, many *years* after BTES and Erwin Utilities made the attachments, and more than a year after BrightRidge had filed its Complaint in this action. In short, CenturyLink's letters demonstrate that CenturyLink allowed other electric companies, while operating under contractual language materially identical to the language at issue here, to attach internet equipment in the telephone space of CenturyLink's poles for years without paying any fee beyond the adjustment payment in the Agreement and without objection from CenturyLink.

6

In its Complaint, BrightRidge alleged that other electric companies had placed internet attachments in the telephone space of joint use poles owned by CenturyLink. (Doc. 1, ¶ 16, PageID #: 6.) CenturyLink denied this allegation. (Doc. 7, PageID: # 110.) In its Answer, CenturyLink stated the following: "CenturyLink denies that it has ever permitted any electric supply entity to attach communication facilities in the designated communication space of its poles without paying rental for that space in addition to any rental paid for attachments in the designated electric supply space on CenturyLink poles." (*Id.*) The letters attached to CenturyLink's Response prove that CenturyLink's statement in its Answer is not true. There would be no need for CenturyLink to send "cease and desist" letters to BTES and Erwin Utilities telling those companies that they have "been making, and/or continuing to make, attachments in the communications space of utility poles owned by CenturyLink," if those Companies had not attached internet equipment in the telephone space of joint use poles owned by CenturyLink. (Doc. 67-2, 67-3.) Thus, the letters prove the allegations in BrightRidge's Complaint that other electric companies had placed internet attachments in the telephone space of joint use poles owned by CenturyLink without paying an additional fee, and demonstrate that CenturyLink's denial of BrightRidge's allegations was false.

And just as importantly, CenturyLink's letters show that CenturyLink did nothing to oppose the other electric companies' attachments in the telephone space for *years*, and did not do so until more than a year *after* this lawsuit was filed. BTES began providing internet and cable television services in 2005. (Ex. 1, Evans Aff., ¶ 19.) BTES placed internet and cable attachments in the telephone space on joint use poles owned by CenturyLink in the BTES service territory. (*Id.*) The attachments were open and obvious. In fact, information about BTES's internet system is even included on BTES's public website (https://www.btes.net/Page/about-us). (*Id.*) CenturyLink's letter to BTES in June 2021, sixteen years later, was apparently CenturyLink's first

7

attempt to express any opposition to BTES's attachments in the telephone space on joint use poles owned by CenturyLink. Likewise, Erwin Utilities began providing fiber internet services to its customers in January 2015. (Ex. 1, Evans Aff., ¶ 20.) Erwin Utilities made fiber attachments in the telephone space on joint use poles owned by CenturyLink in the Erwin Utilities service territory. (*Id.*) Information about Erwin Utilities' internet deployment is publicly displayed on Erwin Utilities' website (https://www.e-u.cc/about/). (*Id.*) Erwin Utilities placed and maintained internet attachments in the telephone space of joint use poles owned by CenturyLink for six years before CenturyLink expressed any opposition. Moreover, CenturyLink sent the letters to BTES and Erwin Utilities in June 2021, only after this litigation had been pending for sixteen months. (*See* Doc. 1, Complaint, filed 2/19/2020.)

Accordingly, far from being evidence that BrightRidge regrets it asked for, CenturyLink's letters are key pieces of *relevant* evidence supporting BrightRidge's claims because the letters prove exactly what BrightRidge has alleged: Other electric companies in the region, while operating under materially identical contract language in joint use pole agreements between them and CenturyLink, placed internet attachments in the telephone space of joint use poles owned by CenturyLink and maintained them for years without any additional payment and without any opposition from CenturyLink. Thus, CenturyLink knew about and allowed the attachments to be in place for years without seeking additional fees and it did not take any action until June 2021, over year after this litigation had commenced and well after any statute of limitations had expired for asserting claims against those other electric companies. CenturyLink's June 2021 letters to BTES and Erwin Utilities demonstrate that CenturyLink understood very well that the language in the joint use pole agreements between CenturyLink and other electric companies allowed the electric companies to make attachments for internet equipment in the telephone space of joint use

poles owned by CenturyLink. That was the practice observed by CenturyLink and BVU, BTES, and Erwin Utilities for years before BrightRidge first began placing fiber attachments in the telephone space of joint use poles owned by CenturyLink. CenturyLink's letters are directly relevant to BrightRidge's claims and highly probative of CenturyLink's understanding of the contractual language at issue and the interpretation placed upon that language in the industry. "[A] court may look to known customs or usages in a particular industry to determine the meaning of a contract, [if] the parties … prove those customs or usages using affirmative evidentiary support in a given case." *M & G Polymers USA, LLC v. Tackett*, 574 U.S. 427, 439, 135 S. Ct. 926, 935, 190 L. Ed. 2d 809 (2015); *Tackett v. M & G Polymers USA, LLC*, 811 F.3d 204, 208 (6th Cir. 2016) ("a court may look to known customs or usages in a particular industry to determine the meaning of a contract"). This litigation apparently caused CenturyLink change its position and send cease and desist letters to BTES and Erwin Utilities.

In sum, far from demonstrating that evidence related to BVU, BTES, and Erwin Utilities is irrelevant, CenturyLink's Response, and the newly revealed documents attached to it as exhibits, demonstrate that the evidence is highly relevant. The construction that CenturyLink placed on its joint use pole agreements with BVU, BTES, and Erwin Utilities, each of which contain materially identical language to the Agreement between BrightRidge and CenturyLink with respect to attachments on joint use poles, and the custom and usage in the industry for years, are highly relevant to the interpretation of the parties' Agreement, which is the primary issue in this matter.

## III.    The Email From Greeneville Light & Power System Is Suspect

Like CenturyLink's cease-and-desist letters to BTES and Erwin Utilities, the unauthenticated email, purportedly from Mr. Bolton and Greeneville Light & Power System ("GPLS"), which CenturyLink also disclosed for the first time as an exhibit to its Response, was sent long after BrightRidge filed its Complaint in this matter. (Doc. 67-4.) BrightRidge filed its

9

Complaint in February 2020. (Doc. 1.) The purported email from GPLS was not sent until August 5, 2021. Additionally, the email lacks any context and purports to share with CenturyLink privileged communications and opinions from GPLS's legal counsel, which is an odd disclosure to make and raises suspicions about the circumstances that prompted the email.[3] Adding to the suspicious nature of the email is the "disclaimer" at the end which states "This email may contain confidential or privileged information *of Brightspeed*." (Doc. 67-4 (emphasis added).) Brightspeed is the new name that CenturyLink uses following a corporate transaction. (*See* Doc. 58-1, PageID #: 536.) It is curious that an email from GPLS includes a disclaimer referencing CenturyLink's new business name. Moreover, CenturyLink did not produce any contract or amendments between CenturyLink and GPLS that purportedly underlie the opinion of GPLS's unidentified legal counsel. In any event, the very recent GPLS email is inadmissible and does not invalidate in any way the evidence that CenturyLink allowed BVU, BTES, and Erwin Utilities to place internet attachments in the telephone space of joint use poles owned by CenturyLink without additional payments for many *years* while operating under joint use pole agreements that CenturyLink admits have "the same words."

## IV.    The Other Electric Utilities Are Similarly Situated In All Material Respects

In an attempt to escape compelling evidence regarding CenturyLink's longstanding construction of the very same contractual language at issue in this case, CenturyLink argues that other electric companies with adjacent or nearby service territories who negotiated a materially identical joint use pole agreements with CenturyLink in 1980, and have placed attachments in the

---

[3] The content and timing of the email, coming just two months after CenturyLink's cease and desist letters to BTES and Erwin Utilities, make the purportedly unprompted email too coincidental to be a coincidence. Contrary to CenturyLink's assertion, BrightRidge would be interested to know the circumstances surrounding Mr. Bolton's email because, as with BVU's January 2019 Invoice, and CenturyLink's cease and desist letters, BrightRidge believes that the facts could turn out to be different from what CenturyLink represents them to be.

10

telephone space of joint use poles owned by CenturyLink, are not similarly situated to BrightRidge. In support of its argument, CenturyLink lists a number of meaningless distinctions between BrightRidge and the other electric utility companies who have the same joint use pole agreement with CenturyLink. But CenturyLink does not explain why any of those distinctions make any difference to the interpretation of the Joint Use Pole Agreement at issue in this case.

First, CenturyLink claims that "BVU has never been regulated by the Tennessee Valley Authority." (Doc. 67, PageID #: 931.) This representation is <u>false</u>. CenturyLink's Response provides no citation for its claim; most likely because BVU has been, and currently is, a TVA distributor. (Ex. 1, Evans Aff. ¶ 5; *see also* https://www.tva.com/energy/public-power-partnerships/local-power-companies, identifying BVU Authority as part of the TVA system (along with BrightRidge and BTES in close proximity).) In any event, CenturyLink does not explain why BVU being regulated by TVA, or not regulated by TVA, makes any difference in the interpretation of the language in the joint use pole agreements between CenturyLink on one hand, and BVU and BrightRidge on the other; especially when CenturyLink admits that the two joint use pole agreements contain "the same words."

Second, the argument that the utility poles covered by CenturyLink's joint use pole agreements with BVU, BTES, and Erwin Utilities are not in BrightRidge's service territory is true, very basic, and completely irrelevant. Of course CenturyLink's joint use pole agreements with different electric utility companies apply to different joint use poles. But CenturyLink does not explain why that difference changes the meaning of the language in the joint use pole agreements, which CenturyLink admits contain "the same words." (Doc. 67, PageID #: 932.) The fact that different utility poles are covered by different joint use pole agreements does not change the fact that the language of the joint use pole agreements is the same and the conduct engaged in is the

same, which establishes an understanding and usage in the industry. *See Kelich v. Hess Corp.*, No. 14-3411, 2014 WL 7331014, at *5 (6th Cir. Dec. 23, 2014) ("Because usage of trade can be examined to interpret a contract without regard to its ambiguity, … a court must consider such evidence before determining the meaning of a contract as a matter of law." (internal citation omitted)). Additionally, establishing a custom or usage in an industry does not require that BVU or the other electric companies be "written into the contract" or named "as parties or beneficiaries." (*See* Doc. 67, PageID #: 932.) Including all the players in the industry in the same contract is not required to establish an industry custom or usage of trade. CenturyLink also does not cite any authority for the assertion that usage of trade is limited exclusively to BrightRidge's service territory. Nor does that assertion make sense because BrightRidge is the only pole owner besides CenturyLink in the BrightRidge service territory and joint use pole agreements are necessarily between parties who both own utility poles.

CenturyLink appears to take the curious position that its joint use pole agreements with BVU, BTES, and Erwin Utilities allowed those electric utility companies to attach their respective internet equipment in the telephone space of joint use poles owned by CenturyLink, but BrightRidge's joint use pole agreement (which contains "the same words") does not allow the exact same conduct. If CenturyLink has an explanation for it why it treated BrightRidge differently after allowing other electric companies operating under joint use agreements containing "the same words" to attach their internet equipment in the telephone space of joint use poles owned by CenturyLink without paying an additional fee, CenturyLink can do so. But such evidence is discoverable and directly relevant for three reasons: (1) it is evidence of the construction CenturyLink placed on the language that appears in the joint use agreements; (2) it is evidence of a common custom and usage in the industry established over years of performance; and (2) it bears

on whether CenturyLink complied with the duty of good faith and fair dealing implied in every contract under Tennessee law.

## V.     CenturyLink Violated the Court's Standing Order Governing Depositions Because the Court's Prior Order [Doc. 32] Does Not Apply To This Discovery Dispute

CenturyLink's attempt to rely on the Magistrate Judge's Prior Order (Doc. 32) to justify its violation of this Court's Standing Order Governing Depositions (Doc. 5) is misguided for multiple reasons.

First, CenturyLink's reasons for resisting discovery regarding other electric companies in the region who have attached internet equipment in the telephone space of joint use poles owned by CenturyLink while operating under joint use pole agreements materially identical to the one at issue in this case have changed over time. Initially, CenturyLink resisted discovery related to BVU on the ground that CenturyLink's actions under identical contract language were not relevant. (*See* Ex. 2, Email from CenturyLink's counsel dated October 13, 2022.) Indeed, CenturyLink initially took the position that it would oppose discovery related to BVU "unless we informally resolve the issue beforehand or otherwise have the Court address whether such discovery will be permitted." (*Id.*) Obviously, there would be no need for CenturyLink to suggest that "the Court address whether such discovery will be permitted" if CenturyLink believed the Court had already done so previously. CenturyLink's October 13, 2022 email contained no mention of the Prior Order as a basis for refusing discovery regarding BVU. (*Id.*)

Later, CenturyLink asserted with respect to depositions that "the scope of discovery is dictated by Rule 26." (Ex. 3, Email from CenturyLink's counsel dated October 20, 2022.) CenturyLink went on to say "We can raise the issue of BVU with the Court, as can you." (*Id.*) There was no mention of the Prior Order. (*Id.*) If CenturyLink believed that the scope of discovery related to BVU was actually governed by the Court's Prior Order, it should have raised that point

13

in its October 20, 2022 email. And if CenturyLink believed that the scope of discovery related to BVU was already governed by the Court's Prior Order, there would have been no reason for CenturyLink to say that the issue was "governed by Rule 26" or could be "raised with the Court" – there is no reason to raise an issue with the Court that has already been decided.

Instead, the first time CenturyLink raised the Magistrate Judge's Prior Order as a basis for instructing two witnesses not to answer questions at their depositions was an email on <u>November 29</u>, <u>2022</u>, the day before the deposition of Marcy Buckles (on November 30, 2022) and one day before the deposition of Andrew Chong (on December 1, 2022).[4] (Ex. 4, Email from CenturyLink's counsel dated November 29, 2022.) CenturyLink waited until the eve of the deposition to raise the Prior Order as its basis for instructing witnesses not to answer deposition questions. Even if the burden was on BrightRidge to raise the issue (which BrightRidge denies), CenturyLink's belated reliance on the Prior Order effectively prevented BrightRidge from having an opportunity, before the depositions that were scheduled for the next two days, to seek judicial review of CenturyLink's newly asserted ground for stonewalling basic discovery.

Furthermore, CenturyLink objected to BrightRidge's questions about BVU and other electric company attachers only during the depositions of Marcy Buckles and Andrew Chong, the first two depositions taken in the case on November 30, 2022 and December 1, 2022 (respectively). In the later depositions of Andy Ice, Jeff Honeycutt, Ryan Sikes, and Josh Freeman, CenturyLink did not object to BrightRidge's questions about BVU and other electric companies. If CenturyLink genuinely believed that the Prior Order made discovery regarding BVU off limits, CenturyLink would not have abandoned the objection in the later depositions of Ice, Honeycutt,

---

[4] The very first time CenturyLink suggested that the Prior Order imposed any limitation on discovery was in CenturyLink's Objection to BrightRidge's Second Request for Production of Documents, which was served on BrightRidge's counsel on November 28, 2022, at 5:18 p.m.

Sikes, and Freeman. CenturyLink did not instruct its witnesses at later depositions not to answer questions regarding BVU and other electric companies because it knew that the Prior Order addressed different evidence related to a different topic and did not even reach the question related to other electric companies placing attachments in the telephone space of joint use poles. It stands to reason CenturyLink abandoned its objection in later depositions to avoid compounding its violation of the Court's Order Governing Depositions during the depositions of Mrs. Buckles and Mr. Chong.

CenturyLink's belated and inconsistent reliance on the Magistrate Judge's prior order is misguided for the reasons explained in BrightRidge's Objection. (Doc. 55, PageID #: 385-87.) Simply put, the Magistrate Judge's prior ruling did not limit discovery to BrightRidge's service territory because discovery beyond BrightRidge's service territory was not requested by BrightRidge's discovery request at issue at that hearing. Even the language quoted in CenturyLink's Response demonstrates that the Prior Order was "for the limited purpose of the issue because [CenturyLink] had counter-filed that for the limited purpose of this market rate issue that I was going to require them to provide discovery." (Doc. 67, PageID #: 929.) Thus, the Magistrate Judge noted that the Prior Order was for the "limited purpose of this market rate issue." (*Id.*) BrightRidge did not seek evidence related to BVU, BTES, and Erwin Utilities for purposes of obtaining information related to "the market rate issue," or damages generally. Rather, as explained, the evidence from BVU, BTES, and Erwin Utilities is directly relevant to a different issue – the proper interpretation of the language in the Agreement that is at issue in this case. By definition, evidence related to other electric utilities must come from outside BrightRidge's service territory because the other electric utilities with materially identical joint use pole agreements with

15

CenturyLink are necessarily outside of BrightRidge's electric service territory because electric service territories typically do not overlap.

Moreover, nothing in the Prior Order purported to restrict questioning at depositions. The Prior Order required CenturyLink to produce the documents that BrightRidge had requested – the Prior Order compelled full production, it did not limit it. If CenturyLink wanted an expansion of the Prior Order to also serve as a *prohibition* on *BrightRidge* from asking questions at a *deposition*, it was incumbent upon CenturyLink to request that the Court expand its ruling beyond the previous "limited purpose" of the Prior Order. Indeed, the Federal Rules of Civil Procedure place the burden on the party claiming that discovery is beyond the extraordinarily broad scope of Rule 26 to seek protection. For these reasons, CenturyLink's reliance on the Prior Order as a basis for violating the Court's Standing Order Governing Depositions should be rejected.

## VI. BrightRidge Does Not Allege that Agreement is Ambiguous

CenturyLink's assertion in its Response that "BrightRidge has taken the position in its Objection that there might be a latent ambiguity in the" parties' Agreement is either obtuse or grossly misleading. BrightRidge did not say that there "might be a latent ambiguity" in the parties Agreement. Rather, BrightRidge pointed out the indisputable fact that the Court has not made a ruling yet on whether the parties' Agreement is ambiguous or unambiguous. (*See* Doc. 55, PageID #: 393 ("while BrightRidge believes the language of the 1980 Joint Use Pole Agreement at issue here is clear and unambiguous … in the event the Court determines that the 1980 Joint Use Pole Agreement is ambiguous …, extrinsic evidence is admissible to aid the Court in the interpretation of the contractual language.") Although BrightRidge believes the Agreement is unambiguous, if the Court determines that the Agreement is ambiguous, making extrinsic evidence admissible, BrightRidge must be prepared to present that evidence to the Court. If the Court later determines that the Agreement is ambiguous, BrightRidge will not get another opportunity to conduct

16

discovery to gather evidence demonstrating that BrightRidge's interpretation of the Agreement is the correct one. Thus, a discovery ruling that cuts off discovery based on ruling that has not yet been made is premature. Until a ruling is made on whether the Agreement is ambiguous, BrightRidge should be permitted to discover evidence that is directly relevant to the parties' understanding and conduct under the contractual language at issue that could be admissible depending on the Court's later ruling. It is a simple, common-sense proposition and CenturyLink's suggestion that BrightRidge somehow altered its position on whether the Agreement is ambiguous is incorrrect.

Indeed, the Magistrate Judge's Prior Order recognized this same concept when it rejected CenturyLink's argument that discovery related to damages should be prohibited because the case might settle. (*See* Doc. 32, PageID #: 295.) Specifically, the Magistrate Judge's Order states:

> BrightRidge would be severely prejudiced if the Court refused them discovery as to damages because Century Link believes the parties might ultimately negotiate an agreed upon resolution, especially given that all the while important deadlines would be passing. To take the argument to its logical conclusion, given that the overwhelming percentage of lawsuits filed today do in fact resolve by agreement, the Court would be delaying discovery in every case where particularly sensitive documents are at issue to see if the matter might resolve.

(*Id.*) The same principle applies to discovery of extrinsic evidence regarding CenturyLink's understanding and construction of the language at issue in the parties' Agreement, which language also appears in joint use pole agreements of just seven other geographically-related utility companies who each negotiated the same joint use pole agreement with CenturyLink in 1980. If BrightRidge is prohibited from conducting discovery regarding CenturyLink's understanding and construction of materially identical language in its joint use pole agreements with other utility companies in the region until the Court rules on whether the parties' Agreement is ambiguous, it will be too late. While BrightRidge believes the evidence is relevant and admissible even if the Agreement is unambiguous, it is indisputably relevant is the Agreement is later found to be

17

ambiguous. And if the Agreement is later found to be ambiguous, BrightRidge must be prepared to present evidence that demonstrates the construction CenturyLink placed on the contractual language, and the understanding of the language in the industry by the parties to joint use pole agreements all containing the same pertinent language.

## VII.   The *Sedona* Decision Supports BrightRidge's Position

CenturyLink acknowledges that *Sedona Corp. v. Open Solutions., Inc.*, 249 F.R.D. 19, 20 (D. Conn. 2008), decision stands for the very proposition that BrightRidge asserts because the court "found the circumstances to warrant application of the exception to the general rule" that other contracts are irrelevant. (Doc. 67, PageID #: 942.) The same is true in this case. BrightRidge has demonstrated that the circumstances in this case warrant discovery regarding CenturyLink's conduct with respect to BVU, BTES, and Erwin Utilities, because CenturyLink allowed them to place internet attachments in the telephone space of CenturyLink-owned poles without paying an additional fee for many, many years and raised an objection only after this lawsuit was filed. Such evidence is directly related to three important issues in this case: (1) the construction placed by CenturyLink on the language at issue; (2) the establishment of industry custom and usage; and (2) whether CenturyLink violated its duty of good faith and fair dealing that is implied in every contract under Tennessee law.

## VIII.   Requiring Reasonable Discovery is Proportional and Appropriate

Compelling CenturyLink to comply with its basic discovery obligations is proportional and appropriate for the reasons explained below.

### a.   Andrew Chong

The deposition of Andrew Chong is important because CenturyLink identified Mr. Chong as an expert "in the communications field within which Mr. Chong is employed." (Doc. 58-1, PageID #: 544.) Mr. Chong works for CenturyLink as a "Joint Use Manager." (Ex. 5, Deposition

18

of Andrew Chong ("Chong Dep."), p. 15.) Although BrightRidge has filed a *Daubert* Motion (Doc. 58) to exclude expert testimony from Mr. Chong regarding joint use agreements based on his admission that he is not an expert on that topic, CenturyLink has opposed BrightRidge's *Daubert* Motion (Doc. 69) and briefing on the motion was submitted one day before the filing of this Reply Brief (Doc. 75). While it seems unlikely, there is a possibility that CenturyLink will be permitted to present Mr. Chong as an expert on joint use agreements. Therefore, it was, and would be, fair and reasonable to ask Mr. Chong about CenturyLink's joint use pole agreements with other parties, especially joint use pole agreements that were negotiated at the same time with seven other electric utility companies and that contain materially identical language. As a purported expert on joint use pole agreements, Mr. Chong should have been permitted to answer questions about joint use agreements even if he claims he had not seen them before.

Moreover, even if Mr. Chong is not an expert, asking him about CenturyLink's joint use pole agreements with BVU, BTES, Erwin Utilities, and others is relevant because it deals directly with CenturyLink's decision-making process in this case. When BrightRidge informed CenturyLink that BrightRidge would be installing a fiber network in the telephone space of joint use poles, part of CenturyLink's decision-making process was to ask "what have we done in other areas where power companies began attaching down in the communications zone." (Ex. 6, August 31, 2018 Email from Andy Ice to Andrew Chong, CL00487; *see also* CL00489 "[Joint Use] managers if you have had this situation before please share the solution.") The plain conclusion is that Mr. Ice asked Mr. Chong (the Joint Use Manager) this question because what CenturyLink had done "in other areas where power companies began attaching down in the communications zone" was relevant to how CenturyLink responded to BrightRidge. (*See* Ex. 7, Deposition of Jeff Honeycutt, p. 197-98, 204 (CenturyLink wanted "to see how it was handled in other areas" and

what CenturyLink had done in other areas could be relevant "to a point.") If CenturyLink wanted to know what it had done in prior situations in deciding how to deal with BrightRidge, it is not surprising that BrightRidge also sought this information to explain why CenturyLink treated BrightRidge differently from the way it treated other electric utilities in the area who had the same contractual language and engaged in the same activity. For these reasons, CenturyLink's assertion that Mr. Chong's deposition is unnecessary because Mr. Chong was not aware of CenturyLink's joint use pole agreement with BVU is unavailing.

**b. Marcy Buckles**

The deposition of Marcy Buckles is important because she was the CenturyLink employee with whom BVU employees interacted during BVU's installation of its fiber network, including making attachments in the telephone space of joint use poles owned by CenturyLink. Mr. Evans testified that BVU employees communicated with Mrs. Buckles. (Ex. 8, Deposition of Stacy Evans, p.123-24.) Likewise, Mr. Ice testified that he communicated with Mrs. Buckles about BVU's fiber attachments in the telephone space of joint use poles owned by CenturyLink. (Ex. 9, Deposition of Andy Ice, p.41.) Mrs. Buckles testimony is directly relevant to CenturyLink's knowledge of BVU's fiber attachments in the telephone space of joint use poles owned by CenturyLink and the fact that CenturyLink did not resist or object to BVU's deployment of its fiber network in the telephone space of joint use poles owned by CenturyLink.

**c. BVU Agreement**

CenturyLink is correct that BrightRidge already has the joint use pole agreement between CenturyLink and BVU. But CenturyLink has refused to stipulate to the authenticity of the agreement between BVU and CenturyLink. (*See* Ice Dep., p.81 (MR. EDWARDS: We're not stipulating anything regarding BVU."); Ex. 10, December 16, 2022 Email.) In its Response, CenturyLink asks why BrightRidge needs CenturyLink to produce a joint use pole agreement that

it already has. The better question is why has CenturyLink refused to comply with basic discovery obligations? The BVU agreement is publicly available, not confidential, not privileged, and not the least bit burdensome to produce. The real question is why has CenturyLink gone to such great lengths to stonewall in discovery. CenturyLink has not answered this question, but the answer appears to be that CenturyLink recognizes the evidence related to BVU is devasting to its superficial interpretation of the parties' Agreement. Accordingly, CenturyLink seeks to oppose such discovery at every turn. BrightRidge seeks production of the BVU agreement from CenturyLink to avoid CenturyLink's claim that the agreement in BrightRidge's possession is not authentic or not the actual agreement between the parties. CenturyLink's refusal to comply with basic discovery obligations is inappropriate.

## IX. Reversal of Premature Ruling That Documents and Evidence are "Irrelevant"

CenturyLink's Response claims that "BrightRidge never specifies the 'dicta' that it wants vacated." (Doc. 67, PageID #: 944.) To avoid any confusion, the ruling that BrightRidge asks the Court to vacate is expressed in the following statement from the Magistrate's Judge's Order:

> Given these facts, and especially given that the contracts at issue are not for services within Plaintiff's service area, the Court must find that the contracts at issue are neither relevant to the issues pending before the Court nor will the production of them be likely to lead to discoverable evidence.

(Doc. 54, PageID #: 370.) In the interest of clarity, BrightRidge requests that the Court reverse this and any other language or ruling by the Magistrate Judge that prematurely rules that CenturyLink's joint use pole agreements with other electric utility companies in the region that have placed attachments in the telephone space of joint use poles owned by CenturyLink, relying on joint use pole agreements that contain materially identical language to the Agreement in this case, are irrelevant or beyond the broad scope of discovery under Rule 26 of the Federal Rules of Civil Procedure.

## X.  <u>**CONCLUSION**</u>

For these reasons and those explained in BrightRidge's Objection to the Magistrate Judge's Ruling (Doc. 55), BrightRidge respectfully requests that the Court vacate the Order to the extent it deems as irrelevant evidence regarding CenturyLink's conduct, in response to materially identical conduct taken under materially identical contractual language, with the few electric distribution companies with service territories in the region.  BrightRidge also requests that the Court reopen the depositions of Andrew Chong and Marcy Buckles for the limited purpose of answering questions regarding the topics at issue, along with the other relief requested in BrightRidge's Objection.

Respectfully submitted this 1st day of March, 2023.

<div style="margin-left:40%">

*s/Joseph B. Harvey*

William C. Bovender (BPR# 000751)
Stephen M. Darden (BPR #011461)
Joseph B. Harvey (BPR# 028891)
**HUNTER, SMITH & DAVIS, LLP**
1212 N. Eastman Road
P. O. Box 3740
Kingsport, TN  37664
Ph: (423) 378-8800
Fax: (423) 378-8801
Email:  bovender@hsdlaw.com
Email:  sdarden@hsdlaw.com
Email:  jharvey@hsdlaw.com

*Counsel for Plaintiff and Counter-Defendant BrightRidge*

</div>

22

## CERTIFICATE OF SERVICE

 I hereby certify that on this the 1st day of March, 2023, a copy of the foregoing **Plaintiff BrightRidge's Reply Brief in Support of its Objection to Magistrate Judge's Ruling** was filed electronically.  Notice of this filing will be sent by operation of the Court's electronic filing system to all parties indicated on the electronic filing receipt.  All other parties will be served by regular U.S. mail and Email.  Parties may access this filing through the Court's electronic filing system.

   Misty Smith Kelley, Esq.
   BAKER DONELSON
   633 Chestnut Street, Suite 1900
   Chattanooga, TN 37450
   mkelley@bakerdonelson.com

   Gary L. Edwards, Esq.
   BAKER, DONELSON
   P.O. Box 3038
   Johnson City, TN 37602
   gedwards@bakerdonelson.com

   *Counsel for Defendant and*
   *Counter-Plaintiff CenturyLink*

         s/Joseph B. Harvey
         Joseph B. Harvey

23